**Exhibit C to April 20, 2015 Affirmation of James T. Hughes Jr.**

*Execution Copy*

# GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement (this "**Agreement**"), dated as of November 30, 2012 (the "**Effective Date**"), is being entered into by and among Reed Energy LLC ("**Reed**"), Metropolitan EIH13 LP ("**MET13**"), Metropolitan Equity Partners, L.L.C. ("**MEP**" and collectively with MET13, "**MET**"), NFI Acquisition Co., which is a wholly-owned subsidiary of Reed ("**NFIAC**"), North East Fuel, Inc., which is a wholly-owned subsidiary of NFIAC ("**NE Fuel**" and together with NFIAC, "**NEF**") and SGM Holdings LLC ("**SGM**"). Reed, MET, NEF and SGM are collectively referred to as the "**Parties**" and each a "**Party**".

## Background

On November 10, 2011, Reed Energy LLC was formed as a Delaware limited liability company. The Limited Liability Company Agreement of Reed was executed as of January 4, 2012 (the "**Reed Operating Agreement**"), and the initial members of Reed were: MET13 (52% member), MEP (2% member), SGM (40% member) and Regent Private Capital, LLC ("**Regent**") (6% member). Subsequently, on or about April 6, 2012, Jason Henthorne ("Henthorne") became a member of Reed, with a 0.50% membership interest in Reed, diluting all members pro rata.

Concurrently with the execution of the Reed Operating Agreement, MET13 became the senior lender to Reed pursuant to that certain Loan and Security Agreement dated as of January 4, 2012 (the "**Loan Agreement**"). The date January 4, 2012 may be referred to from time to time as the "**Original Closing Date**".

Since the Original Closing Date, Reed has determined that additional capital is required to maintain the assets of the business and to achieve a successful financial exit for the members of Reed.

The Parties have agreed (i) to restructure the equity ownership and certain of the relative rights of the Parties (as described herein and in the New SGM Fee Agreement annexed hereto) in order to facilitate (a) the continued operation of Reed and (b) the potential investment of additional working capital into Reed, and (ii) to settle and release each other from any and all claims that they may have against each other on the terms hereof.

For purposes of clarity, subject to the terms hereof, MET13's rights under the Loan Documents (defined below) are intended to remain in full force and effect.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1. <u>Defined Terms</u>.

    (a) **"Affected Anderson Deep Rights"** means those O & G Conveyances beginning at the top of the Marcellus shale formation to all depths, strata and formations below

the top of the Marcellus shale formation granted and/or assigned by any member of the Anderson Group to Reed in which Reed received a total net revenue interest of less than 81.375%, as set forth on the attached Exhibit "E-1".

(b) **"Affected Anderson Shallow Rights"** means those O & G Conveyances beginning at the surface to all depths, strata and formations between the surface and the top of the Marcellus Shale Formation granted and/or assigned by any member of the Anderson Group to NE Fuel and/or were already owned by NE Fuel (at the time NFIAC acquired NE Fuel) in which NE Fuel received and/or already owned (at the time NFIAC acquired NE Fuel) a total net revenue interest of less than 80%, as set forth on the attached Exhibit "E-2".

(c) "**Anderson Group**" means, collectively, Bobby B. Anderson, Marjorie I. Anderson, Anderson Drilling, Inc., North East Fuel, Inc., Ace Gas and Oil, Inc. and Crude Oil Marketing, Inc.

(d) "**Caywood Group Contracts**" means the O & G Acquisition Contracts pertaining to the Caywood Group Properties as set forth on Exhibit "D-1".

(e) "**Caywood Group Properties**" means those real property parcels pertaining to the Caywood Group Contracts or any O & G Conveyance resulting from the Caywood Group Contracts.

(f) "**Exit Event**" means the consummation of a transaction or series of transactions pursuant to which Reed sells, leases, sub-leases, assigns or otherwise transfers or conveys more than fifty percent (50%) of the following acreage: (i) the Reed Effective Date Acreage **minus** (ii) any acreage that Reed has under an O & G Acquisition Contract that expires prior to Reed entering into an O & G Conveyance for such acreage **minus** (iii) any acreage that Reed has under an O & G Acquisition Contract that Steptoe & Johnson concludes is "defected" (e.g. has title or other defects) **plus** (iv) any additional acreage acquired by Reed after the Effective Date.

(g) **"Lang Group"** means those Underlying Landowners who execute the form of O & G Acquisition Contract for the Lang Group and/or the form of O & G Conveyance for the Lang Group.

(h) **"Loan Agreement"** means that certain Loan and Security Agreement, dated, as of January 4, 2012, by and between Reed Energy LLC and MET13.

(i) **"Loan Documents"** means the Loan Agreement and the agreements relating to the loan transactions contemplated thereby, including without limitation (capitalized terms in this definition have the meaning associated with such terms in the Loan Agreement): (i) the Promissory Note, (ii) the Deep Rights Mortgage (as amended), (iii) the Shallow Rights Mortgage, (iv) the Membership Interest Pledge and Control Agreement among SGM, MET13 and Reed, dated as of January 4, 2012 (the "**SGM Pledge Agreement**"), (v) the Membership Pledge and Control Agreement among Regent Private Capital LLC, MET13 and Reed, dated as of January 4, 2012, (vi) a Membership Interest Pledge and Control Agreement, dated as of January 4, 2012 among MEP, MET13 and Reed.

2

(j)    **"MET13 LPA"** means the First Amended and Restated Partnership Agreement of MET13, dated as of May 31, 2012, a copy of which is attached as Exhibit "F".

(k)    "**MNW Group Contracts**" means the O & G Acquisition Contracts pertaining to the MNW Group Properties as set forth on Exhibit "D-2".

(l)    "**MNW Group Properties**" means those real property parcels pertaining to the MNW Group Contracts or any O & G Conveyance resulting from the MNW Group Contracts.

(m)    "**New MET13 Capital Contribution**" means any new capital (debt, equity or otherwise) that may be invested into and/or contributed to MET13 by existing and/or new investors.  For the purposes of this Agreement, the term "New MET13 Capital Contribution" does not include any portion of the SGM Capital Contribution and/or any portion of the Original MET13 Capital Contribution.

(n)    "**New Reed ORRI**" means a grant and/or assignment of 100% of the available overriding royalty interest associated with the SGM Retained Contracts less (i) up to 0.375% (such percentage being subject to reduction as provided in Section 6(e) hereof) to be retained by SGM with respect to SGM Retained Contracts that are not Caywood Group Contracts or (ii) up to 0.25% (such percentage being subject to reduction as provided in Section 6(e) hereof) to be retained by SGM with respect to SGM Retained Contracts that are Caywood Group Contracts, in the form to be provided by Steptoe & Johnson and to be agreed upon by Reed, MET13 and SGM, in accordance with the terms herein.  For the avoidance of doubt, Reed, MET13 and SGM agree that the New Reed ORRI shall be a gross royalty calculated on the gross revenue prior to any and all deductions and subject only to Reed's pro rata share of federal, state and local gross production taxes (and not any production, marketing or transportation costs, income or other taxes, or any other fees or costs).

(o)    "**New SGM Fee Agreement**" means that certain SGM Fee Agreement, between SGM and Reed, in the form attached as Exhibit "A" and executed contemporaneously herewith.

(p)    "**New SGM ORRI**" means a grant and/or assignment of an overriding royalty interest of 0.375% (such percentage being subject to reduction solely with respect to the Affected Anderson Deep Rights and Affected Anderson Shallow Rights as provided in Sections 5(a) and 5(b) of this Agreement) to the Reed Acreage in the form to be provided by Steptoe & Johnson and to be agreed upon by Reed, MET13 and SGM, in accordance with the terms herein. For the avoidance of doubt, Reed, MET13 and SGM agree that the New SGM ORRI shall be a gross royalty calculated on the gross revenue prior to any and all deductions and subject only to SGM's pro rata share of federal, state and local gross production taxes (and not any production, marketing or transportation costs, income or other taxes, or any other fees or costs).

(q)    "**O & G Acquisition Contract**" means any purchase and sale agreement (or "PSAs"), contract, option, and/or any other transfer or conveyance document that by intent or effect transfers, conveys and/or assigns the right or creates the obligation to acquire/convey Oil and Gas Mineral Rights.  For the avoidance of doubt, for the purpose of this Agreement, an O &

GSA-000003

G Acquisition Contract does not include O & G Conveyances but rather shall mean only such instruments that grant the right to acquire/convey Oil & Gas Mineral Rights.

(r)     "**O & G Conveyance**" means any instrument, lease, sub-lease, assignment, mineral deed, memorandum of lease, grant and/or any other transfer or conveyance document that by intent or effect  transfers, conveys, or assigns legal title to Oil and Gas Mineral Rights, whether all such rights or any discrete and severable rights.  For the avoidance of doubt, for the purposes of this Agreement, an O & G Conveyance transfers legal title or ownership to Oil & Gas Mineral Rights, and does not include O & G Acquisition Contracts.

(s)     "**Oil & Gas Mineral Rights**" means the (i) right to use, explore, drill for, exploit, develop, produce, market and/or sell oil and gas minerals whether such rights arise as a result of fee ownership, leasehold rights or otherwise and/or (ii) the right to receive revenues, royalties, rentals, bonuses, net profits payments, non-participating royalties, overriding royalties and/or other economic benefit arising from the conveyance, leasing, development or production of oil and gas minerals and/or a working interest in oil and gas minerals.

(t)     "**Original MET13 Capital Contribution**" means the original Twenty Seven Million Five Hundred Fifty One Thousand Twenty Dollars ($27,551,020) that was invested in and/or contributed to MET13 and which was the source of the funding for MET13's loan to Reed pursuant to the Loan Agreement.

(u)     "**Original MET13 Investors**" means those limited partners of MET13 who made the Original MET13 Capital Contribution.

(v)     "**Original MET13 LP Class**" means the Class A Limited Partner Interests, as such term is defined in the MET13 LPA.

(w)     "**Original SGM Fee Agreement**" means the SGM Fee Agreement, dated January 4, 2012, by and between SGM and Reed.

(x)     "**Original SGM ORRI Agreements**" means (i) the Assignment of Overriding Royalty, dated as of February 7, 2012, by and between Reed and SGM, in which Reed assigned an overriding royalty interest in Reed's oil and gas leases to SGM (the "**Old ORRI**") and (ii) the ORRI Purchase Option, dated February 7, 2012, by and between Reed and SGM, in which Reed received an option from SGM to purchase the Old ORRI (the "**Original ORRI Purchase Option**").

(y)     "**Reed Acreage**" means any and all Oil & Gas Mineral Rights with respect to which:

(i)     Reed and/or NEF executed an O & G Conveyance on or before the Effective Date, as set forth on the attached Exhibit "B-1";

(ii)     Reed and/or NEF executed an O & G Acquisition Contract on or before the Effective Date, as set forth on the attached Exhibit "B-2";

GSA-000004

(iii)    Reed executes an O & G Acquisition Contract and/or O & G Conveyance after the Effective Date, but prior to an Exit Event;

(iv)    Reed executes an O & G Acquisition Contract and/or O & G Conveyance after an Exit Event that is for, with or from the Lang Group;

(v)    NEF executes an O & G Acquisition Contract and/or O & G Conveyance after the Effective Date, but prior to the earlier of (A) an Exit Event or (B) the date on which NEF is sold to and/or merged with another entity (the "**Sale of NEF**"); and

(vi)    NEF executes an O & G Acquisition Contract and/or O & G Conveyance after an Exit Event and/or the Sale of NEF that is for, with or from the Lang Group.

For the avoidance of doubt, Reed Acreage shall not include: (i) the SGM Retained Contracts or (ii) any assets of MEP or its affiliates that are owned today or acquired in the future other than the MET13 investment in Reed. For the further avoidance of doubt, pursuant to Section 6(c), any SGM Retained Contract transferred to Reed pursuant to Reed's Assignment Right (as defined in Section 6(c)) shall not be included within the Reed Acreage, and the economics applicable to such rights shall continue to be governed by Section 6.

(z)    "**Reed Effective Date Acreage**" means those Oil & Gas Mineral Rights represented by Section 1(y)(i) and (ii) of this Agreement.

(aa)    "**Reed Exit-Buyer**" means any person or entity who executed or executes an O & G Conveyance with respect to any or all of the Reed Acreage.

(bb)    "**Reed Operating Agreement**" means that certain Limited Liability Company Agreement of Reed dated as of January 4, 2012, a copy of which is attached as Exhibit "G".

(cc)    "**SGM Exit-Buyer**" means any person or entity who acquires or takes an assignment for any or all of the Oil & Gas Mineral Rights associated with the SGM Retained Contracts.   The list of SGM contacts that may be prospective SGM Exit-Buyers is attached hereto as Exhibit "C" (collectively, the "**SGM Contacts**"), and shall be timely updated by SGM from time to time and shall include the primary contact person at each prospective SGM Exit-Buyer.

(dd)    "**SGM Capital Contribution**" has the meaning set forth in Section 3(e) of this Agreement.

(ee)    "**SGM Rebate Amount**" means an amount equal to $500,000.

(ff)    "**SGM Retained Contracts**" means both the Caywood Group Contracts and MNW Group Contracts, as set forth on Exhibits D-1 and D-2, respectively.   For the avoidance of doubt, the SGM Retained Contracts do not include the Reed Acreage.

(gg)    "**Surviving Agreements**" shall include but not be limited to, the following agreements: (i) the Loan Documents, except for the SGM Pledge Agreement which,

GSA-000005

upon giving effect to the transactions contemplated hereby, is terminated in accordance with Section 3(f) hereof, (ii) the Original SGM ORRI Agreements (subject to the assignment of rights thereunder pursuant hereto), (iii) the Regent Fee Agreement dated as of January 4, 2012 between Regent Private Capital, LLC and Reed, (iv) the MEP Fee Agreement dated as of January 4, 2012 between MEP and Reed and (v) the Reed Operating Agreement.

(hh)    **"Underlying Landowner"** means the underlying landowner, lessor, sub-lessor and/or assignor of an O & G Acquisition Contract, O & G Conveyance and/or Oil & Gas Mineral Rights (as applicable).

2.    <u>SGM Fees & Expenses</u>.

(a)    Reed shall pay to SGM One Hundred Thousand Dollars ($100,000) in immediately available funds in full satisfaction and settlement of any and all fees and expenses now or hereafter due and owing to SGM pursuant to the Original SGM Fee Agreement, including, but not limited to, any acreage threshold payments and any expenses incurred by SGM on behalf of Reed through the Effective Date, within five (5) business days following the earliest of (i) the date on which there is an aggregate investment of Five Million Dollars ($5,000,000) into Reed and/or MET13 in the form of equity and/or debt financing (e.g. three separate investments on separate dates from separate investors or lenders totaling Five Million Dollars ($5,000,000) or more), (ii) the consummation of an Exit Event, or (iii) the consummation of a transaction or series of transactions pursuant to which Reed acquires more than five hundred (500) acres from the Reed Acreage after the Effective Date.

(b)    Notwithstanding anything to the contrary contained herein, in the event that (i) none of the events set forth in Section 2(a)(i), (ii) or (iii) of this Agreement take place and (ii) MET13 elects to exercise its rights under the Loan Documents to take control over Reed, NEF and/or the assets of Reed and/or NEF, including, without limitation, the Reed Acreage, then MET13 shall pay or shall cause Reed to pay to SGM One Hundred Thousand Dollars ($100,000) simultaneous with MET13 exercising such rights and such payment shall satisfy the obligations of Reed in Section 2(a) above.

(c)    Notwithstanding anything herein, the Parties hereto agree and acknowledge that nothing contained in this Agreement, including Section 3(a) of this Agreement shall be deemed and/or interpreted to require or obligate MET13 (or any affiliate thereof) (i) to raise or invest additional capital, including, but not limited to, the New MET13 Capital Contribution or (ii) to loan or invest new capital into Reed, including, but not limited to, the New MET13 Capital Contribution.

(d)    Subject only to the terms of Sections 2, 4, 5 and 6 of this Agreement, and notwithstanding anything else herein, nothing contained in this Agreement shall prohibit MET13 (or any of its affiliates) from investing in Reed. Notwithstanding the foregoing, MET13 shall not transfer or assign any of its rights under the Loan Documents except in connection with an Exit Event or in connection with a sale of any such rights (in a transaction that does not constitute an Exit Event) to an unaffiliated third party in an arms-length transaction that provides at least fair market value to MET13 in consideration for the conveyance of such rights.

6

3. <u>Matters Pertaining to the Original Transaction</u>.

(a)     As of the date hereof, the Original SGM Fee Agreement is deemed to be terminated and of no further force of effect.

(b)     As of the date hereof, the Original SGM ORRI Agreements and all of the rights and benefits thereunder are hereby assigned, transferred and conveyed to MET13.

(c)     As of the date hereof, all right, interest and title to one hundred percent (100%) of the Reed membership interests owned by SGM (the "**SGM Membership Interests in Reed**") is hereby assigned, transferred and conveyed to MET13, such rights to include without limitation SGM's right to appoint members to Reed's board of managers and SGM's voting rights.  The parties agree that for purposes of this Agreement, the current value assigned to such membership interests (not including the value of the Old ORRI) shall be One Thousand Dollars ($1,000).  SGM hereby consents to any amendment or amendment and restatement of the Reed Operating Agreement to reflect this change of ownership and transfer of all of SGM's rights associated therewith.

(d)     Simultaneous with the execution and delivery of this Agreement, SGM shall deliver executed assignment agreements or other instruments of transfer (collectively, the "**Membership Interest Assignment Agreements**") in favor of MET13 in a form reasonably acceptable to both MET13 and SGM, reflecting the assignment, transfer and conveyance of property and rights set forth in this Section 3.  The Parties further agree that (i) SGM shall not be required, obligated and/or requested to make any representation, warranty and/or indemnification in the Membership Interest Assignment Agreements that is not expressly set forth in this Agreement and (ii) the governing law, submission to jurisdiction and waiver of jury trial provisions set forth in this Agreement shall be incorporated (either directly or by reference) into the Membership Interest Assignment Agreements.

(e)     The matters set forth in Section 3(a)-(d) hereof, including without limitation, the property and rights described in Section 3(b) and (c) above and the assignment of such property and rights, shall collectively constitute the "**SGM Capital Contribution**".

(f)     Upon delivery to MET13 of executed instruments of transfer in favor of MET13 as described in Section 3(d) above, (i) MET13 hereby accepts the SGM Capital Contribution from SGM and deems such SGM Capital Contribution as paid/contributed in full to MET13 and (ii) the SGM Pledge Agreement shall be terminated and be of no further force or effect.

(g)     SGM shall cause Mr. Kenneth T. Hern to resign from the Board of Managers of Reed no later than five (5) business days after the full execution and delivery of this Agreement.

(h)     SGM, Reed and MET13 shall cooperate and use their respective commercially reasonable efforts to obtain a waiver from Regent Private Capital, LLC and from Jason Henthorne with respect to their rights of first refusal associated with the transfer of Reed

GSA-000007

membership interests provided herein hereto.  In the event that Regent Private Capital, LLC or Jason Henthorne does not waive or otherwise forgo exercising such rights, the Parties hereto agree that (i) they shall remain bound by the terms and conditions of this Agreement and (ii) the value of the SGM Capital Contribution (as set forth in Section 4(a) below) and/or the size of the SGM LP Interest (as set forth in Section 4(b) below) shall not be reduced or otherwise modified.

(i)    For purposes of the Loan Documents and the Reed Operating Agreement, MET13 and MEP approve and consent to the transactions contemplated by this Agreement.

(j)    For purposes of the Loan Documents, the Reed Operating Agreement and the Original SGM ORRI Agreements, Reed approves and consents to the transactions contemplated by this Agreement.

(k)    For purposes of the Reed Operating Agreement and the Original SGM ORRI Agreements, SGM approves and consents to the transactions contemplated by this Agreement.

(l)    To the extent that any of the transactions contemplated by this Agreement do not comply (in whole or in part) with any or all of the terms, conditions, requirements and/or restrictions set forth in the Loan Documents, the Reed Operating Agreement and/or the Original SGM ORRI Agreements, the Parties hereby waive such terms, conditions, requirements and/or restrictions.

(m)    The Parties further agree and notwithstanding anything to the contrary contained in this Agreement, that after giving effect to the transactions contemplated in this Agreement, (i) SGM is not a party to any of the Surviving Agreements, (ii) the Surviving Agreements shall not be enforceable against SGM and (iii) any and all adverse claims, threats, statements (oral, written or otherwise), letters and/or emails by and/or among the Parties are hereby deemed settled and withdrawn in full.

4.    Limited Partnership in MET13.

(a)    The Parties agree that the SGM Capital Contribution shall be valued at Two Million Five Hundred Thousand Dollars ($2,500,000) and upon the consummation of the transactions contemplated hereby, SGM's Unreturned Capital Contributions (as such term is defined in the MET13 LPA), as of the date hereof, shall equal $2,500,000.

(b)    In consideration for the SGM Capital Contribution to MET13, SGM and MET13 have agreed that MET13 shall issue to SGM a limited partnership interest in MET13 equal to 8.319185% of the Original MET13 LP Class, on a fully diluted basis as of the Effective Date (the limited partnership interest issued to SGM pursuant to this Agreement being referred to as the "**SGM LP Interest**") and simultaneous with the execution of this Agreement.

(c)    The SGM LP Interest shall be on the exact same terms and conditions as the Original MET13 Investors, except that:

(i)    With respect to distributions made by MET13 on account of the Original MET13 LP Class, SGM shall be entitled to receive its pro rata share (equal to

8

8.319185%) of all such distributions, subject to the following terms of this Section 4(c)(i).  For purposes of clarity, (A) proceeds available for distribution under Section 3.02 of the MET13 LPA are initially apportioned among all the Class A Limited Partners in proportion to their respective Percentage Interests; (B) then the amounts thus apportioned to the HNW Limited Partners are distributed under Section 3.02(a) of the MET13 LPA, and the amounts thus apportioned to the Partners other than the HNW Limited Partners are distributed under Section 3.02(b) of the MET13 LPA; (C) for purposes of such Section 3.02 of the MET 13 LPA, SGM shall be included in the initial apportionment of distributable proceeds under clause (A) above in accordance with SGM's Percentage Interest; (D) the amount thus apportioned to SGM shall then be distributed (x) first, to SGM in an amount equal, on a cumulative basis, to SGM's Unreturned Capital Contributions (as such term is defined in the MET13 LPA), (y) second, the next $500,000 representing the SGM Rebate Amount, reduced for any management fees paid out of the SGM Rebate Amount, otherwise apportioned to SGM shall be reapportioned to the other Class A Limited Partners in proportion to their respective Percentage Interests and the amounts thus apportioned to each shall be distributed pursuant to Section 3.02(a) or (b), as applicable, with each such amount being subject to the applicable carried interest payment to the Carried Interest Limited Partner as set forth in such Sections, and (z) all amounts apportioned to SGM in excess of the amounts set forth in the preceding clauses (x) and (y) shall be distributed 85% to SGM and 15% to the Carried Interest Limited Partner; and the distributions set forth in this clause (D) shall apply to SGM in place of either Section 3.02(a) or (b) of the MET13 LPA, provided, however, that references to Section 3.02 in the MET13 LPA shall be interpreted to include this Section 4(c)(i) so as to reflect the intended economic arrangement among the Partners (as such term is defined in the MET13 LPA), including, without limitation, the references (in each case, in the MET13 LPA) to Section 3.02 in the definition of Unreturned Capital Contributions and in Section 3.01, the crediting of tax withholding and Tax Distributions against Section 3.02 distributions, the references to Section 3.02 in determining allocations under Sections 4.01 and 4.05, and the reference to Article III in Section 8.02(b).  For clarity, the distributable proceeds initially apportioned to SGM pursuant to clauses (A) and (C) of the preceding sentence shall include all such proceeds available for distribution as of the date hereof and as of any later date, and it is not the intention of this Agreement or the MET13 LPA to reduce the amount thus apportioned to SGM on the grounds that any such proceeds were earned prior to the date hereof, and no such reduction in the amount thus apportioned to SGM shall be made; and, therefore, the allocations under Article IV of the MET13 LPA, to both Capital Accounts and for tax purposes (that is, the tax allocations under Section 4.04 of such Article IV), shall be adjusted so that SGM is allocated a share of Profits, Losses, and items thereof to reflect the distributive share rights set forth in this Section 4(c)(i).

(ii)     The management fee associated with SGM's interest in MET13 shall be paid out of the SGM Rebate Amount only, including any previous year's accrued and unpaid management fee, and not out of the initial distributions or series of distributions to be paid by MET13 to SGM until such distributions equal in the aggregate $2,500,000.  The SGM Rebate Amount shall be reduced by management fees paid pursuant to the previous sentence.

(iii)    After SGM has received distributions from MET13 in an amount equal to its SGM Capital Contribution of $2,500,000, SGM shall pay or shall agree to have withheld, and MET13 shall be entitled to withhold, from any additional distributions which would otherwise have been made to SGM, or to the Carried Interest Limited Partner as a carried

9

interest with respect to SGM's distributive share, an amount equal to the SGM Rebate Amount, all as set forth in Section 4(c)(i) above. The SGM Rebate Amount paid by or withheld from SGM to MET13, reduced for management fees paid therefrom, shall be re-allocated back to all limited partners of the same class as SGM, other than SGM, and shall be distributed under Section 3.02(a) or (b), as applicable, including distributing any carried interest payable with respect thereto to the Carried Interest Limited Partner, all as set forth in Section 4(c)(i) above. For the avoidance of doubt, pursuant to Section 4(c)(i) above, (1) the SGM Rebate Amount shall not include any portion of the SGM Capital Contribution (in whole or in part) nor shall it be paid or withheld from the initial distributions received by SGM (in whole or in part) until after SGM has received $2,500,000 in distributions, and (2) SGM shall not be required to pay or rebate to MET13 any distributions received by SGM from MET13 after the SGM Rebate Amount has been paid or withheld in full in accordance with this Agreement. SGM hereby waives and shall not be entitled to receive any portion of the $2,500,000 payment that MET13 will receive from Reed's exercise of the Original ORRI Purchase Option.

(iv)     SGM shall not be required to participate (directly or indirectly) in any capital call of MET13.

(v)     Under no circumstances, but subject to the following sentence, shall the SGM LP Interest (directly or indirectly) in the Original MET13 LP Class be diluted below 8.319185%, even if SGM elects not to participate in a capital call. Notwithstanding the preceding sentence, SGM agrees, understands and consents to the issuance of additional classes of limited partnership interest from time to time by MET13, which will have the effect of diluting SGM's economic interest in MET13, provided that (A) SGM shall be provided with equal opportunity and information to participate in such new class and (B) such new class (1) shall be required to pay/contribute fair market value and/or consideration for their limited partnership interests and (2) is not created for the principal purpose or principal intent of diluting SGM and/or lowering the priority of return to SGM.

(vi)     In the event the Original MET13 LP Class receives dilution or accretion with regards to the underlying equity in Reed as a result of a subsequent financing of Reed, SGM shall participate in such dilution or accretion on a pari passu and pro rata basis, based on its 8.319185% interest in the Original MET13 LP Class.

(d)     Simultaneous with the execution and delivery of this Agreement, (i) SGM shall execute and deliver to MET13 a subscription agreement in the form provided by MET13 to all other investors (the "**MET13 Subscription Agreement**"), (ii) SGM shall execute and deliver a joinder to the MET13 LPA and (iii) SGM shall be reflected as the owner of the SGM LP Interest.

(e)     Except as set forth herein, under no circumstances shall MET and/or Reed have the right to offset and/or withhold any or all distributions due and owing to SGM with respect to the SGM LP Interest in MET13, regardless of whether or not MET and/or Reed have an actual or alleged claim (directly or indirectly) against SGM (in contract, law, equity or otherwise). Except with respect to the provisions herein concerning the SGM Rebate Amount, MET represents, warrants and agrees that any distributions made to the Original MET13

GSA-000010

Investors (or their successors) with respect to the Original MET13LP Class shall also be made simultaneously to SGM without delay.

(f)     MET13 further agrees to provide SGM with a copy of any offering materials concerning the proposed New MET13 Capital Contribution simultaneous with MET13 submitting such information and/or documentation to the Original MET13 Investors or any other investors.  MET13 will promptly notify SGM of MET13 closings on any portion of the New MET13 Capital Contribution

(g)     For purposes of clarity, it is intended that if the Original MET13 Investors receive any new benefit pertaining to their Original MET13 Capital Contribution in consideration for making a New MET13 Capital Contribution, then SGM shall receive those same benefits on the SGM Capital Contribution pari passu and pro rata without the need for SGM to contribute additional capital.  Further, it is agreed that MET13 simultaneously shall offer and disclose to SGM any new benefit and any other information that MET13 provides or discloses, directly or indirectly, to the Original MET13 Investors (or their successors or assigns). Further, SGM is not required under any circumstance to contribute any additional capital (debt or equity) to Reed or MET13.

(h)     The distribution provisions (including the priority of distributions) set forth in Section 4(c)(i) above shall not be amended without SGM's prior written consent. Further, to the extent that a provision set forth in this Section 4 is inconsistent with a provision in the MET13 LPA or the MET13 Subscription Agreement, this Agreement shall govern and control over the MET13 LPA and the MET13 Subscription Agreement with regard to the SGM LP Interest.

5.     New SGM ORRI.  SGM is to be granted the New SGM ORRI on the Reed Acreage pursuant to the terms of this Section 5, as follows:

(a)     Structure:

(i)     Other than the Affected Anderson Deep Rights and the Affected Anderson Shallow Rights (both of which shall be governed by Section 5(b) below), within ten (10) business days from the execution of this Agreement: (A) MET13 and Reed shall cause the New SGM ORRI to be granted to SGM on that portion of the Reed Acreage with respect to which Reed and/or NE Fuel has executed an O & G Conveyance (as beneficiary) on or before the Effective Date as a carve out from the Old ORRI and out of the rights acquired by MET13 and (B) to the extent that the New SGM ORRI is not granted to SGM on any portion of the Reed Acreage with respect to which Reed and/or NE Fuel has executed an O & G Conveyance (as beneficiary) on or before the Effective Date pursuant to (A) above (again, for purposes of clarity, other than the Affected Anderson Deep Rights and the Affected Anderson Shallow Rights), Reed shall cause the New SGM ORRI to be granted to SGM on such portion of the Reed Acreage with respect to which Reed and/or NE Fuel has executed an O & G Conveyance (as beneficiary) on or before the Effective Date as a new grant/assignment of an overriding royalty interest.

(ii)     To the extent that the New SGM ORRI is not granted to SGM on any portion of the Reed Acreage pursuant to Section 5(a)(i) above, then the New SGM ORRI is

11

to be granted to SGM as a new grant and/or assignment of an overriding royalty interest on the portion of the Reed Acreage that was not granted to SGM pursuant to Section 5(a)(i) above and shall be implemented in accordance with the following:

(A)     With respect to each portion of the Reed Acreage with respect to which Reed and/or NEF executes an O & G Conveyance (as beneficiary) after the Effective Date, MET13, Reed and NEF shall cause the New SGM ORRI to be granted/assigned to SGM and recorded in favor of SGM on all such acreage simultaneous with Reed's execution of the O & G Conveyance for such portion of the Reed Acreage; and

(B)     In the event that Reed assigns any of the O & G Acquisition Contracts for any portion of the Reed Acreage to a Reed Exit-Buyer (prior to Reed executing an O & G Conveyance as beneficiary for such portion of the Reed Acreage) (collectively, the "**Assigned O & G Acquisition Contracts**") then MET13, Reed and NEF shall ensure that any agreement, contract, assignment and/or other conveyance or transfer document between Reed and the Reed Exit-Buyer for such Assigned O & G Acquisition Contracts, requires the Reed Exit-Buyer to grant/assign the New SGM ORRI to SGM and to record the New SGM ORRI in favor of SGM simultaneous with the execution of each O & G Conveyance by the Reed Exit Buyer and the Underlying Landowners of the Assigned O & G Acquisition Contracts.

(b)     Provisions Concerning Affected Anderson Deep Rights and Affected Anderson Shallow Rights:

(i)     With respect to the Affected Anderson Deep Rights, Reed shall grant/assign the New SGM ORRI to SGM and record the New SGM ORRI in favor of SGM simultaneous with the Exit Event involving the conveyance of the Affected Anderson Deep Rights (all or a portion as applicable), provided that the New SGM ORRI is subject to reduction in accordance with the following:

(A)     In the event that Reed is conveying an 81% net revenue interest in the Reed Acreage to the Reed Exit-Buyer, then the New SGM ORRI shall be reduced on the Affected Anderson Deep Rights to the extent necessary so that once the New SGM ORRI is granted/assigned to SGM and recorded in favor of SGM, Reed is still able to convey an 81% Net Revenue Interest to the Reed Exit Buyer.

(B)     In the event that Reed is conveying less than an 81% net revenue interest in the Reed Acreage to a Reed Exit-Buyer (the "**Agreed Upon NRI**") then the New SGM ORRI shall be reduced on the Affected Anderson Deep Rights to the extent necessary so that once the New SGM ORRI is granted/assigned to SGM and recorded in favor of SGM, Reed is still able to convey the Agreed Upon NRI on the Affected Anderson Deep Rights to the Reed Exit-Buyer.

(ii)     For the avoidance of doubt, no New SGM ORRI shall be granted/assigned to SGM and recorded in favor of SGM with respect to the Affected Anderson Shallow Rights.

(c)     Reed and NEF hereby consent and agree to the grant of the New SGM ORRI set forth in Section 5(a)(i) and (ii) and 5(b) above, and Reed and MET13 agree that the

GSA-000012

Original ORRI Purchase Option and the Old ORRI are hereby deemed amended to the extent necessary so that the New SGM ORRI, when granted pursuant to Section 5(a) and (b), is deducted from the rights to be purchased by Reed pursuant to an exercise of such Original ORRI Purchase Option; provided however, that Reed also acknowledges and agrees that no reduction in the Aggregate Exercise Price (as such term is defined in the Original ORRI Purchase Option) shall be made as a result of the transactions contemplated in Section 5(a)(i) or (ii) and/or (b) above.  For the avoidance of doubt and notwithstanding anything to the contrary contained in this Agreement or any other agreement or document, in the event that the New SGM ORRI is not and/or cannot be carved out of the Old ORRI on any portion of the Reed Acreage, then Reed, MET13 and NEF agree to grant/assign to SGM the New SGM ORRI as a new overriding royalty interest on such portion of the Reed Acreage.   MET13 further agrees (i) that the Loan Documents are hereby deemed amended solely to the extent necessary to permit the grant of the New SGM ORRI as set forth in Sections 5(a), (b) and (c) of this Agreement and (ii) to execute any document reasonably requested and/or deemed necessary to give effect to the New SGM ORRI as set forth in Sections 5(a), (b) and (c) of this Agreement.

(d)     With respect to the matters contemplated in Section 5(a) and (b), Reed shall cause the Reed Exit-Buyer to cooperate with the provisions of this Section 5.

(e)     Reed shall pay the recording cost and fees for the New SGM ORRI to be granted hereunder.

(f)     Notwithstanding anything to the contrary contained in this Agreement, in the event that NEF is sold to and/or merged with another entity, then SGM shall not receive the New SGM ORRI on any new Oil & Gas Mineral Rights acquired by NEF and/or the joint venture/development entity, unless such Oil & Gas Mineral Rights are a part of the Reed Acreage as defined by this Agreement.

(g)     For the avoidance of doubt, Reed, NEF and/or MET shall not (directly or indirectly) have any right, title, claim and/or interest (via O & G Acquisition Contract, O & G Conveyance or otherwise) in or to the New SGM ORRI and hereby assigns any such right, title, claim and/or interest to SGM.  Further, Reed, NEF and/or MET shall not be required to represent that the New SGM ORRI has clean title today or in the future, except that Reed, NEF and MET represent and agree that they have not taken and will not knowingly take any action for the purpose of creating any new encumbrance on SGM's title to the New SGM ORRI.  Further, SGM will be granted reasonable access to all title work completed by Reed.

(h)     In the event that MET13 (or its permitted transferee or assignee pursuant to Section 2(d) hereof, as applicable) elects to exercise its rights under the Loan Documents to take control over Reed, NEF and/or the assets of Reed and/or NEF, including, without limitation, the Reed Acreage, then MET13 (or its permitted transferee or assignee pursuant to Section 2(d) hereof, as applicable) shall assume the obligations of Reed and NEF to grant/assign the New SGM ORRI to SGM and record the New SGM ORRI in favor of SGM on all of the Reed Acreage even if it is MET13 that executes the O & G Conveyance (as beneficiary) as set forth in this Agreement.

13

(i)     Anytime Reed, NEF and/or MET13 execute an O & G Acquisition Contract and/or O & G Conveyance to purchase and/or sell O & G Mineral Rights with respect to the Reed Acreage, Reed, NEF and/or MET13 (as applicable) shall notify SGM within five (5) business days thereafter.

6.     <u>SGM Retained Contracts</u>.

(a)     Except as set forth herein, Reed hereby assigns to SGM any and all right, title, interest or claim Reed may have in or to the SGM Retained Contracts, including without limitation any down payments and title work.  The title work, to the extent it has been conducted and conveyed to SGM, shall be conveyed back to Reed by SGM in the event Reed exercises its Assignment Right as described below.

(b)     The Parties agree that upon the execution of an O & G Conveyance, sale, assignment and/or other transfer or conveyance of the SGM Retained Contracts to any SGM Exit-Buyer that SGM, Reed, NEF and/or MET (as applicable) shall direct the proceeds of such sale, to be disbursed as follows:

(i)     First, any amount due and owing the Underlying Landowner shall be paid to such Underlying Landowner.

(ii)     Second, any bona fide third party broker fees owed to MNW Group, Evercore (if any), Headwaters MB (if any) and/or any other mutually approved third-party broker.  For the avoidance of doubt, SGM, Reed, NEF, MET, and their respective affiliates shall not be entitled to any broker fee pursuant to this Section 6(b)(ii) of the Agreement.

(iii)     Third, to SGM, as follows (collectively, the "**SGM Broker Fee**"):

(A)     In the event that SGM and/or a pre-approved agent of SGM (which is either scheduled (i) on the exhibit of SGM Contacts set forth on <u>Exhibit C</u> hereto or (ii) otherwise pre-approved by Reed, provided that Reed shall pre-approve such proposed agent so long as the proposed agent does not have a pre-existing relationship with Reed or its affiliates and so long as such proposed agent has not been introduced by Evercore), procures an SGM Exit-Buyer for the SGM Retained Contracts, then with respect to such SGM Exit-Buyer, SGM shall receive for:

(I)     Both the Caywood Group Properties and Northern MNW Group Properties:

a.     Four Hundred Dollars ($400) per acre on any and all O & G Conveyances in which SGM and/or Reed do not use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyances.

b.     Two Hundred Dollars ($200) per acre on any and all O & G Conveyances in which SGM and/or Reed use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyance.

14

(II)    Southern MNW Group Properties:

a.    Two Hundred Dollars ($200) per acre on any and all O & G Conveyances in which SGM and/or Reed do not use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyances.

b.    One Hundred Dollars ($100) per acre on any and all O & G Conveyances in which SGM and/or Reed use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyance.

(B)    In the event that MET, Reed or any other party other than SGM and/or a pre-approved agent of SGM (which is either scheduled (i) on the exhibit of SGM Contacts set forth on Exhibit C hereto or (ii) otherwise pre-approved by Reed, provided that Reed shall pre-approve such proposed agent so long as the proposed agent does not have a pre-existing relationship with Reed or its affiliates and so long as such proposed agent has not been introduced by Evercore), procures an SGM Exit-Buyer for the SGM Retained Contracts, then with respect to such SGM Exit-Buyer, SGM shall receive for:

(I)    Both the Caywood Group Properties and Northern MNW Group Properties, SGM shall receive:

a.    Two Hundred Dollars ($200) per acre on any and all O & G Conveyances in which SGM and/or Reed do not use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyances.

b.    One Hundred Dollars ($100) per acre on any and all O & G Conveyances in which SGM and/or Reed use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyance.

(II)    Southern MNW Group Properties, SGM shall receive:

a.    One Hundred Dollars ($100) per acre on any and all O & G Conveyances in which SGM and/or Reed do not use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyances.

b.    Fifty Dollars ($50) per acre on any and all O & G Conveyances in which SGM and/or Reed use funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner pursuant to such O & G Conveyance.

(C)    For the purposes of Section 6(b)(iii) of this Agreement:

15

(I)   "**Northern MNW Group Properties**" means those MNW Group Properties located in (i) Aurileus, Fearing, Marietta, Muskingum, and Salem Townships in Washington County and (ii) Bethel Township in Monroe County.

(II)   "**Southern MNW Group Properties**" means any and all MNW Group Properties that are not Northern MNW Group Properties.

(III)   The SGM Contacts and their respective subsidiaries, parent companies and/or affiliates shall each be deemed an "SGM procured SGM Exit-Buyer" should it or they execute an O & G Conveyance for any of the SGM Retained Contracts.   Notwithstanding anything herein, PDC Energy and Antero Resources and their respective subsidiaries, parent companies and/or affiliates shall not be permitted to be considered an SGM procured Exit-Buyer for any purpose.

(IV)   The phrase "funds borrowed from MET13 to pay the balance of the purchase price due and owing the Underlying Landowner" shall be interpreted to not include funds borrowed from MET13 by Reed that are (i) used in a "table top financing" or (ii) used in a "back-to-back closing".

(V)   The phrase "the balance of the purchase price" shall be interpreted to not include down payments that have previously been paid to the Underlying Landowners (or their assigns).

(iv)   Fourth, the balance of the sale proceeds shall be disbursed to Reed, including, but not limited to the balance of the purchase price, any title bonus and/or any carried/working interest and Reed shall be responsible for paying any outstanding direct transaction fees, including, without limitation, reasonable legal fees and title work fees up to the amount of proceeds received by Reed pursuant to this subparagraph (iv).

Notwithstanding the foregoing, SGM agrees that with regard to the SGM Broker Fee, in the event that the consideration for the SGM Retained Contracts is paid 50% or more in "kind" consideration (including but not limited to public equity or preferred equity, but explicitly excluding any drilling carry), then Reed may elect to have the SGM Broker Fee paid in the same ratio it receives the different forms of consideration, excluding the drilling carry.   As an example, if the consideration for the SGM Retained Contracts are comprised of 10% in the form of a drilling carry, 45% in the form of preferred equity and 45% cash, then Reed would have the option to require that the SGM Broker Fee be paid 50% in preferred equity and 50% in cash.   If a transaction for the SGM Retained Contracts is comprised of 25% in the form of a drilling carry, 25% in the form of preferred equity and 50% in cash, the SGM Broker Fee would be required to be paid in cash in full.

(c)   Unless the Parties otherwise agree, the Parties hereby agree to sell the SGM Retained Contracts to whichever SGM Exit-Buyer is paying the highest total purchase price for the SGM Retained Contracts reflecting appropriate discounts made to non-cash or in-kind consideration being offered.   All purchase price offers must be submitted in writing to be considered and SGM, Reed and MET shall promptly provide any written or non-written information concerning such offers to SGM, Reed and MET (as applicable).   Reed has the right

GSA-000016

to require SGM to first assign the SGM Retained Contracts to Reed prior to a transaction with any MET or Reed procured SGM Exit-Buyer (the "**Assignment Right**") at which time Reed will use its commercially reasonable efforts to consummate such transaction and shall be required to disburse the proceeds resulting from the O & G Conveyance, sale, assignment and/or other transfer or conveyance of the SGM Retained Contracts in accordance with the waterfall set forth in Section 6(b) above.  Any assignment effected in accordance with Reed's Assignment Right shall not cause the acreage associated with the SGM Retained Contracts to become part of the Reed Acreage.  If Reed provides notice to SGM exercising its assignment right, SGM shall promptly effect such assignment.   For the avoidance of doubt, in the event that Reed exercises its Assignment Right, and requires SGM to assign the SGM Retained Contracts to Reed pursuant to this Section 6(c), Reed covenants that:

(i)   It will direct the proceeds from the sale of the SGM Retained Contracts to an SGM Exit-Buyer (or Reed Exit-Buyer, if applicable) to be disbursed in accordance with Section 6(b) of this Agreement, including without limitation the monies owed to SGM on account of the SGM Broker Fee in accordance with Section 6(b)(iii) of this Agreement.

(ii)   It will cause to be granted/assigned to SGM the Retained SGM ORRI (as defined and described in Section 6(d) below) and record such Retained SGM ORRI as part of the sale to the SGM Exit-Buyer (or Reed Exit-Buyer, if applicable) and pay all recording costs and fees associated with the grant/assignment of the Retained SGM ORRI.

(iii)   It will cause the SGM Exit-Buyer to cooperate with Reed in fulfilling the obligations set forth in Section 6(d) of the Agreement.

(d)   Upon the lease or other sale or conveyance of any portion of the rights associated with the SGM Retained Contracts (the "**Affected SGM Contract Rights**"), SGM shall cause the New Reed ORRI to be granted to Reed with respect to the Affected SGM Contract Rights.  The New Reed ORRI, with respect to any portion of the Affected SGM Contract Rights shall be 100% of the available overriding royalties associated with such Affected SGM Contract Rights after the SGM Retained Contracts are conveyed, assigned and/or otherwise transferred to an SGM Exit-Buyer, **less** the Retained SGM ORRI (defined below), which shall be kept by SGM.  SGM shall cause the New Reed ORRI to be recorded within five (5) business days following a conveyance of the Affected Acreage, as contemplated hereby.  SGM shall cause the SGM Exit-Buyer to cooperate with the provisions of this Section 6(d).  Reed shall pay the recording costs and fees for the New Reed ORRI and the Retained SGM ORRI.  SGM shall not be required to represent that the New Reed ORRI has clean title today or in the future, except that SGM represents and agrees that it has not taken and will not knowingly take any action for the purpose of creating any new encumbrance on Reed's title to the New Reed ORRI.

(e)   The "**Retained SGM ORRI**" shall mean: (i) in the case of Affected SGM Contract Rights comprised of the Caywood Group Properties, 0.25% provided that such amount shall be reduced to the extent necessary so that assuming the Retained SGM ORRI is granted/assigned to SGM and recorded in favor of SGM, the SGM Exit-Buyer is still able to receive and be conveyed the agreed upon net revenue interest in such Affected SGM Contract Rights to be conveyed to such SGM Exit-Buyer as a result of the lease or other sale or

17

conveyance of such Affected SGM Contract Rights; and (ii) in the case of Affected SGM Contract Rights comprised of the MNW Group Properties, 0.375% provided that such amount shall be reduced to the extent necessary so that assuming the Retained SGM ORRI is granted/assigned to SGM and recorded in favor of SGM, the SGM Exit-Buyer is still able to receive and be conveyed the agreed upon net revenue interest in such Affected SGM Contract Rights to be conveyed to such SGM Exit-Buyer as a result of the lease or other sale or conveyance of such Affected SGM Contract Rights.  For purposes of clarity, should the SGM Exit-Buyer require an 81% net revenue interest for the Affected SGM Contract Rights, there will be zero Retained SGM ORRI for Caywood Group Properties and 0.375% Retained SGM ORRI for the MNW Group Properties.

(f)    Notwithstanding anything to the contrary contained in this Agreement, Reed shall continue to be responsible for and be obligated to pay the reasonable attorney and title work fees and costs of Steptoe & Johnson, Complete Title Solutions and/or any other third party(s) that Reed, MEP and/or MET13 directly engages with respect to the SGM Retained Contracts that are incurred in the ordinary course of business (and consistent with previous experience) regardless of whether such fees and costs arise before, on or after the Effective Date. For purposes of clarity, Reed shall not be responsible for any expenses initiated or directed by SGM or Richard Featherly unless SGM or Richard Featherly obtains written approval to incur such expenses, with such written approval evidenced by an email from Paul Lisiak, Miles Peet or Jason Henthorne approving such expense.

7.    <u>Consulting Services</u>.  The New SGM Fee Agreement includes the obligations of SGM and Reed as it pertains to certain services to be provided by SGM.  The New SGM Fee Agreement shall be executed and delivered in connection with the execution and delivery of this Agreement.

8.    <u>Representations of SGM</u>.  SGM hereby represents and warrants as follows:

(a)    SGM is a limited liability company validly existing and in good standing under the laws of the State of Delaware, and has all requisite limited liability power and authority to own, lease and operate its assets, and to carry on its business as currently conducted.

(b)    SGM has the full right, power and authority to execute, deliver and perform this Agreement and each of the other documents and instruments to which it is a party and to perform its obligations hereunder and thereunder, and all actions and transactions contemplated hereby.

(c)    The execution, delivery and performance by SGM of this Agreement and each of the other documents and instruments to be executed and delivered by SGM pursuant hereto has been duly authorized by all necessary limited liability action on the part of SGM, and no additional member authorization or consent is required in connection with the execution, delivery and performance by SGM of this Agreement or any of the other documents and instruments to which it is party.

(d)    This Agreement and each of the other documents and instruments to which SGM is or will be a party, when executed and delivered by the other parties thereto,

18

constitutes or will constitute, as the case may be, a valid and legally binding obligation of SGM enforceable against SGM in accordance with its terms.

(e)     Except with respect to the transfer of the equity in Reed to MET13, no consent, approval, waiver, authorization, notice or filing is required to be obtained by SGM from, or to be given by SGM to, or made by SGM with, any person or entity (including governmental entities), in connection with the execution, delivery and performance by SGM of this Agreement and the other documents and instruments to be executed and delivered by SGM pursuant hereto.

(f)     The execution, delivery and performance by SGM of this Agreement and the other documents and instruments to be executed and delivered by SGM pursuant hereto, and the consummation of the transactions contemplated hereby and thereby, do not and will not (i) violate any provision of the organizational documents of SGM, (ii) conflict with, or result in the material breach of, or constitute a material default under, or result in the termination, cancellation, modification or acceleration (whether after the filing of notice or the lapse of time or both) of any right or obligation of the SGM under the terms of any agreement or instrument to which SGM is a party, or result in a loss of any material benefit to which SGM is entitled under or relating to the property or rights conveyed pursuant hereto, or result in the creation of any material encumbrance upon any of the property or rights conveyed pursuant hereto or (iii) violate or result in a material breach of or constitute a material default under any law or regulation to which SGM is subject.

(g)     There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending, or, to the knowledge of SGM or Rick Featherly, threatened, against or relating to the SGM Capital Contribution, SGM or the transactions contemplated by this Agreement.

(h)     SGM is not a party to, or subject to, or bound by, any currently existing order, judgment, injunction, writ or decree of any court or governmental authority, or any arbitration award that would preclude or restrict performance of this Agreement by any of the Parties.

(i)     SGM has not sold, transferred, assigned, conveyed, hypothecated or attempted to sell, transfer, convey, assign or hypothecate any part of the SGM Capital Contribution or any interest therein, since the date of original issuance to SGM.

(j)     SGM has the full right, power and authority to sell, assign, transfer and convey the SGM Capital Contribution to MET13, free and clear of all claims, liens, pledges, options, contracts, charges, easements, security interests, mortgages, encumbrances or other rights or claims of third parties of any nature whatsoever, whether voluntarily incurred or arising by operation of law (collectively, "**Encumbrances**"), pursuant to this Agreement, except for  (i) those Encumbrances which existed on the Old ORRI immediately prior to the time that Reed granted/assigned the Old ORRI to SGM, including without limitation those Encumbrances which may exist in the title chain or otherwise on any of the underlying O & G Conveyances between an Underlying Landowner and Reed and/or NEF upon which the Old ORRI was granted, if any, (ii) those Encumbrances which exist on the Old ORRI as a result of the Loan Documents (e.g.

19

the Deep Rights Mortgage and the Shallow Rights Mortgage), if any, (iii) those Encumbrances which exist on the Old ORRI as a result of SGM not recording the Old ORRI, if any, (iv) those Encumbrances which exist on the Old ORRI as a result of Reed and/or NEF not granting/assigning and/or recording an overriding royalty interest that is otherwise due and owing a broker, (v) those Encumbrances which existed on the SGM Membership Interests in Reed prior to the time Reed issued the SGM Membership Interests in Reed to SGM, if any, (vi) those Encumbrances which exist on the SGM Membership Interests in Reed as a result of the Joint Operating Agreement, dated on or about April 6, 2012, by and between Reed, NEF and Jaden Oil LLC, if any and (vii) those Encumbrances which exist on the Old ORRI and/or the SGM Membership Interests as a result of the actions and/or failure to act of Reed and/or NEF (e.g. the failure to pay taxes, pay register agent fees, pay attorneys fees, pay broker fees, pay title work fees, obtain required corporate consents, documentation or approvals), if any (collectively, the "**Permitted Encumbrances**").   Except (x) as set forth in the Original SGM ORRI Agreement and the title reports prepared by Steptoe & Johnson for the underlying O & G Mineral Rights for the Old ORRI and (y) for the Permitted Encumbrances, no other person has any right to acquire or otherwise holds any interest in, or has any rights or claims with respect to the SGM Capital Contribution to be paid/made to MET13 pursuant to this Agreement.  Except as set forth in the Original SGM ORRI Agreement and the Reed Operating Agreement, SGM is not a party to any other contracts, options, warrants, claims or rights with respect to the property and rights to be conveyed pursuant to this Agreement.

(k)    SGM is the sole owner of the SGM Capital Contribution to be made to MET13 pursuant to this Agreement and has and will transfer to MET13 (A) the same title to the Old ORRI that was originally received by SGM from Reed at the time that Reed granted the Old ORRI to SGM and (B) the same title to the SGM Membership Interests in Reed that was originally received by SGM from Reed at the time that Reed issued the SGM Membership Interests in Reed to SGM, and in the case of each of (A) and (B) above, free and clear of all Encumbrances, except for the Permitted Encumbrances, if any.

(l)    No representation or warranty or other statement made by SGM in this Agreement, or any certificate or agreement delivered pursuant to this Agreement contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

For the avoidance of doubt and notwithstanding anything to the contrary contained in this Agreement (including, without limitation, this Section 8 of the Agreement), (i) except as specifically stated in this Section 8, SGM is not making any representation or warranty on whether or not there is clean title today or in the future on the Old ORRI or the underlying O & G Mineral Rights to the Old ORRI and (ii) it shall not be deemed an "Encumbrance" on the SGM Capital Contribution (or on the SGM Membership Interests in Reed) should (A) Regent Private Capital LLC and/or Jason Henthorne fail to execute the waiver contemplated in Section 3(h) of this Agreement and/or (B) if Regent Private Capital LLC and/or Jason Henthorne elect to exercise their right of first refusal as set forth in the Reed Operating Agreement

9.    <u>Representations of MET13 and MEP</u>.  Each of MET13 and MEP, on a several and not joint basis, represents and warrants as follows:

GSA-000020

(a)      Such party is a limited partnership or limited liability company, as applicable, validly existing and in good standing under the laws of the State of Delaware, and has all requisite limited liability power and authority to own, lease and operate its assets, and to carry on its business as currently conducted.

(b)      Such party has the full right, power and authority to execute, deliver and perform this Agreement and each of the other documents and instruments to which it is a party and to perform its obligations hereunder and thereunder, and all actions and transactions contemplated hereby.

(c)      The execution, delivery and performance by such party of this Agreement and each of the other documents and instruments to be executed and delivered by such party pursuant hereto has been duly authorized by all necessary limited liability action on the part of such party, and no additional member authorization or consent is required in connection with the execution, delivery and performance by such party of this Agreement or any of the other documents and instruments to which it is party.

(d)      This Agreement and each of the other documents and instruments to which such party is or will be party, when executed and delivered by the other parties thereto, constitutes or will constitute, as the case may be, a valid and legally binding obligation of such party enforceable against such party in accordance with its terms.

(e)      No consent, approval, waiver, authorization, notice or filing is required to be obtained by such party from, or to be given by such party to, or made by such party with, any person or entity (including governmental entities), in connection with the execution, delivery and performance by such party of this Agreement and the other documents and instruments to be executed and delivered by such party pursuant hereto.

(f)      The execution, delivery and performance by such party of this Agreement and the other documents and instruments to be executed and delivered by such party pursuant hereto, and the consummation of the transactions contemplated hereby and thereby, do not and will not (i) violate any provision of the organizational documents of such party, (ii) conflict with, or result in the material breach of, or constitute a material default under, or result in the termination, cancellation, modification or acceleration (whether after the filing of notice or the lapse of time or both) of any right or obligation of such party under the terms of any agreement or instrument to which such party is a party or (iii) violate or result in a material breach of or constitute a material default under any law or regulation to which such party is subject.

(g)      There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending, or, to the knowledge of MET13, MEP and/or Mr. Paul Lisiak, threatened against or relating to the SGM LP Interest, MET13 or the transactions contemplated by this Agreement.

(h)      No representation or warranty or other statement made by MET13 and/or MEP in this Agreement, or any certificate or agreement delivered pursuant to this Agreement contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

21

10.    <u>Representations of Reed, NE Fuel and NFI Acquisition, Co</u>.  Each of Reed, NE Fuel and NFI Acquisition Co.**,** on a several and not joint basis, represents and warrants as follows:

(a)    Such party is a limited liability company or corporation, as applicable, validly existing and in good standing under the laws of the State of Delaware, and has all requisite limited liability power or corporate power and authority, as applicable, to own, lease and operate its assets, and to carry on its business as currently conducted.

(b)    Such party has the full right, power and authority to execute, deliver and perform this Agreement and each of the other documents and instruments to which it is a party and to perform its obligations hereunder and thereunder, and all actions and transactions contemplated hereby.

(c)    The execution, delivery and performance by such party of this Agreement and each of the other documents and instruments to be executed and delivered by such party pursuant hereto has been duly authorized by all necessary limited liability action on the part of such party, and no additional member authorization or consent is required in connection with the execution, delivery and performance by such party of this Agreement or any of the other documents and instruments to which it is party.

(d)    This Agreement and each of the other documents and instruments to which such party is or will be party, when executed and delivered by the other parties thereto, constitutes or will constitute, as the case may be, a valid and legally binding obligation of such party enforceable against such party in accordance with its terms.

(e)    No consent, approval, waiver, authorization, notice or filing is required to be obtained by such party from, or to be given by such party to, or made by such party with, any person or entity (including governmental entities), in connection with the execution, delivery and performance by such party of this Agreement and the other documents and instruments to be executed and delivered by such party pursuant hereto.

(f)    The execution, delivery and performance by such party of this Agreement and the other documents and instruments to be executed and delivered by such party pursuant hereto, and the consummation of the transactions contemplated hereby and thereby, do not and will not (i) violate any provision of the organizational documents of such party, (ii) conflict with, or result in the material breach of, or constitute a material default under, or result in the termination, cancellation, modification or acceleration (whether after the filing of notice or the lapse of time or both) of any right or obligation of such party under the terms of any agreement or instrument to which such party is a party or (iii) violate or result in a material breach of or constitute a material default under any law or regulation to which such party is subject.

(g)    There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending, or, to the knowledge of Reed, NE Fuel and/or NFI, threatened against or relating to this Agreement or the transactions contemplated by this Agreement.

GSA-000022

(h)     No representation or warranty or other statement made by Reed, NE Fuel and NFI Acquisition, Co. in this Agreement, or any certificate or agreement delivered pursuant to this Agreement contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

11.     Releases.

(a)     Release by SGM and Richard Featherly.   For only the consideration contained herein, SGM and Richard Featherly, for themselves and their affiliates, and their respective, assigns, representatives and agents (as applicable), hereby fully and finally release, forgive and forever discharge (i) MET13 and MEP, and their respective successors, assigns, subsidiaries, affiliates, members, managers, shareholders, officers, directors, employees and agents (including but not limited to, for purposes herein, Jason Henthorne) and any and all persons or entities acting by, through, under or in concert with any of them (including, but not limited to, Paul Lisiak, Miles Peet and Jason Henthorne) (individually, a "**MET Released Part**y", and collectively, the "**MET Released Parties**") and (ii) Reed, NE Fuel and NFIAC, and their respective successors, assigns, subsidiaries, affiliates, members, managers, shareholders, officers, directors, employees and agents and any and all persons or entities acting by, through, under or in concert with any of them (individually, a "**Reed Released Party**" and collectively, the "**Reed Released Parties**"), from any and all actions, suits, prosecutions, claims, liabilities, damages or other legal or equitable remedies, whether known or unknown, foreseeable or unforeseeable, arising or claimed to arise out of any act or failure to act of any MET Released Party or Reed Released Party from the beginning of time to the date of the execution of this Agreement; provided however, that this release shall not include and shall not release, waive or discharge the MET Released Parties or the Reed Released Parties from any obligations of any MET Released Party or Reed Released Party set forth in or contemplated by this Agreement or any other agreements entered into by some or all of the Parties in connection with this Agreement.   In addition to the foregoing, SGM and Richard Featherly agree not to induce or attempt to induce the commencement of any action against any MET Released Party or Reed Released Party for any claim or cause of action of the type released under the terms of this Agreement.  SGM and Rick Featherly hereby warrant that each is the legal and equitable holder of all claims released by them under the terms of this Section 11(a), and that neither has assigned or in any way hypothecated any of those such rights or claims to any person or entity, and that the releases provided by them above are fully and finally effective.

(b)     Release by MET13, MEP and Paul Lisiak.  For only the consideration contained herein, MET13, MEP and Paul Lisiak, for themselves and their respective, assigns, representatives and agents (as applicable) other than Reed, NE Fuel and NFIAC, and their respective, assigns, representatives and agents (as applicable), hereby fully and finally release, forgive and forever discharge SGM and its successors, assigns, subsidiaries, affiliates, members, managers, shareholders, officers, directors, employees and agents and any and all persons or entities acting by, through, under or in concert with any of them (including but not limited to, for purposes herein, Mr. Richard R. Featherly and Mr. Kenneth T. Hern) (individually, a "**SGM Released Party**", and collectively, the "**SGM Released Parties**"), from any and all actions, suits, prosecutions, claims, liabilities, damages or other legal or equitable remedies, whether known or unknown, foreseeable or unforeseeable, arising or claimed to arise out of any act or failure to act of any SGM Released Party from the beginning of time to the date of the execution

23

of this Agreement; provided however, that this release shall not include and shall not release, waive or discharge the SGM Released Parties from any obligations of any SGM Released Party set forth in or contemplated by this Agreement or any other agreements entered into by some or all of the Parties in connection with this Agreement.   In addition to the foregoing, MET13, MEP and Paul Lisiak agree not to induce or attempt to induce the commencement of any action against any SGM Released Party for any claim or cause of action of the type released under the terms of this Agreement.   MET13, MEP and Paul Lisiak hereby warrant that each is the legal and equitable holder of all claims released by them under the terms of this Section 11(b), and that neither has assigned or in any way hypothecated any of those such rights or claims to any person or entity, and that the releases provided by them above are fully and finally effective.

(c)      Release by Reed, NE Fuel and NFIAC.   For only the consideration contained herein, Reed, NE Fuel and NFIAC, for themselves and their respective, assigns, representatives and agents (as applicable), hereby fully and finally release, forgive and forever discharge the SGM Released Parties, from any and all actions, suits, prosecutions, claims, liabilities, damages or other legal or equitable remedies, whether known or unknown, foreseeable or unforeseeable, arising or claimed to arise out of any act or failure to act of any SGM Released Party from the beginning of time to the date of the execution of this Agreement; provided however, that this release shall not include and shall not release, waive or discharge the SGM Released Parties from any obligations of any SGM Released Party set forth in or contemplated by this Agreement or any other agreements entered into by some or all of the Parties in connection with this Agreement.   In addition to the foregoing, Reed, NE Fuel and NFIAC agree not to induce or attempt to induce the commencement of any action against any SGM Released Party for any claim or cause of action of the type released under the terms of this Agreement. Reed NE Fuel and NFIAC hereby warrant that each is the legal and equitable holder of all claims released by them under the terms of this Section 11(c), and that neither has assigned or in any way hypothecated any of those such rights or claims to any person or entity, and that the releases provided by them above are fully and finally effective.

(d)      The Parties agree to use reasonable commercial efforts to obtain a release from Jason Henthorne, Miles Peet and Kenneth T. Hern in a form to be agreed upon by the Parties.

(e)      Acknowledgement.   Notwithstanding the terms of Sections 11(a), (b) and (c) hereof and specifically subject to Section 3(m) of this Agreement, the Parties agree that these release provisions shall not include and shall not release, waive or discharge the obligations of the respective Parties under this Global Settlement Agreement, under the New SGM Fee Agreeement executed contemporaneously herewith (and annexed hereto as Exhibit A), or under the Surviving Agreements as such obligations exist after giving effect to the transactions contemplated by this Agreement.

12.      Indemnification.

(a)      Indemnification by SGM.   SGM does hereby agree that it will hold harmless and indemnify the MET Released Parties and the Reed Released Parties, individually and/or collectively, from any claim, demand, action, suit, resulting judgment, costs, disbursements and expenses (including, without limitation, reasonable attorneys' fees and

24

expenses) of any kind or nature whatsoever, resulting from, relating to or founded upon (i) any breach of this Agreement by SGM or Richard Featherly, or claims subject to the release provided in Section 11 above, and warranted as released hereby; and (ii) any undisclosed liabilities, indebtedness or obligations of SGM, Richard Featherly or their affiliates).

(b)     Indemnification by MET13 and MEP.  MET13 and MEP, on a several and not joint basis, do hereby agree that each will hold harmless and indemnify the SGM Released Parties, individually and/or collectively, from any claim, demand, action, suit, resulting judgment, costs, disbursements and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any kind or nature whatsoever, resulting from, relating to or founded upon  (i) any breach of this Agreement by MET13, MEP or Paul Lisiak, or claims subject to the release provided in Section 11 above, and warranted as released hereby; and (ii) any undisclosed liabilities, indebtedness or obligations of MET13, MEP or their affiliates (other than Reed, NE Fuel and NFIAC).

(c)     Indemnification by Reed, NE Fuel and NFIAC.  Reed, NE Fuel and NFIAC, on a joint and several basis, do hereby agree that each will hold harmless and indemnify the SGM Released Parties, individually and/or collectively, from any claim, demand, action, suit, resulting judgment, costs, disbursements and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any kind or nature whatsoever, resulting from, relating to or founded upon  (i) any breach of this Agreement by Reed, NE Fuel or NFIAC, or claims subject to the release provided in Section 11 above, and warranted as released hereby; and (ii) any undisclosed liabilities, indebtedness or obligations of Reed, NE Fuel or NFIAC or their affiliates (other than MET13 and MEP).

13.     No Disparagement.  Each of the Parties hereto agrees that he shall not (and shall use reasonable best efforts to cause all persons associated with him to refraining to) use disparaging or disrespectful words to or in the presence of any third party intended or reasonably expected to injure or otherwise compromise any other Party's reputation or business or professional or personal status.

14.     Non-Solicitation.  SGM agrees that for a period of six (6) years, SGM shall not contact, solicit or permit any of its affiliates to contact or solicit (directly or indirectly) the Original MET13 Investors and/or any new investors in and/or limited partners of MET13 who become members of MET13 on or before December 31, 2013 to the extent MET13 have notified SGM of the names of such new investors or new limited partners in writing, and further provided that SGM was not previously in contact with or doing business with any such future new investors or new limited partners in MET13.   Notwithstanding the foregoing, SGM may contact the affiliates of MEP solely with respect to matters pertaining to an investment in Reed, in the ordinary course of business.  Further, when MET13 holds limited partner meetings, if any, Section 14 would not apply relative to ordinary discourse during such event, subject to Sections 13 and 16 of this Agreement.

15.     No Publicity.  No Party shall issue any press releases regarding this Agreement without mutual consent of the Parties hereto.  Further, SGM and its affiliates shall not and shall not permit any party to directly or indirectly disclose or represent to any third party (other than legal counsel, tax or other advisors, investors and/or lenders (both current and prospective) that

GSA-000025

SGM is a limited partner in MET13 or has an investment in an entity formed by MEP.  Further, SGM shall not directly or indirectly disclose or represent to any third party that SGM represents MET13 or MEP other than the indirect services provided by SGM to Reed pursuant to the New SGM Fee Agreement.

16.    <u>Confidentiality</u>.  Each of the Parties does hereby agree to keep the terms of this Agreement confidential and not to disclose such terms as well as the alleged facts or circumstances of any underlying claims hereby released to any other person, or entity, whether such person or entity be a natural person, business organization or governmental organization, subdivision or agency, other than pursuant to valid legal process requiring disclosure of such matters, either by judicial or administrative authority; provided that nothing contained herein shall be deemed to limit any party's right to disclose any of the terms of this Agreement to attorneys, accountants or other professional advisors having a reasonable need to know such information, so long as such third parties agree to maintain the confidentiality of such matters, or to taxing authorities in tax filings, or to any persons as required to enforce the provisions of this Agreement.  Notwithstanding, (a) MET shall be entitled to provide information concerning the transactions set forth hereunder to its current investors and prospective investors and (b) SGM shall be entitled (i) to provide information concerning the transactions set forth hereunder to its current investors and prospective investors and (ii) to provide information concerning Reed for purposes of attracting a new additional investment in Reed.

17.    <u>Governing Law</u>.  This Agreement and all actions arising from or in connection herewith shall be governed by, and construed in accordance with, the substantive laws of the State of New York, without regard to conflict of law provisions.

18.    <u>Submission to Jurisdiction; Waivers</u>.  Each of the Parties agrees that if any dispute is not resolved by the parties, it shall be resolved only in the state or federal courts located in the State and County of New York (collectively, the "<u>Proper Courts</u>").  In that context, and without limiting the generality of the foregoing, each of the Parties irrevocably and unconditionally (a) submits for itself and its property in any action relating to the document delivered pursuant to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Proper Courts and agrees that all claims in respect of any such action shall be heard and determined in such court in the State of New York, to the extent permitted by law, in such federal court; (b) consents that any such action may and shall be brought in such courts and waives any objection that it may now or thereafter have to the venue or jurisdiction of any such action in any such court or that such action was brought in an inconvenient court and agrees not to plead or claim the same; (c) agrees that service of process in any such action may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address that is on record at the principal office of the Company; and (d) agrees that nothing in this Agreement or any document delivered pursuant to this Agreement shall affect the right to effect service of process in any other manner permitted by the Laws of the State of New York.

19.    <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY (A) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS

GSA-000026

AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH, (B) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (C) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AMONG OTHER THINGS, BY THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 19.

20.    <u>Complete Agreement</u>.   This Agreement, the Exhibits and the documents and agreements described herein that are required to be executed and delivered in connection herewith, and the Surviving Agreements, embodies the final, entire agreement of the Parties with respect to all matters in controversy and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements between the Parties. There are no unwritten oral agreements between the Parties, and all prior negotiations and agreements pertaining to the subject matter hereof are merged into this Agreement; <u>provided</u>, <u>however</u>, the covenants, representations and warranties contained herein shall survive the execution hereof and the consummation of the transactions contemplated hereby.

21.    <u>Binding Effect</u>.   Subject to Section 22 below, the Parties hereto acknowledge and agree that the terms of this Agreement are contractual and not merely a recital, and that this Agreement shall be binding upon each Party and their heirs, predecessors, successors, subsidiaries, parties, affiliates, assigns, past and present officers, directors, agents, servants, employees, attorneys, and any and all persons or entities acting in concert or participation with the foregoing entities and individuals.

22.    <u>Assignments</u>.   Neither this Agreement nor any of the rights and/or obligations of any Party set forth in this Agreement can be assigned by any Party hereto (including, without limitation, to an affiliate or subsidiary of such Party), without the prior written consent of the other Parties which consent may be withheld for any reason or no reason.   Any attempted or purported assignment by any Party hereto shall be deemed null and void.   Notwithstanding anything to the contrary contained in this Agreement (including without limitation this Section 22 of the Agreement) and subject to standard KYC and AML compliance procedures required by MET and its commercial banks, SGM reserves the right to have the SGM's limited partnership interest in MET13 and/or the New SGM ORRI, to be paid and/or assigned/granted to Grand Rapids Investment Partners LLC or any other entity designated by SGM without obtaining the consent of any or all of the Parties to this Agreement.

23.    <u>Modification</u>.   This Agreement is one which cannot be modified, irrespective of what might take place or occur, unless all of the Parties hereto expressly agrees to such modification in writing.

24.    <u>Severability</u>.   If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable to any extent, the validity of the remaining parts, terms or provisions of this Agreement shall not be affected thereby, and such illegal or invalid part, term or provision shall be deemed not to be part of this Agreement.   The remaining

GSA-000027

provisions shall nevertheless survive and continue in full force and effect without being invalidated in any way.

      25.    <u>Counterparts</u>.  This Agreement may be executed in identical counterparts, each of which shall be construed as an original for all purposes, but all of which taken together shall constitute one and the same Agreement.

      26.    <u>Further Assurances</u>.  The Parties agree to cooperate in the preparation, execution and delivery of any document(s) necessary to effectuate the terms and provisions of this Agreement and take any act reasonably requested by the other Parties to effect this Agreement or the intent hereof.  Notwithstanding the foregoing, the Parties agree that with the exception of SGM's execution and delivery of (a) the MET13 LPA, (b) the subscription agreement pertaining to the issuance of the SGM LP Interest") and (c) the New SGM Fee Agreement, none of the agreements contemplated to be executed by SGM or Richard Featherly in this Agreement shall require, obligate and/or request that SGM or Richard Featherly make any representation, warranty and/or indemnification that is not expressly set forth in this Agreement.

      27.    <u>No Presumption Against Drafter</u>.  Each of the Parties hereto has participated in the negotiation and drafting of this Agreement.  In the event that there arises any ambiguity or question of intent or interpretation with respect to this Agreement, this Agreement shall be construed as if drafted jointly by all of the Parties hereto and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement.

      28.    <u>Acknowledgements</u>.  (a) Each Party acknowledges and agrees that good, valuable and sufficient consideration was exchanged and received for this Agreement.  (b) The Parties to this Agreement have carefully read this Agreement, know the contents thereof and have had the benefit of counsel of their own choice, and have been afforded an opportunity to review this Agreement with their chosen counsel.  (c) Subject to the satisfaction of fiduciary duties of applicable parties, nothing contained in this Agreement shall prohibit (i) any of the managers (on the board of managers) of Reed or (ii) any of the members of Reed from causing Reed to sell, lease or otherwise monetize the Reed Acreage at current or future prices, net revenue interests or other terms based on available market conditions and the financial condition of Reed.

*-Signatures on Next Page-*

28

**IN WITNESS WHEREOF,** the parties have, intending to be legally bound hereby, caused this Agreement to be duly executed and delivered as of the day and year first written above.

REED ENERGY, LLC

By: _____
Name: PAUL LISIAK
Title: Chairman

METROPOLITAN EIH13, LP

By: METROPOLITAN GP HOLDINGS, LLC,
SERIES MEIH13, its General Partner

By: _____
Name:
Title:

METROPOLITAN EQUITY PARTNERS,
L.L.C.

By: _____
Name:
Title:

NORTH EAST FUEL, INC.

By: _____
Name: PAUL LISIAK
Title: Authorized Person

NFI ACQUISITION CO.

By: _____
Name: PAUL LISIAK
Title: Authorized Person

SGM HOLDINGS LLC

By: _____
Name: Richard Featherly
Title:  Manager/President

Joinder:

_____
RICHARD FEATHERLY, solely for
purposes of Sections 11(a), and 13-16
inclusive

_____
PAUL LISIAK, solely for purposes of
Sections 11(b) & 13-16 inclusive

[SIGNATURE PAGE TO GLOBAL SETTLEMENT AGREEMENT]

**IN WITNESS WHEREOF**, the parties have, intending to be legally bound hereby, caused this Agreement to be duly executed and delivered as of the day and year first written above.

REED ENERGY, LLC

By: _____
Name:
Title:

METROPOLITAN EIH13, LP

By: METROPOLITAN GP HOLDINGS, LLC,
SERIES MEIH13, its General Partner

By: _____
Name:
Title:

METROPOLITAN EQUITY PARTNERS,
L.L.C.

By: _____
Name:
Title:

NORTH EAST FUEL, INC.

By: _____
Name:
Title:

NFI ACQUISITION CO.

By: _____
Name:
Title:

SGM HOLDINGS LLC

By: _____
Name: Richard Featherly
Title:  Manager/President

Joinder:

_____
RICHARD FEATHERLY, solely for
purposes of Sections 11(a), and 13-16
inclusive

_____
PAUL LISIAK, solely for purposes of
Sections 11(b) & 13-16 inclusive

[SIGNATURE PAGE TO GLOBAL SETTLEMENT AGREEMENT]

GSA-000030

**IN WITNESS WHEREOF**, the parties have, intending to be legally bound hereby, caused this Agreement to be duly executed and delivered as of the day and year first written above.

REED ENERGY, LLC                              NORTH EAST FUEL, INC.


By: _____                  By: _____
Name:                                         Name:
Title:                                        Title:

                                              NFI ACQUISITION CO.


                                              By: _____
METROPOLITAN EIH13, LP                        Name:
                                              Title:
By: METROPOLITAN GP HOLDINGS, LLC,
SERIES MEIH13, its General Partner

By: _____                  SGM HOLDINGS LLC
Name:   Eric D. Chasser
Title:    Manager
                                              By: _____
METROPOLITAN EQUITY PARTNERS,                 Name: Richard Featherly
L.L.C.                                        Title:  Manager/President


By: _____
Name:   Eric D. Chasser
Title:    Chief Administrative Officer         Joinder:


                                              _____
                                              RICHARD FEATHERLY, solely for
                                              purposes of Sections 11(a), and 13-16
                                              inclusive


                                              _____
                                              PAUL LISIAK, solely for purposes of
                                              Sections 11(b) & 13-16 inclusive

[SIGNATURE PAGE TO GLOBAL SETTLEMENT AGREEMENT]

## LIST OF EXHIBITS

Exhibit A –      New SGM Fee Agreement

Exhibit B-1 –   Reed Acreage – O & G Conveyances Existing as of Effective Date

Exhibit B-2 –   Reed Acreage – O & G Acquisition Contracts Existing as of Effective Date

Exhibit C –      List of Prospective SGM Exit-Buyers

Exhibit D-1–   List of O & G Acquisition Contracts pertaining to Caywood Group Properties

Exhibit D-2 –  List of O & G Acquisition Contracts pertaining to MNW Group Properties

Exhibit E-1 –   List of O & G Conveyances Constituting Affected Anderson Deep Rights

Exhibit E-2 –   List of O & G Conveyances Constituting Affected Anderson Shallow Rights

Exhibit F –      First Amended & Restated Partnership Agreement of MET13, dated as of May 31, 2012

Exhibit G –     Limited Liability Company Agreement of Reed as of January 4, 2012

GSA-000032

**Exhibit A**

**New SGM Fee Agreement**


*Attached.*

GSA-000033

*Execution Copy*

## SGM FEE AGREEMENT

This SGM Fee Agreement (this "<u>Agreement</u>"), by and among, Reed Energy, LLC ("<u>Reed</u>"), SGM Holdings, LLC ("<u>SGM</u>") and solely for purposes of Section 1 hereof, Metropolitan EIH13, LP ("<u>MET13</u>") and Richard R. Featherly ("<u>Featherly</u>"), is being entered into as of November 30, 2012 (the "<u>Effective Date</u>"). This Agreement is being entered into simultaneously with the Global Settlement Agreement, dated as of November 30, 2012 (the "<u>Settlement Agreement</u>"), by and among Reed, SGM, MET13, Metropolitan Equity Partners LLC, North East Fuel, Inc. and NFI Acquisition Co. This Agreement is an exhibit to the Settlement Agreement.

1.    <u>Services</u>.  Each of the parties agree that:

a.    MET13 shall appoint Featherly to the board of managers of Reed. Featherly hereby agrees to fulfill the responsibilities required for a member of a board of managers of a privately held company.

i.    In connection with the appointment to the board seat, Featherly hereby confirms and agrees that he will approve and vote in favor of the following board of managers resolutions:

1.    An amendment to the LLC Agreement of Reed, dated as of January 4, 2012, requiring any and all decisions of the Reed board of managers to be decided via a simple majority vote.

2.    The appointment of Mr. Jason Henthorne as Chief Executive Officer of Reed.

3.    An equity grant to Mr. Jason Henthorne of eight percent (8%) of Reed's total membership interests (on a fully diluted basis as of the Effective Date) for being the Chief Executive Officer of Reed, <u>provided that</u> GEO Southern acquires all or some of the Reed Acreage (as defined in the Settlement Agreement) and if GEO Southern does not acquire all or some of the Reed Acreage, then such equity grant shall be reduced by fifty percent 50%.

ii.    Reed also agrees to purchase and maintain director and officer insurance in the amount of Five Million ($5,000,000) with a Twenty Five Thousand Dollar ($25,000) deductible for as long as Featherly is a member of the Reed board of managers.

iii.    Featherly shall not be authorized to execute any agreement on behalf of Reed unless he has the written approval of the board of managers of Reed and/or Mr. Paul Lisiak as Chairman of Reed.

b.    SGM agrees that it shall (i) assist Reed with the marketing and sale of the Reed Acreage, including, but not limited to, marketing the Reed Acreage to the potential exit buyers listed on Exhibit B of the Settlement Agreement (the "<u>SGM Contacts</u>") and (ii) keep the board of managers of Reed apprised of SGM's discussions with such parties, and to the extent commercially reasonable, such information shall be provided on a real-time basis.

c.      SGM shall provide Reed with a ten (10) calendar day written right of first refusal on all additional opportunities with respect to which SGM or its principal, Richard Featherly, or any of their respective affiliates enters into a written contract for the purchase, lease or sub-lease (with SGM, Richard Featherly or either of their respective affiliates as the purchaser, lessor or sub-lessor) of Deep Rights within the AMI after the Effective Date.  SGM shall promptly deliver to Reed an AON Notice within three (3) business days from the date SGM, Richard Featherly or either of their respective affiliates executes such written contract for such additional opportunity. Reed shall have ten (10) calendar days from the date Reed receives a written AON Notice from SGM regarding such additional opportunity to accept such additional opportunity by written notice to SGM (the "Acceptance Notice").  This limited right of first refusal shall not include any additional opportunities that SGM submitted to Reed prior to the date hereof which Reed rejected, including, but not limited to, Wilson Energy LLC.  To the extent terms are used that are not defined herein, they are to be defined consistently with the Settlement Agreement.  For the purposes of Section 1(c), (d) and (e) of this Agreement, the following terms apply:

i.      "AMI" means Washington County, Ohio.

ii.      "AON Notice" means a written notice from SGM describing the material terms and conditions of an additional opportunity for Deep Rights within the AMI together with a copy of SGM's purchase and sale agreement, contract, option, lease or sub-lease for such additional opportunity and any due diligence that SGM has in its possession for such additional opportunity.  The parties hereto agree that SGM shall not include in any AON Notice and shall not be entitled to receive (A) any broker fee or (B) other compensation (directly or indirectly) from any party associated with the additional opportunities described in Section 1(c); *provided that* if any such additional opportunity becomes a part of the Reed Acreage (as such term is defined in the Settlement Agreement), SGM will be entitled to the New SGM ORRI pursuant to the terms of the Settlement Agreement.

iii.      "Deep Rights" means those oil and gas mineral rights beginning at the top of the Utica Shale Formation and all depths, strata and formations below the top of the Utica Shale Formation.

Furthermore, "time is of the essence" with respect to Reed submitting to SGM an Acceptance Notice within ten (10) calendar days from the date Reed receives an AON Notice from SGM. Reed's failure to submit an Acceptance Notice to SGM within ten (10) calendar days from the date Reed receives an AON Notice from SGM will automatically result in Reed forfeiting any and all, right, title, claim and/or interest in or to the additional opportunity that was the subject of the AON Notice.

The parties further agree that (a) the AON Notice may be submitted by SGM to Reed via electronic mail to Mr. Paul Lisiak at plisiak@metropolitanequity.com and (b) the Acceptance Notice may be submitted by Reed to SGM via electronic mail to Featherly sent to both rfeatherly@rfholdingsinc.com and rfholdings@aol.com.

d.      Within ten (10) calendar days from the date that SGM, Richard Featherly or either of their respective affiliates enters into a written contract for the purchase, lease or sub-

2

lease (with SGM, Richard Featherly or either of their respective affiliates as the purchaser, lessor or sub-lessor) of Deep Rights in the State of Ohio that is outside the AMI, SGM shall provide Reed with written notice of the execution of such contract, which notice shall include a description of the Deep Rights and the material terms and conditions of such contract.  The parties understand that the purpose of this Section 1(d) is to permit Reed to have a "first look" on the business development opportunities of SGM, Richard Featherly or either of their respective affiliates in the State of Ohio, beyond the AMI.  It is further understood and agreed that notwithstanding the notice obligation herein, SGM, Richard Featherly and their respective affiliates however, are not under any obligation whatsoever to sell, assign or otherwise transfer to or jointly purchase, develop or market and/or enter into an agreement with Reed for any Deep Rights that are outside the AMI.

The parties further agree that any notice submitted by SGM to Reed pursuant to this Section 1(d) of the Agreement may be submitted by SGM to Reed via electronic mail to Mr. Paul Lisiak at plisiak@metropolitanequity.com.

e.      SGM, Richard Featherly and their respective affiliates shall not be permitted to solicit, contact or otherwise engage in business with any Reed Exit-Buyer (as such term is defined in the Settlement Agreement) or any affiliate or subsidiary thereof, without the prior written consent of Reed.  Without limiting the foregoing, it is understood that the intent of the parties is that any contact with a Reed Exit Buyer shall be coordinated through Reed.  It is further clarified that this Section 1(e) shall not apply to (i) the SGM Contacts, (ii) PDC Energy and Antero Resources or (iii) any other party that Reed agrees in writing may be excluded from the Section 1(e) obligations (collectively, "Excluded Parties").

f.      Nothing contained in (i) this Agreement, (ii) the Limited Liability Company Agreement of Reed , dated as of January 4, 2012 (or any existing or future amendment thereto), (iii) the First Amended and Restated Partnership Agreement for MET13, dated  as of May 31, 2012 (or any existing or future amendment thereto),  (iv) the Settlement Agreement and/or (v) any other agreement or document by, among or between the parties as of the date hereof shall be deemed or interpreted to restrict, limit, prevent and/or prohibit SGM or its principal Richard Featherly from either (A) competing with either Reed or MET13 and/or any of their respective subsidiaries or affiliates and/or (B) pursuing, purchasing, selling, developing and/or marketing any oil and gas opportunity in the world (including without limitation Deep Rights within the AMI), provided however that the activities described in (A) and (B) above shall be specifically subject to the restrictions set forth in Sections 1(c), (d) and (e) of this Agreement and SGM and its principal, Richard Featherly shall be required to comply with Sections 1(c), (d) and (e) of this Agreement as a condition precedent to conducting the activities described in (A) and (B) above.  The obligations of Section 1(c), (d) and (e) hereof shall survive the termination of this Agreement and shall remain in force a period of three (3) months after the termination of this Agreement.  Further, during the Term (and not the three month post-termination period), Reed's payment of the Compensation to SGM shall be deemed to be a condition precedent to SGM's and Richard Featherly's obligations under Sections 1(c), (d) and (e) hereof.

2.      Compensation. In exchange for the services described in Section 1 of this Agreement, Reed will: (i) pay SGM the sum of Ten Thousand Dollars ($10,000) per month (the

3

"Compensation") payable in advance on the first business day of each month during the term of this Agreement (with the first payment due and owing SGM on or before December 7, 2012 for the month of December 2012) and (ii) reimburse SGM for all of SGM's reasonable and customary expenses incurred on behalf of Reed that SGM incurred in the ordinary course of business (and consistent with previous experience) on or after the Effective Date; provided that monthly gross expenses in excess of $5,000 shall require pre-approval by the Board of Managers of Reed.

     3.    <u>Personnel</u>.  SGM shall provide and devote to the performance of this Agreement such representatives of SGM as SGM shall deem appropriate to the furnishing of the services required.  The fees and other compensation contemplated by this Agreement shall be payable by Reed regardless of the extent of services requested by Reed pursuant to this Agreement, and regardless of whether or not Reed requests SGM to provide such Services;

     4.    <u>Indemnity</u>.  Reed shall indemnify and hold harmless SGM and each of its designees pursuant to this Agreement, and each of its Affiliates, and each of its and their respective partners, members, equity-holders and representatives and any Person claiming by or through any of them (including, without limitation, Featherly) (each such person, an "<u>SGM Indemnitee</u>"), to the fullest extent permitted by applicable law from any and all losses, costs, expenses, liabilities, claims and damages (including reasonable attorneys' fees and expenses and other costs and expenses incident to any suit, action or proceeding.) (collectively, "<u>Expenses</u>") arising out of or in connection with any act performed or omitted to be performed under this Agreement; provided that Reed will not be required to provide such indemnification to the extent that such Expenses have resulted from SGM Indemnitee's fraud, gross negligence or willful misconduct.  An adverse judgment or plea of *nolo contendere* shall not, of itself, create a presumption that SGM Indemnitee committed willful misconduct.  Expenses and other costs and expenses incident to any suit, action or proceeding, including those incurred in defending any civil or criminal action, arising out of or relating to any event or circumstance to which this Section 4 shall apply, shall be paid by Reed, in cash, promptly, and in any event within ten (10) business days, after receipt of a written statement setting forth in reasonable detail the costs and expenses for which SGM Indemnitee is seeking payment, and upon receipt of an undertaking by or on behalf of the SGM Indemnitee to repay such amount if it be later shown that such SGM Indemnitee was not entitled to indemnification.

     5.    <u>Liability</u>.  No SGM Indemnitee shall be liable to the indemnifying party or any of its affiliates, partners, members, equity-holders or representatives or any Person claiming by or through any of them for any act or omission by SGM Indemnitee, as the case may be, in the performance of its duties hereunder or otherwise in relation hereto except to the extent it has been determined by a final, non-appealable judgment of a court of competent jurisdiction that such act or omission constituted fraud, gross negligence or willful misconduct on the part of such SGM Indemnitee, as the case may be.

     6.    <u>Right of Set-Off</u>.  Any payments to be made by Reed under this Agreement shall not be subject to set-off unless and to the extent that a final, non-appealable judgment of a court of competent jurisdiction establishes that the amount to be set-off is duly owed by SGM Indemnitee.

4

7.     Payments.  Any amounts payable by Reed hereunder, if not paid when due and within ten (10) calendar days after written notice from SGM, shall accrue interest daily at a rate of 10.0% per annum as simple interest until paid.

8.     Construction.   All section and paragraph titles or captions contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.   All terms used in this Agreement include, where appropriate, the singular as well as the plural and the masculine, feminine and neuter genders.  The words "herein," "hereof" and "hereunder," and other words of similar import, refer to this Agreement as a whole and not to any particular section, paragraph or other subdivision; the words "include" and "including" shall mean without limitation; and all section, paragraph and other subdivision references contained herein refer to sections, paragraphs and other subdivisions hereof unless another agreement or instrument is specifically referenced.   Use herein of the term "or" is not intended to be exclusive, unless the context clearly requires.  All provisions hereof apply to successive events and transactions.  Time is of the essence for each and every term and condition of this Agreement in which time is a factor.   Financial and accounting terms used but not defined herein have the meanings ascribed to such terms under U.S. generally accepted accounting principles, consistently applied.

9.     Severability.  If any term or provision of this Agreement or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining terms and provisions of this Agreement or the application of such terms and provisions to circumstances other than those as to which it is held invalid or enforceable.

10.    Notices.  Except as set forth in Section 1(c) and (d) of this Agreement, all notices and other communications required or permitted to be given under this Agreement shall be in writing and either hand-delivered or sent by FedEx (or other nationally-utilized overnight delivery service that maintains written records and receipts in connection with deliveries) on a priority pre-paid basis, addressed as set forth below. Notices given by e-mail, fax, or postal service shall not be effective.  Any party may change its address for receipt of notices by written notice to the other parties given as prescribed above.  Notices shall be deemed to have been given and made on the Business Day on which hand-delivered or one Business Day after the Business Day on which sent by FedEx or other nationally-utilized overnight delivery service on a priority pre-paid basis.

If to Reed:

Reed Energy, LLC
c/o Metropolitan Equity Partners, LLC
Attn: Paul K. Lisiak
70 East 55th Street, 15th Floor
New York, New York 10022
Tel:  (212) 561-1256
Fax:  (212) 591-4289

5

GSA-000038

with a copy to (which copy shall not be deemed notice):

Blank Rome LLP
Attn: Louis M. Rappaport, Esq.
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Tel: (215) 569-5647
Fax: (215) 832-5647

If to SGM:

SGM Holdings LLC
Attn: Richard R. Featherly
3075 Charlevoix Drive S.E.
Grand Rapids, Michigan 49546
Tel:  (616) 940-1332
Fax: (616) 825-6230

With a copy to (which copy shall not be deemed notice):

Schulman Blackwell LLP
Attn: Dan J. Schulman, Esq.
100 Park Avenue, 16th floor
New York NY 10017
Tel: (646) 688-5214

11.    Attorneys' Fees.  If any legal proceeding is necessary to enforce or interpret the terms of this Agreement, or to recover damages for breach thereof, the prevailing party shall be entitled to reasonable attorneys' fees, as well as associated costs and disbursements, in addition to any other relief to which such party is entitled.

12.    Subsidiaries.  If at any time after the date of this Agreement, Reed acquires or creates one or more subsidiaries (a "Subsequent Subsidiary"), Reed shall cause such Subsequent Subsidiary to be subject to this Agreement.  Each Subsequent Subsidiary shall be jointly and severally liable and obligated hereunder with respect to each obligation, responsibility and liability of Reed, as if a direct obligation of such Subsequent Subsidiary.  All references herein to Reed shall be interpreted to include each Subsequent Subsidiary.

13.    Independent Contractor Status.  The parties hereby acknowledge that it is not their intention to create between themselves a partnership, joint venture, fiduciary or employment or agency relationship for purposes of this Agreement or for any other purpose whatsoever. Accordingly, notwithstanding any expressions or provisions contained herein, nothing herein shall be construed or deemed to create, or to express an intent to create a partnership, joint venture, fiduciary or employment or agency relationship of any kind or nature whatsoever between the parties hereto.  SGM and its personnel shall render and perform services hereunder

6

GSA-000039

as an independent contractor in accordance with its own standards, subject to its compliance with the provisions of this Agreement and with all applicable laws, ordinances and regulations. Further, nothing contained in this Agreement shall authorize, empower or constitute any party as an agent of any other party in any manner; authorize or empower one party to assume or create an obligation or responsibility whatsoever, express or implied, on behalf of or in the name of any other party; or authorize or empower a party to bind any other party in any manner or make any representation, warranty, covenant, agreement or commitment on behalf of any other party.

14.    Indemnification.

a.    SGM.  SGM shall indemnify and hold harmless all Reed Indemnitees to the fullest extent permitted by applicable law from any and all losses, costs, expenses, liabilities, claims and damages (including reasonable attorneys' fees and expenses and other costs and expenses incident to any suit, action or proceeding) arising out of or in connection with, or claimed to arise out of or to be in connection with the breach by SGM of any representation, warranty, covenant or agreement set forth in this Agreement.

b.    Reed.    Reed shall indemnify and hold harmless all SGM Indemnitees to the fullest extent permitted by applicable law from any and all losses, costs, expenses, liabilities, claims and damages (including reasonable attorneys' fees and expenses and other costs and expenses incident to any suit, action or proceeding) arising out of or in connection with, or claimed to arise out of or to be in connection with the breach by Reed of any representation, warranty, covenant or agreement set forth in this Agreement.

15.    Term.  Subject to the terms herein, this Agreement shall automatically terminate 90 days following the consummation of an Exit Event (as such term is defined in the Settlement Agreement) (the "Original Term"); provided however that upon the mutual agreement of both Reed and SGM, the Original Term may be extended for additional one month periods until Reed gives written notice of termination of not less than one month's notice to SGM (the "Extended Term").  The Original Term and the Extended Term, if any, may be referred to as the "Term".  SGM shall be entitled to be paid the Compensation during the entire Term (including the Extended Term, if any).  Within fifteen (15) days following the termination of this Agreement, Reed shall (i) pay SGM for any and all outstanding Compensation due and owing SGM and (ii) reimburse SGM for any and all outstanding and approved expenses due and owing to SGM pursuant to the terms hereto, to the extent that such Compensation and/or expenses were not previously paid and/or reimbursed to SGM during the Term.

16.    General.  That certain SGM Fee Agreement between Reed and SGM dated as of January 4, 2012 (the "Old Fee Agreement") is hereby terminated and of no further force or effect.  This Agreement together with the agreements referred to herein (i) constitutes the entire agreement and supersedes all other prior and contemporaneous agreements and undertakings (including without limitation the Old Fee Agreement), whether written or oral, among the parties hereto with regard to the subject matter hereof; (ii) except for any Indemnitee or any designee or assignee of SGM or any of its Affiliates, each of which are specifically intended to be third-party beneficiaries of this Agreement to the extent provided herein, is not intended to confer upon any person or entity any rights or remedies hereunder or with respect to the subject matter hereof; (iii) shall not be assigned by Reed or SGM by operation of law or otherwise, except in the case

7

of Reed to a successor to Reed's business, whether pursuant to a merger, consolidation, sale of assets or otherwise.

17.    Amendment.    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by Reed and SGM, and no waiver of any provision of this Agreement, and no consent to any departure by a party hereto, shall be effective unless it is in writing and signed by the other party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given and to the extent specified in such writing. Notwithstanding the foregoing, the parties and their counsel may serve formal notices consistent with the provisions of Section 10 hereof to advise if their notice addresses have changed.

18.    Governing Law.    This Agreement shall be construed in accordance with and governed by the law of the State of New York.  Any dispute under this Agreement shall be resolved by the State or Federal Courts sitting in the State and County of New York.

19.    Submission to Jurisdiction; Waivers.    Each of the parties hereto agrees that if any dispute is not resolved by the parties, it shall be resolved only in the state or federal courts located in the State and County of New York (collectively, the "Proper Courts").  In that context, and without limiting the generality of the foregoing, each of the parties hereto irrevocably and unconditionally (a) submits for itself and its property in any action relating to the document delivered pursuant to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Proper Courts and agrees that all claims in respect of any such action shall be heard and determined in such court in the State of New York, to the extent permitted by law, in such federal court; (b) consents that any such action may and shall be brought in such courts and waives any objection that it may now or thereafter have to the venue or jurisdiction of any such action in any such court or that such action was brought in an inconvenient court and agrees not to plead or claim the same; (c) agrees that service of process in any such action may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address that is on record at the principal office of the Company; and (d) agrees that nothing in this Agreement or any document delivered pursuant to this Agreement shall affect the right to effect service of process in any other manner permitted by the Laws of the State of New York.

20.    Waiver of Jury Trial.  EACH PARTY HEREBY (A) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH, (B) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (C) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AMONG OTHER THINGS, BY THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 20.

GSA-000041

21.    <u>Binding Effect</u>.  Subject to the provisions of Section 22 hereof, the parties hereto acknowledge and agree that the terms of this Agreement are contractual and not merely a recital, and that this Agreement shall be binding upon each party and their heirs, predecessors, successors, subsidiaries, parties, affiliates, assigns, past and present officers, directors, agents, servants, employees, attorneys, and any and all persons or entities acting in concert or participation with the foregoing entities and individuals.

22.    <u>Assignments</u>.  Neither this Agreement nor any of the rights and/or obligations of any party set forth in this Agreement can be assigned by any party hereto (including, without limitation, to an affiliate or subsidiary of such party), without the prior written consent of the other parties which consent may be withheld for any reason or no reason.  Any attempted or purported assignment by any party hereto shall be deemed null and void.

23.    <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts (including by email attachment or facsimile transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

*-signatures on next page-*

9

GSA-000042

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

REED ENERGY, LLC                                    SGM HOLDINGS, LLC

By:                                                 By:
Name: Paul K. Lisiak                                Name: Richard R. Featherly
Title: Chairman                                     Title: President


Solely for purposes of Section 1 hereof:

METROPOLITAN EIH13, LP

By: METROPOLITAN GP HOLDINGS, LLC,
SERIES MEIH13, its General Partner


By:
Name:                                               _____
Title:                                              RICHARD R. FEATHERLY


10

GSA-000043

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

REED ENERGY, LLC

By:_____
Name: Paul K. Lisiak
Title: Chairman

SGM HOLDINGS, LLC

By:_____
Name: Richard R. Featherly
Title: President

Solely for purposes of Section 1 hereof:

METROPOLITAN EIH13, LP

By:  METROPOLITAN GP HOLDINGS, LLC,
SERIES MEIH13, its General Partner

By:_____
Name:   Eric D. Chasser
Title:    Manager

_____
RICHARD R. FEATHERLY

10

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

REED ENERGY, LLC

By:_____
Name: Paul K. Lisiak
Title: Chairman

SGM HOLDINGS, LLC

By:_____
Name: Richard R. Featherly
Title: President

Solely for purposes of Section 1 hereof:

METROPOLITAN EIH13, LP

By:  METROPOLITAN GP HOLDINGS, LLC,
SERIES MEIH13, its General Partner

By:_____
Name:
Title:

_____
RICHARD R. FEATHERLY

10

GSA-000045

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

*Attached.*

GSA-000046

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

| Anderson Group: 3,654 | | |
|---|---|---|
| **Lessor** | **Acreage** | **Township** |
| Holly and Wano McCoy | 152 | Barlow |
| A.F. and W.D. Turner | 133 | Barlow |
| John and Rachel Kirby | 95 | Barlow/Watertown |
| Donald and Dorothy Fleming | 38 | Warren |
| Donald Jones | 73 | Barlow |
| James Smith | 105 | Warren |
| Catherine V. Henderham and Rose Abbott | 53 | Warren |
| Russell and Mary Lou Dravis | 21.59 | Warren |
| Carol Warner | 60 | Warren |
| Thomas and Shirley Wilson | 30 | Barlow |
| James and Mary Hale | 83 | Barlow |
| John and Barbara Moyers | 30 | Barlow |
| Frank and Asenath Lemley | 20 | Watertown |
| Hilda and Walter Tornes | 110 | Warren |
| Glenda McCain | 100 | Warren |
| Jacob and R.E. Vickers | 92 | Warren |
| John and Regina Wigal | 18.3 | Warren |
| Andrew and Helen Bardos | 160 | Barlow/Warren |
| Harold and Letha Miller | 10.5 | Warren |
| Sheldon and Juineta Blair | 10 | Belpre |
| Daniel and Mary Cole | 35 | Barlow |
| Richard and Carol Daniel | 145 | Belpre |
| Lillian V. Gates | 106 | Warren |
| Ray and Ruby Newell | 6 | Barlow |
| Black River Land Company | 64 | Barlow |
| Clealon and Helen Thompson | 16 | Barlow |
| William and Donna Weinrich | 11 | Barlow |
| Lonnie and Ollie Christoper | 63.8 | Barlow |
| Joseph and Lois Morgan | 18.80 | Barlow |
| Pearl and Emily Harvey | 32.42 | Barlow |
| Fred and Betty Knick | 63 | Barlow |
| Laurena Hendrickson | 13.06 | Warren |
| Carl and Nellie Riggenbach | 212 | Warren |
| Arlene Archer | 34.5 | Watertown |
| Edwin and Irma Carver | 38.36 | Warren |
| Edwin and Irma Carver | 26 | Warren |
| John and Winifred Leibrand | 15 | Barlow |
| John and Nancy Hannan | 30 | Barlow |
| Derwood and Glenda | 38.28 | Dunham |

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

| | | |
|---|---|---|
| Toothman | | |
| James Archer | 75 | Watertown |
| Anderson Homestead, LLC | 85 | Barlow |
| W.R. Beach, Mercia Fleming, etc. | 182 | Barlow |
| Edith & B.J. Wilking, Rosalea and Cecil Knotts | 60 | Barlow |
| Bobby and Marjorie Anderson | 13 | Barlow |
| Roberta Mindling, Grace Potter, etc. | 30 | Barlow |
| Buckhorn Energy Co. | 93.79 | Warren |
| Charles and Edna Ludwig | 78.5 | Barlow |
| James and Janice Robinson | 166 | Warren |
| Charles Tratchel | 80.37 | Barlow |
| Cecil and Rosemary Arnold | 180 | Warren |
| Goodfellows Club of Marietta | 200.4 | Warren |
| Raymond and Gladys Winland | 6.79 | Barlow |
| J.E. and Helen Henry | 30 | Barlow |
| J.E. and Helen Henry | 10 | Barlow |

| Lang Group: 1,917.93 | | |
|---|---|---|
| **Lessor** | **Acreage** | **Township** |
| Dustin and Tiffany Jones | 48.95 | Watertown |
| Robert and Robin Johnson | 36.96 | Waterford |
| Larry and Penelope Stanley | 9.527 | Waterford |
| Carl E. Landaker | 10 | Waterford |
| Patrick and Margaret Jones | 78 | Waterford/Watertown |
| Samuel L. Brooker | 11.859 | Waterford |
| Marvin Arnold | 107 | Watertown |
| Raymond and Sara Jones | 198.197 | Waterford |
| Michael and Susan West | 14.553 | Watertown |
| Raymond and Sara Jones | 187.794 | Watertown/Waterford |
| Andrew and Sharon Jones | 38.026 | Waterford |
| Jeffrey E. Jones | 38.644 | Waterford |
| Lazy J. Farms, LLC | 81.832 | Watertown |
| Jeff E. Jones and Thomas J. Jones | 85.91 | Watertown |
| B&B Petroleum Corp. | 157 | Muskingum |
| RE Ohio Holdings, LLC | 589.374 | Waterford/Muskingum/Warren/Belpre |
| David J. Jones | 10.015 | Watertown |
| Daniel and Alecia Jones | 1.092 | Watertown |
| Randy and Evelyn Hall | 1.42 | Watertown |

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

| | | |
|---|---|---|
| Stephen and Barbara Littler | 1.034 | Waterford |
| Thomas and Doddi Jones | 143.45 | Watertown |
| Thomas Jones and Andrew Jones | 67.29 | Waterford |

| Lucas Well Service: 148.94 | | |
|---|---|---|
| **Lessor** | **Acreage** | **Township** |
| Raymond Mahoney | 62.69 | Muskingum |
| Roy C. and Hazel E. Pugh | 30 | Muskingum |
| John W. and Garnet Rake | 56.25 | Muskingum |

| Kroll Energy: 456.217 | | |
|---|---|---|
| **Lessor** | **Acreage** | **Township** |
| William J. Burkhart | 13.9 | Muskingum |
| Beverly Slag Company | 65.28 | Muskingum |
| Hille-Rob Inc. | 31.133 | Muskingum |
| David C. Kaneff | 8.048 | Muskingum |
| Kris-Mar Inc. | 40.5 | Muskingum |
| Winston A. Love | 90 | Muskingum |
| W. Eldon Ness | 56 | Muskingum |
| Masonic Park Corporation | 13.88 | Muskingum |
| Tom and Allen Love | 24.19 | Muskingum |
| Kris-Mar Inc. | 46.596 | Muskingum |
| Carol S. Love | 60 | Muskingum |
| Tom and Allen Love | 6.69 | Muskingum |

| Allen Anderson: 200.58 | | |
|---|---|---|
| **Lessor** | **Acreage** | **Township** |
| Paul and Alma Eaton | 82 | Barlow |
| Thomas and Carol Ryan | 18.83 | Barlow |
| Ralph and Mary Stacy | 24 | Muskingum |
| Raymond and Hattie Bailey | 46.75 | Warren |
| James and Virginia Via | 29 | Warren |

| Other: 789.5339 | | |
|---|---|---|
| Lakeside | 745.35 | Watertown |
| Kern/Cumberledge | 28.36 | Warren |
| Gary & Paulette Naylor | 2.626 | Waterford |
| Glen Miller | 0.3517 | Waterford |

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

| | | |
|---|---|---|
| Dwight Biehl | 0.268 | Waterford |
| Joyce Flesher | 0.461 | Waterford |
| Bruce Lauer | 0.182 | Waterford |
| Monica Deitz | 0.6632 | Waterford |
| Garret Powers | 0.262 | Waterford |
| Adam Duskey | 0.211 | Waterford |
| Douglas & Deanna Dye | 0.238 | Waterford |
| Kenneth Cumberledge | 10.561 | Warren |

| |
|---|
| **Total: 7,166.80** |

## [Intentionally Left Blank,

## Continued on Next Page]

GSA-000050

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

The following oil and gas leases and sub-leases are owned by North East Fuel Inc:

| Lessor | County | Township | Legal Description Vol./Pg. |
|---|---|---|---|
| Donald Jones, Trustee | Washington | Barlow | 277/577 |
| Barlow Agricultural& Mechanical Association | Washington | Barlow | 259/307 |
| Black River Land Company | Washington | Warren | 223/914 |
| Buckhorn Energy Co. | Washington | Warren | 217/264 |
| Lonnie and Ollie Christopher(Bob Braden) | Washington | Barlow | 200/480 |
| Hugh R. and Blanche Cook | Meigs | Bedford | 37/555 |
| Mindling and Deming | Washington | Barlow | 213/176 |
| Russell and Mary Lou Dravis | Washington | Warren | 219/520 |
| Ralph Gearhart(Albert Grooniees) | Washington | Watertown | 251/812 130/259 |
| Sheldon and Juineta Blair Glenda Johnson McCain | Washington | Warren | 254/407 218/689 |
| James L. and Mary G. Hale | Washington | Barlow | 210/935 |
| John P. and Nancy Hannan | Washington | Barlow | 211/259 |
| Pearl and Emily Harvey | Washington | Barlow | 211/261 |
| George E. Margaret H. Hauck | Meigs | Bedford | 37/386 |
| Margaret Heaton/Jennie Roush | Meigs | Chester | 38/511 |
| Catherine Henderhan/Rose Abbott | Washington | Warren | 238/258 |
| H.E. and Virginia Henthorne | Washington | Warren | 224/889 |
| George and Clara E. Heines | Meigs | Bedford | 37/558 |
| Edith and BJ Wilking, et al | Washington | Barlow | 187/404 268/724 |
| Union Slag Corp/Kris-Mar | Washington | Warren/Marietta | 225/420 |
| Wilma and Herman LeMasters | Washington | Warren | 219/215 |
| Frank and Asenath Lemley | Washington | Warren | 219/80 227/252 |
| Edna and Charles Ludwig | Washington | Barlow | 172/424 |
| John and Rachel Kirby(D.McCoy) | Washington | Barlow | 179/416 |
| Holly and Wano (Holly McCoy) | Washington | Barlow | 179/422 268/726 |

GSA-000051

Exhibit B-1

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

| | | | |
|---|---|---|---|
| James, Mildred, Sherwood Mered | Meigs | Bedford | 60/439 |
| Harold and Letha Miller | Washington | Warren | 224/891 |
| Loyld and Betty Matheny(Moore) Bobby Anderson | Washington | Barlow | 209/569 280/204 |
| John L. and Barbara H. Moyers JR. | Washington | Barlow | 213/174 |
| Elmer and A.A, Alta Nelson | Meigs | Bedford | 37/557 |
| James T. and Janice M. Robinson | Washington | Warren | 209/399 |
| Daniel and Belinda Rogers | Washington | Warren | 242/607 |
| James Smith, SR. James Smith,SR. and Georgette Smith | Washington | Warren | 248/680 248/678 |
| Elmer and A.A, Alta Nelson | Meigs | Bedford | 37/557 |
| Clealon C. and Helen L. Thompson | Washington | Barlow | 190/775 |
| A.F. and W.D. Turner | Washington | Barlow | 210/933 |
| Valentine and Audith Wells | Meigs | Orange | 37/417 |
| Jonh and Regina Wigal | Washington | Warren | 219/218 |
| Thomas and Shirley Wilson | Washington | Warren | 218/715 |
| Henry G. and Mary E. Woodyard | Meigs | Orange | 30/262 |
| Gladys Abbott | Washington | Dunham | 272/267 |
| Claude and Patricia Ullman | Washington | Dunham | 220/629 |
| Floyd Alloway, et. Al | Washington | Belpre | 240/258 |
| Roger and Delores Amos and Blaine and Dorothy Church | Washington | Belpre | 212/44 212/184 217/45 |
| J.E. and Hellen Henry | Washington | Barlow | 211/692 211/694 |
| Forbe and Karen Heihle | Washington | Dunham | 230/119 |
| W.D. Houser | Washington | Belpre | 224/47 |
| Hamlin and Mary King | Gallia | Gallipolis | 43/449 44/221 51/87 |
| Larry and Judy Well | Meigs | Bedford | 69/609 71/613 80/593 |
| John B. Martin | Washington | Dunham | 220/42 & 802 |
| Edward and Wanda Maze | Washington | Dunham | 229/221 |
| Jeffrey and Cynthia Maze | Washington | Dunham | 229/233 |
| Alma Mellinger | Washington | Belpre | 218/39 |
| Lewis and Iris Fern | Washington | Dunham | 225/422 |

## Exhibit B-1

### Reed Acreage – O & G Conveyances Existing as of the Effective Date

| | | | |
|---|---|---|---|
| Morris | | | |
| Loyld and Poulton Sr.,et ux | Washington | Warren | 218/547 220/693 |
| Bobby and Clara Powers | Meigs | Bedford | 69/135 71/613 80/593 |
| Herbert and Lena Roush | Washington | Belpre | 229/227 |
| James P. Baird et. al. | Gallia | Gallipolis | 38/9 44/339 51/317 |
| Herbert Burns, et. al. | Washington | Dunham | 222/746 220/804 |
| James and Grace Camp and Robert and Harriet McDonald | Washington | Dunham | 274/332 274/334 |
| Harry and Margaret Husk and Roland and Patricia Capenter | Washington | Belpre | 222/797 228/810 220/44 |
| Community Improvement Corp (CIC) | Gallia | Gallipolis | 44/215 44/221 |
| Community Improvement (CIC) | Gallia | Gallipolis | 44/215 44/221 51/87 51/99 |
| Wendel and Marjorie Counts | Washington | Dunham | 230/131 |
| R. and Carol Daniell | Washington | Belpre | 219/78 |
| William and Anna Davis | Gallia | Gallipolis | 37/795 39/677 44/337 45/213 45/215 44/443 51/317 |
| W.T. Epling Company | Gallia | Gallipolis | 38/595 |
| Merry Marilyn Lee, et. al Fleming/Bunn | Washington | Barlow | 221/506 271/140 |
| Donald and Dorothy Fleming | Washington | Warren | 235/174 |
| Eloise and Ralph J. Nutter | Washington | Warren | 239/34 & 412 |
| Paul E. Ann Grimm | Washington | Dunham | 270/280 |

GSA-000053

**Exhibit B-1**

**Reed Acreage – O & G Conveyances Existing as of the Effective Date**

| | | | |
|---|---|---|---|
| J.E. and Hellen Henry | Washington | Barlow | 211/692<br>211/694<br>271/139 |
| Denzil and Alice Sargent | Washington | Dunham | 220/627<br>220/627<br>221/198<br>237/174 |
| Larry D. Smith<br>Roland and Patricia Carpenter | Washington | Belpre | 220/52<br>220/44 |
| Denzil and Georgia Smith | Washington | Dunham | 223/387 |
| James and Alice Sinder | Washington | Dunham | 232/235<br>241/347<br>241/354 |
| James and Alice Snider | Washington | Dunham | 232/235<br>241/347<br>241/354 |
| Clarence L. Story | Meigs | Bedford | 69/677<br>71/613<br>80/587 |
| Cecile and Thompson, et al | Gallia | Gallipolis | 38/11<br>38/201<br>41/297-305<br>51/193-243<br>38/199 |
| D.&G. Toothman<br>Dorothy Reed Doyls<br>Dennis Reed<br>Donna Reed<br>Edward W. Reed | Washington | Dunham | 274/336<br>274/862<br>274/864<br>274/912<br>274/914<br>274/918 |
| Thurman E. Waggoner | Washington | Dunham | 270/106 |
| Raymond and Judith A. Wiblin | Washington | Dunham | 236/911 |
| Kaye E. Williams, et al | Washington | Belpre | 209/118 |
| William and Mary Windland | Washington | Belpre | 213/693 |
| Carroll and Shirley Wingrove | Washington | Dunham | 223/219 |

**Exhibit B-2**

**Reed Acreage – O & G Acquisition Contracts Existing as of the Effective Date**

*Attached.*

GSA-000055

EXHIBIT B-2

**Reed Acreage – O & G Acquisition Contracts Existing as of the Effective Date**

| Lang Group:  8,781.9 | | | |
|---|---|---|---|
| **Lessor** | **Estimated Acreage** | **Township** | **Date PSA Signed** |
| B&B Petroleum | 865 | Muskingum | 4/19/2012 |
| Jerry and Deborah Barnett | 5.35 | Waterford | 4/18/2012 |
| Gregory Miller | 20 | Waterford/Watertown | 4/18/2012 |
| Barry and Patsy Stollar | 1.75 | Waterford | 4/18/2012 |
| PPC, LLC | 889.79 | Watertown | 4/13/2012 |
| Donald Coleman | 200.602 | Waterford | 4/11/2012 |
| Donald Offenberger | 88.58 | Waterford | 4/11/2012 |
| William and Sandra Pendleton | 236.8 | Waterford | 4/18/2012 |
| Ronald and Lois Young | 15.42 | Waterford | 4/11/2012 |
| John and Jill Miller | 135 | Waterford | 4/11/2012 |
| Linda Marks | 22.9 | Waterford | 4/11/2012 |
| The Jones Group | 1200 | Waterford/Watertown | 4/11/2012 |
| Travis Harra | 3 | Watertown | 4/11/2012 |
| Todd & Monica Hilverding | 10.571 | Watertown | 4/11/2012 |
| Ralph and Bonnie Anderson | 5.2 | Watertown | 4/11/2012 |

GSA-000056

EXHIBIT B-2

**Reed Acreage – O & G Acquisition Contracts Existing as of the Effective Date**

| Rita Offenberger | 93 | Watertown/Waterford | 4/11/2012 |
|---|---|---|---|
| Richard and Denise Lang | 3 | Waterford | 4/12/2012 |
| Virginia Heiss | 547.434 | Waterford | 4/12/2012 |
| Larry T. Lang | 1 | | 4/12/2012 |
| Chris Armstrong | 2.6 | Waterford | 4/12/2012 |
| Franklin and Judith Lang Trust | 5.29 | Warren | 4/12/2012 |
| B&E Resources | 244 | Warren/Muskingum | 4/11/2012 |
| G&L Production | 721 | Muskingum/Warren/Waterford/Watertown | 4/11/2012 |
| Lang Oil & Gas | 1395 | Waterford/Watertown | 4/11/2012 |
| Larry D Lang | 600 | Barlow/Muskingum/Waterford/Watertown | 4/11/2012 |
| Gary Lang | 3.147 | Watertown | 4/11/2012 |
| Brady Lang | 1.04 | Watertown | 4/11/2012 |
| Robert & Edna Lang Trust | 198.35 | Watertown | 4/12/2012 |
| Larry and Gary Lang | 3 | Waterford | 4/12/2012 |
| Russell Lang | 4.8 | Waterford | 4/11/2012 |
| Casey and Cristal Lang | 1.728 | Watertown | 4/11/2012 |
| Robert and Karen Lang | 26.52 | Watertown | 4/11/2012 |
| Franklin & Judith Lang Trust | 20 | Warren | 4/12/2012 |
| Tyler | 10 | Waterford | 4/12/2012 |

EXHIBIT B-2

**Reed Acreage – O & G Acquisition Contracts Existing as of the Effective Date**

| | | | |
|---|---|---|---|
| McGlumphy | | | |
| Charles and Wanda Hall | 1.06 | Watertown | 4/11/2012 |
| Donald B. Coleman | 49 | Watertown | 4/24/2012 |
| Betty Landaker | 0.54 | Waterford | 4/11/2012 |
| Douglas and Janelle Sprague | 102.856 | Watertown | 4/20/2012 |
| Barry and Constance Stollar | 1.5 | Waterford | 5/5/2012 |
| Donald Boyd | 3 | Waterford | 6/4/2012 |
| Eric and Nicole Brown | 38 | Adam | 5/4/2012 |
| Geneda Toomey | 10 | | 6/4/2012 |
| Irving and Gladys Honesty | 73.3 | Barlow/Watertown | 5/8/2012 |
| Irving Honesty | 195 | Adams/Barlow | 5/8/2012 |
| John Ratzer | 98.9 | Watertown/Waterford | 5/16/2012 |
| June Styer | 6.5 | Waterford | 5/22/2012 |
| Matt Brook | 27 | Adams | 4/11/2012 |
| Michael and Marcella Mayle | 1.48 | Waterford | 6/4/2012 |
| Nathan and Amanda Walters | 2 | | 5/1/2012 |
| Patricia Huck | 177.814 | Adams/Waterford | 5/9/2012 |
| Ronald Offenberger | 39.445 | Waterford | 5/1/2012 |

GSA-000058

EXHIBIT B-2

**Reed Acreage – O & G Acquisition Contracts Existing as of the Effective Date**

| | | | |
|---|---|---|---|
| Steve and Karen Biedenbach | 5 | Watertown/Waterford | 4/30/2012 |
| Thomas and Winona Mullenix | 113 | Watertown/Waterford | 5/8/2012 |
| Tubular Solutions, Inc. | 3.5 | | 5/2012 |
| Greg Greene | 140 | Adams/Waterford | 4/10/2012 |
| Cindy Angle | 17.09 | | 8/29/2012 |
| Mark Townsend | 0.72 | Waterford | 9/4/2012 |
| Brent Farmer | 2.37 | Waterford | 10/3/2012 |
| Josh Farmer | 5.751 | Waterford | 10/3/2012 |
| Kevin and Rita Stollar | 86.215 | Watertown | 10/3/2012 |

| **Charlie Huck Group: 490.3** | | | |
|---|---|---|---|
| **Lessor** | **Estimated Acreage** | **Township** | **Date PSA Signed** |
| Charlie Huck | 292.74 | Watertown | 9/4/2012 |
| Todd and Annette Schott | 123.33 | Watertown | 9/6/2012 |
| George Harra | 74.2 | Watertown | 9/21/2012 |

| **Other: 2,559.92*** | | | |
|---|---|---|---|
| **Lessor** | **Estimated** | **Township** | **Date PSA** |

EXHIBIT B-2

**Reed Acreage – O & G Acquisition Contracts Existing as of the Effective Date**

|  | **Acreage** |  | **Signed** |
|---|---|---|---|
| Harris Resources | 117 | Muskingum/Adams | 9/6/2012 |
| J&T Productions | 800 | Barlow/Warren | 5/17/2012 |
| Stevens Oil and Gas | 195 | Watertown | 4/25/2012 |
| Eastern Minerals | 98 | Warren | 3/27/2012 |
| Allen Anderson | 1,188.42 |  | 2/22/2012 |
| TJ Wilson | 16.03 | Warren | 8/1/2012 |
| Rodney Wingrove | 52.23 | Barlow | 8/21/2012 |
| David R. Morgan | 50 | Barlow | 8/24/2012 |
| Dotty Welch | 0.49 | Waterford | 8/22/2012 |
| William Bader | 0.17 | Waterford | 9/5/2012 |
| Dennis Erb | 0.16 | Waterford | 9/5/2012 |
| Cathy Stevens | 21.92 | Barlow | 11/12/2012 |
| James Brookover | 20.5 | Watertown | 10/2/2012 |
| Any oil and gas leases purchased from or granted by Bobby B. Anderson, Marjorie I. Anderson, Ben Anderson, Anderson Drilling, Inc., Buckeye Drilling, North East Fuel, Inc., Ace Gas and Oil, Inc. and Crude Oil Marketing, Inc. (collectively, the "Anderson Group"). |  |  |  |

*The remaining Anderson Group acreage is not included in this number.

GSA-000060

**Exhibit C**

**List of Prospective SGM Exit-Buyers**

*Attached.*

GSA-000061

Exhibit C

SGM Contacts

Natural Gas Partners
5 Houston Center
1401 McKinney Suite 1025
Houston, TX 77010
(713) 579-5700
Chris Ryals – Managing Director

Halcon Resources
1000 Louisiana Street
Suite 6700
Houston, TX 77002
Floyd Wilson-CEO

Trendwell Energy Corporation
10 E Bridge Street
Suite 200
Rockford, MI 49341
(616) 866-5024
Todd Mall – President

Vitruvian Exploration II
4 Waterway Sq.
Suite 400
The Woodlands, TX 77380
(832) 458-3100
Sharon Lemke

Wilder Source Energy
3729 E. 64th Place
Tulsa, OK 74136
(918) 633-5536
Mike Wilder

128752.00100/12260980v.1

GSA-000062

**Exhibit D-1**

**List of O & G Acquisition Contracts pertaining to Caywood Group Properties**

*Attached.*

GSA-000063

**EXHIBIT D-1**

**List of O & G Acquisition Contracts pertaining to Caywood Group Properties**

| Lessor | Estimated Acreage | Date PSA Executed |
|---|---|---|
| Dieringer, Richard | 42.144 | 6/27/2012 |
| Hartline Valley Farms Inc. | 402.48 | 6/27/2012 |
| Heiss, Sam & Amber | 4.44 | 6/27/2012 |
| Frazier, Brenda K | 1.36 | 6/27/2012 |
| Sloter, Kelly & Larry | 14.88 | 6/27/2012 |
| Nonnenmacher Living Trust | 76.52 | 6/27/2012 |
| Berga, Kurtis & Angela | 10.23 | 6/27/2012 |
| Patterson, Tabitha & Thomas | 1.89 | 6/27/2012 |
| Madison, Donald & Deborah | 8.78 | 7/9/2012 |
| Cassill, John & Jodie | 7.56 | 7/9/2012 |
| Frye, Bret & Erin | 85.802 | 7/9/2012 |
| Madison, Richard M & Donald L. | 55.91 | 7/9/2012 |
| Danver, Myles L. | 78.15 | 7/9/2012 |
| Lowe, David & Barbara | 2.23 | 7/9/2012 |
| Travis, Robert & Betty | 6.21 | 7/9/2012 |
| Seever, James & Lorrie | 30.74 | 7/9/2012 |
| Casto, Jerry & Eleanor | 17.13 | 7/9/2012 |
| Adams, Tina & William Mason | 0.78 | 7/9/2012 |
| Danver, Janet | 1.5 | 7/9/2012 |
| Arnold, Jacob | 22.91 | 7/9/2012 |
| Zimmerview Dairy Farm, LLC | 433.012 | 7/9/2012 |
| Zimmerview Dairy Farm, LLC | 66.367 | 7/9/2012 |
| Gillard, John & Deborah | 68.55 | 7/10/2012 |
| Bertram, Paul & Janice | 130.91 | 7/10/2012 |
| Forshey, David & Sandra | 6.64 | 7/10/2012 |
| VanDyk, Adrian & Judy | 100.145 | 7/10/2012 |
| Riggs, Michael | 1.75 | 7/10/2012 |
| Riggs, Dwight & Sandra | 58.756 | 7/10/2012 |
| Waite, Jerry P. Sr | 30.39 | 7/10/2012 |
| Perrine, Leonard & Marilyn | 61.65 | 7/10/2012 |
| Sutton, Frederic D. | 130 | 7/10/2012 |
| Williams, Bonita | 0.61 | 7/10/2012 |
| Morris, Bradley & Ruth | 18.1 | 7/10/2012 |
| Wigal, Pete & Lisa | 1.88 | 7/10/2012 |
| Drennen, David & Karen | 23.7 | 7/10/2012 |
| Miller, Lloyd & Ollie | 114.33 | 7/10/2012 |

**EXHIBIT D-1**

## List of O & G Acquisition Contracts pertaining to Caywood Group Properties

| | | |
|---|---|---|
| Casto, Gerald | 10.42 | 7/10/2012 |
| Lisk, Mervyn & Ruth | 2.59 | 7/10/2012 |
| Modesitt, Leigh Ann | 0.91 | 7/10/2012 |
| Saboley, Eric Edward | 17.95 | 7/10/2012 |
| Criss, Mark | 3.66 | 7/10/2012 |
| Payne, Hal & Kimberly | 19.31 | 7/10/2012 |
| Antill, Gregory & Carol | 1.53 | 7/10/2012 |
| Haught, Brian & Roberta | 19.366 | 7/10/2012 |
| Bravo, Carol & Carlos | 9.65 | 7/10/2012 |
| Vannoy, Jason & Nicole | 3.5 | 7/10/2012 |
| Gardner, Leonard | 2.35 | 7/10/2012 |
| Gardner Custom Sawing, LLC | 42.05 | 7/10/2012 |
| Jean M. Heldman Trust | 61.08 | 7/10/2012 |
| Jean M. Heldman Trust | 98.63 | 7/10/2012 |
| Heldman, Jean M | 3.58 | 7/10/2012 |
| Davison, Susan & Loring | 133.75 | 7/11/2012 |
| Nelson, Robert & Stephanie | 3.171 | 7/11/2012 |
| Duckworth Farms, LLC | 230.433 | 7/11/2012 |
| Groves, Ricky & Deborah | 1.41 | 7/11/2012 |
| Neff, Gary & Marie | 17.99 | 7/11/2012 |
| Bertram, Seth & Melanie | 5.23 | 7/11/2012 |
| McElroy, Beth & James | 115.367 | 7/11/2012 |
| Offenberger, Raymond | 1.88 | 7/11/2012 |
| Henry, John & Sherry | 15 | 7/11/2012 |
| Spindler, David & Nancy | 260.55 | 7/11/2012 |
| Spindler, David - ETAL | 99.35 | 7/11/2012 |
| Nonnenmacher, Harold & Diana | 77.34 | 7/11/2012 |
| Morrison, Charles & Helen | 40.26 | 7/11/2012 |
| Lisk, Karen & Michael | 1.19 | 7/11/2012 |
| Mendenhall, William & Amy | 1 | 7/11/2012 |
| Moore, Michael & Connie | 26.3 | 7/11/2012 |
| Erb Trustees, David & Wendy | 64.38 | 7/11/2012 |
| Erb, David & Wendy. Hester McCain | 44.5 | 7/11/2012 |
| Swazey, Inc. Donald Mallett | 2.01 | 7/18/2012 |
| E&M Developers, LLC Matthew Mallett | 1.02 | 7/18/2012 |
| Donald D. Mallett Rentals, LLC | 1.21 | 7/18/2012 |
| E&M Developers, LLC and J. Douglas Mallett | 5 | 7/18/2012 |
| J. Douglas Mallett Rentals, LLC | 1.15 | 7/18/2012 |

**EXHIBIT D-1**

## List of O & G Acquisition Contracts pertaining to Caywood Group Properties

| | | |
|---|---:|---|
| Wright, Randy & Jill | 3.1 | 7/18/2012 |
| Little Muskingum Valley Farms (Helen F. Hall) | 64.13 | 7/18/2012 |
| Kildow, Matthew & Monique | 5.19 | 7/18/2012 |
| Little Muskingum Valley Farms (Helen F. Hall) | 39.79 | 7/18/2012 |
| Perry, Randall | 17 | 7/18/2012 |
| Little Muskingum Valley Farms (Helen F. Hall) | 60 | 7/18/2012 |
| Mullen, Barry | 19.01 | 7/18/2012 |
| Cox, Tom & Rebecca and John & Ila Cox | 48.67 | 7/18/2012 |
| JW Cobb Properties, LLC | 7.2 | 7/18/2012 |
| Clark, Richard & Krystal | 14.89 | 7/18/2012 |
| Knolle, Claire & Mark | 38.47 | 7/18/2012 |
| Leister, David & Patricia | 1.32 | 7/18/2012 |
| Schultheis, Ronald & Cathy | 70.3 | 7/18/2012 |
| Thomas, Cecil & Cheryl (Cresthaven Trailer Park) | 7.25 | 7/18/2012 |
| Duck Creek Farm LTD (Kenneth Strahler) | 105.151 | 7/18/2012 |
| Gillard, Kelly | 2.26 | 7/18/2012 |
| Emery, Aaron | 0.91 | 7/25/2012 |
| Marilyn T Dehmlow Living Trust | 88.94 | 7/25/2012 |
| Beardmore, Terri | 16 | 7/25/2012 |
| Harris, Michael & Vicki | 0.69 | 7/25/2012 |
| Cisler, Charles & Candice | 13.25 | 7/25/2012 |
| Huffman, Steven & Jo | 49.63 | 7/25/2012 |
| Huffman, Tanner & Anna | 0.805 | 7/25/2012 |
| Sparks, Amanda | 4.45 | 7/25/2012 |
| Sparks, Peggy | 1.4 | 7/25/2012 |
| LaFaber, Harry | 62.56 | 7/25/2012 |
| Bettinger, Peggy | 5.78 | 7/25/2012 |
| Davis, Jeffrey & Renee | 16.882 | 7/25/2012 |
| Miller, Lawrence & Sherry | 5.33 | 7/25/2012 |
| Morris, Keith & Beverly | 17.93 | 7/25/2012 |
| Rudolph Brothers Limited Partnership | 120.29 | 7/30/2012 |
| Krivchencia Family Limited Partnership | 255.43 | 7/30/2012 |
| Iddings Trucking, Inc | 62.407 | 7/30/2012 |

**EXHIBIT D-1**

### List of O & G Acquisition Contracts pertaining to Caywood Group Properties

| | | |
|---|---|---|
| Carpenter, Ralph | 1.05 | 7/30/2012 |
| Marietta Country Club, Inc | 220.34 | 7/30/2012 |
| Dutton, Joe | 4.18 | 7/30/2012 |
| Lerch, Kurt & Shannon | 25.56 | 7/30/2012 |
| Heslop, Jared & Julie | 4.1 | 7/30/2012 |
| Jarrell, Debbie | 1.64 | 7/30/2012 |
| Gillenwalters, Timothy & Michelle | 13.82 | 7/30/2012 |
| Harold R. Matthews Life Estate | 118 | 8/7/2012 |
| Kelly, Mark & Vickie | 2.24 | 8/7/2012 |
| Hasley, Michael & Lois | 4.62 | 8/15/2012 |
| Covey, Scott | 0.57 | 8/15/2012 |
| Hasley, Randy | 0.98 | 8/15/2012 |
| Reiser, Arthur & Judith | 1.25 | 8/15/2012 |
| Hedrick, Steven & Patricia | 34.09 | 8/15/2012 |
| Mary Burdette Life Estate | 6.08 | 8/15/2012 |
| Diane Joyce & Lyle Hasley | 0.47 | 8/15/2012 |
| Riffe, Stephen & Brenda | 11.55 | 8/15/2012 |
| Miller, Amber | 1.268 | 8/15/2012 |
| Barnes, Teddy & Cynthia | 5.6 | 10/2/2012 |
| Bertram, Elizabeth | 1.45 | 10/2/2012 |
| Britton, Jerry & Dianna | 0.64 | 10/2/2012 |
| Crone, Melinda | 0.95 | 10/2/2012 |
| Emery, Heather | 40.68 | 10/2/2012 |
| Kidd, Steven & Shelly | 5.11 | 10/2/2012 |
| Masters, Jason & Jennifer | 2.66 | 10/2/2012 |
| Masters, Robert & Linda | 21.11 | 10/2/2012 |
| Mele, Ada | 5.04 | 10/2/2012 |
| Patterson, Ted & Susan | 2.85 | 10/2/2012 |
| Ritter, Kevin & Khadine | 6.443 | 10/2/2012 |
| Sally Waters Revocable Living Trust | 3.52 | 10/2/2012 |
| Scott, Thelma | 2.5 | 10/2/2012 |
| **Total** | **5,341.219** | |

GSA-000067

**Exhibit D-2**

**List of O & G Acquisition Contracts pertaining to MNW Group Properties**

*Attached.*

GSA-000068

EXHIBIT D-2

**List of O & G Acquisition Contracts pertaining to MNW Group Properties**

| Lessor | Estimated Acreage | Date PSA Executed |
|---|---|---|
| Dils, Buzzy & Pamela | 41 | 5/31/2012 |
| Armstrong, Chris & April | 54 | 5/31/2012 |
| Daryl Bowersock | 116.262 | 5/31/2012 |
| Depuy/Lindamood | 414.4124 | 5/31/2012 |
| Depuy/Lindamood/Stevens | 321.1 | 5/31/2012 |
| Jackson, Jeff &Celeste | 198.719 | 6/7/2012 |
| Bevridge, Patricia | 40 | 5/31/2012 |
| Armstrong, Robert | 119.12 | 5/31/2012 |
| Greenwood, Shirley | 167 | 5/31/2012 |
| Shirley Greenwood & Diane Kroll | 40 | 5/31/2012 |
| Depuy/Lindamood | 256.899 | 6/7/2012 |
| Engle, Patrick & Sharon | 12.916 | 5/31/2012 |
| Bailey, John & Sherry | 71.5 | 5/31/2012 |
| Schwartz, John A. (Joel) | 73 | 5/31/2012 |
| Schwartz, John | 87.5 | 5/31/2012 |
| Morris, Kelly & Cheryl | 10 | 5/31/2012 |
| Rea, John & Kimberly | 18.07 | 6/7/2012 |
| Smith, Lawrence | 170 | 5/31/2012 |
| Grosklos, Mary & Bobby | 60 | 5/31/2012 |
| Moore, Michael & Connie | 80 | 5/31/2012 |
| Williams, Raymond | 33.92 | 6/7/2012 |
| Bedilion, Sandra | 82.25 | 5/31/2012 |
| Schafer, Wayne & Sandra | 42.63 | 5/31/2012 |
| Reed, William & Jill | 37.561 | 5/31/2012 |
| Smith, Lawrence | 336.67 | 5/31/2012 |
| Gale Depuy | 383.06 | 5/31/2012 |
| Jim Williams a/k/a Gas Enterprise | 2264.525 | 5/31/2012 |
| Jim Williams  a/k/a Gas Enterprise | 450 | 6/7/2012 |
| Becker, Stephanie Ann | 20 | 6/25/2012 |
| Hamilton, Leonard & Miller, Gary | 411.75 | 6/25/2012 |
| Hamilton, Leonard & Sara | 80 | 6/25/2012 |
| Hamilton, Leonard & Sara File No. 2 | 184.5 | 6/25/2012 |
| Hofstetter, Paul & Janet | 40 | 6/25/2012 |
| Szabo, Tim & Karen | 49 | 6/25/2012 |
| Depuy, Gale & Barbara | 1454.237 | 8/15/2012 |
| Davis, Charles & Elizabeth | 50 | 10/2/2012 |
| Gardner, Doug & Tricia | 26.12 | 10/2/2012 |
| Noble Petroleum, LLC | 107 | 10/2/2012 |

EXHIBIT D-2

### List of O & G Acquisition Contracts pertaining to MNW Group Properties

| | | |
|---|---|---|
| Noble Petroleum, LLC | 561.29 | 10/2/2012 |
| Stevens Oil & Gas, LLC | 192 | 10/2/2012 |
| Heldman, Greg & Jo. Dave Ward. Donald & Susan Nentwig | 369.95 | 10/2/2012 |
| **Total** | **9,527.96** | |

GSA-000070

**Exhibit E-1**

**List of O & G Conveyances Constituting Affected Anderson Deep Rights**

*Attached.*

GSA-000071

EXHIBIT E-1

**List of O & G Conveyances Constituting Affected Anderson Deep Rights**

| File Name | Lessor | Lessee | Lease Acreage | County |
|---|---|---|---|---|
| Ace Pipeline #1 | Shelden E. Blair & Juineta R. Blair | Dolpha Anderson | 10 | Washington |
| Anderson #26 | Carol Warner | Dan Wiles | 60 | Washington |
| NIED #14 | Alvin Ludwig | | 78.5 | Washington |
| NIED #17 | Cecil Arnold | | 180 | Washington |

*Parties agree to add additional Affected Anderson Deep Rights if identified by Steptoe & Johnson.

GSA-000072

**Exhibit E-2**

**List of O & G Conveyances Constituting Affected Anderson Shallow Rights**

*Attached.*

GSA-000073

EXHIBIT E-2

Affected Anderson Shallow Rights

| File Name | Lessor | Legal Description Vol./Pg. | Township | County |
|---|---|---|---|---|
| Blair/Johnson | Sheldon and Juineta Blair Glenda Johnson McCain | 254/407 218/689 | Warren | Washington |
| Fleming/Bunn | Merry Marilyn Lee, et. al Fleming/Bunn | 221/506 271/140 | Barlow | Washington |

GSA-000074

**Exhibit F**

**First Amended & Restated Partnership Agreement**
**of**
**MET13, dated as of May 31, 2012**

*Attached.*

GSA-000075

FIRST AMENDED AND RESTATED

PARTNERSHIP AGREEMENT

OF

METROPOLITAN EIH13, LP

This First Amended and Restated Partnership Agreement (this **"Agreement"**) of Metropolitan EIH13, LP, a Delaware limited partnership (the **"Partnership"**), is entered into effective as of the 31st day of May, 2012, by and among the undersigned general partner and limited partners.

**BACKGROUND:**

WHEREAS, the Class A Limited Partners entered into the Partnership Agreement of the Company, dated as of December 22, 2011 (the "**Original Partnership Agreement**") to provide for, among other things, the governance of the Partnership and the conduct of its business and to specify their relative rights and obligations.

WHEREAS, the General Partner has determined that it is in the best interest of the Partnership to amend and restate the Original Partnership Agreement as set forth herein in connection with the solicitation and acceptance of additional subscriptions and related Capital Contributions after the expiration of the Class A Capital Subscription Period up to the maximum amount set forth in the Confidential Disclosure Memorandum of the Partnership, dated December 15, 2011 and as supplemented on May 31, 2012 (as so supplemented, the "CDM"), a copy of which has heretofore been delivered to the Partners.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I**
**DEFINED TERMS; OPERATION OF PARTNERSHIP**

**Section 1.01   Definitions**.  Within the context of this Agreement, the following terms shall have the following meanings:

**"Act"** means the Delaware Revised Uniform Limited Partnership Act.

**"Affected Partner"** shall have the meaning set forth in Section 7.04(a).

**"Agreement"** shall have the meaning set forth in the preamble.

"**Business Day**" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

GSA-000076

**"Capital Account"** means the account established and maintained for each Partner in accordance with Section 2.02 of this Agreement.

**"Capital Contribution"** means the amount of money and the Fair Market Value of any property contributed to the Partnership by a Partner (net of any liabilities to which such property is subject or that are assumed by the Partnership in connection with such contribution).  If any Interest is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Contributions of the transferor to the extent they relate to the transferred Interest.

**"Carried Interest Limited Partner"** means Met GP, or such affiliate or designee of Met GP as Met GP shall determine in its discretion.  The Carried Interest Limited Partner shall be a limited partner as described in the Act.

**"Carried Interest Limited Partner Election Period"** shall have the meaning set forth in Section 7.04(b)(i).

**"Certificate"** means the certificate of limited partnership for the Partnership, and any amendments thereto.

**"Class A Limited Partner"** means the parties listed as "Class A Limited Partners" as set forth on Exhibit "A" hereto, including any successor to such Class A Limited Partner's Interests.

**"Class A Limited Partner Interests"** means an ownership interest in the Partnership designated as Class A Limited Partnership Interests in this Agreement, including all of the rights and obligations in connection therewith under this Agreement and the Act.

**"Class A Subscription Period"** means the period from the date of the Original Partnership Agreement through January 31, 2012.

**"Class B Limited Partner"** means the parties listed as "Class B Limited Partners" as set forth on Exhibit "A" hereto, including any successor to such Class B Limited Partner's Interests.

**"Class B Limited Partner Interests"** means an ownership interest in the Partnership designated as Class B Limited Partnership Interests in this Agreement, including all of the rights and obligations in connection therewith under this Agreement and the Act.

**"Class B Subscription Period"** means the period from the date hereof through May 31, 2012.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Communications"** shall have the meaning set forth in Section 12.01.

**"Confidential Information"** means any and all:

(a)    trade secrets concerning the business and affairs of the Partnership, product specifications, data, know-how, formulae, compositions, processes, designs, graphs, drawings, ideas, past, current, and planned research and development, current and planned methods and processes, customer lists, current and anticipated customer requirements, price lists,

GSA-000077

market studies, business plans, computer software and programs (including object code and source code), computer software and database technologies, systems, structures, and architectures (and related formulae, compositions, processes, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), and any other information, however documented, that is a trade secret within the meaning of Delaware law; and

(b)      information concerning the business and affairs of the Partnership or related to the Investment (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training and techniques and materials), however documented; and

(c)      notes, analysis, compilations, studies, summaries, and other material prepared by or for the Partnership containing or based, in whole or in part, on any information included in the foregoing.

**"Fair Market Value"** means the amount a willing buyer would pay a willing seller, neither under any compulsion to buy or sell and both reasonably informed of all material facts concerning the property that is being valued.

**"General Partner"** shall have the meaning set forth in Section 5.02.

"**HNW Limited Partner**" means a Limited Partner whose Capital Contribution is less than $2,500,000.

**"Indemnified Party"** means any General Partner or Officer and any officer, director, shareholder, partner, member, manager or agent of the General Partner or the Management Company.

"**Institutional Limited Partner**" means a Limited Partner whose Capital Contribution is equal to or greater than $2,500,000.

**"Interest"** means a partnership interest in the Partnership, including all of the rights and obligations in connection therewith under this Agreement and the Act.

**"Investment"** shall have the meaning set forth in Section 1.04.

**"Limited Partner Interests"** means an ownership interest in the Partnership designated as Class A Limited Partner Interests or Class B Limited Partner Interests in this Agreement, including all of the rights and obligations in connection therewith under this Agreement and the Act.

**"Limited Partner Percentage Interest"** means, with respect to each Limited Partner owning Limited Partner Interests, the Percentage Interests set forth next to each such Limited Partner's name on Exhibit "A" attached hereto, including as such Exhibit "A" may be amended from time to time in accordance with this Agreement.  For purposes of clarity, the Limited Partner Percentage Interest is calculated with regard to each Limited Partner as the Unreturned

GSA-000078

Capital Contribution of such Limited Partner divided by aggregate Unreturned Capital Contributions of all Limited Partners.

**"Limited Partners"** shall mean the parties listed as Class A Limited Partners or Class B Limited Partners as set forth on Exhibit "A" hereto, including any successor to such Limited Partner's Interest (it being understood that the General Partner or the Carried Interest Limited Partner can be a Limited Partner and, in the case of the General Partner, also the General Partner to the extent that such party makes a Capital Contribution or becomes the successor to a Limited Partner's Interest).

"**Loan Agreement**" shall have the meaning set forth in Section 3.04(b).

**"Management Company"** means Metropolitan Equity Partners, L.L.C., a Delaware limited liability company and an affiliate of the General Partner, or any other party retained by the General Partner to provide management services to the Partnership.

**"Met GP"** means Series MEIH13 of Metropolitan GP Holdings, LLC, a Delaware limited liability company.

**"Non-Affected Limited Partner"** shall have the meaning set forth in Section 7.04(b)(ii).

**"Officers"** mean the individuals appointed by the General Partner to serve in such capacities as shall be designated by the General Partner pursuant to Section 5.04.

**"Partners"** means the General Partner, the Carried Interest Limited Partner and the Limited Partners, and any Person subsequently admitted as a partner in accordance with the terms of this Agreement.

**"Partnership"** means the limited partnership formed and operated pursuant to the terms of this Agreement.

**"Percentage Interest"** means, with respect to each Partner, the Percentage Interest set forth next to each Partner's name on Exhibit "A" attached hereto, including as such Exhibit "A" may be amended from time to time in accordance with this Agreement.

**"Person"** means any individual or any partnership, corporation, estate, trust, limited liability company or other legal entity.

**"Preferred Return"** means an amount equal to each Limited Partner's Unreturned Capital Contributions (computed as a weighted average during the period for which the Preferred Return is being determined) multiplied by fourteen percent (14%) per annum, which to the extent not paid shall accrue but not compound (it being agreed that the weighted average of the Unreturned Capital Contributions shall be computed on a daily basis).

**"Profits"** and **"Losses"** mean, for each year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with §703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to §703(a)(1) of the Code shall be included in taxable income or loss),

GSA-000079

adjusted in accordance with the Regulations under §704(b) of the Code, and excluding items specially allocated pursuant to Section 4.02.

**"Regulations"** means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time.

**"Reserves"** means amounts set aside to pay future costs or expenses that are anticipated to exceed cash available to pay such costs or expenses when due, as determined in the sole discretion of the General Partner.

**"Securities Act"** means the Securities Act of 1933, as amended.

**"Tax Matters Partner"** shall have the meaning set forth in Section 6.04.

**"Transfer"** shall have the meaning set forth in Section 7.01.

**"Triggering Event"** shall have the meaning set forth in Section 7.04(a).

**"Triggering Event Communication Notice"** shall have the meaning set forth in Section 7.04(a).

**"Triggering Event Purchase Price"** shall have the meaning set forth in Section 7.04(b)(iv).

**"Unpaid Preferred Return"** means, with respect to each Limited Partner, such Limited Partner's Preferred Return earned to the date for which the Unpaid Preferred Return is being determined, reduced (but not below zero) by all distributions to such Limited Partner pursuant to Section 3.02(a)(i) and  Section 3.02(b)(i).

**"Unreturned Capital Contributions"** means, with respect to each Limited Partner, as of any date, an amount equal to such Limited Partner's Capital Contributions, reduced by all distributions made prior to such date to such Limited Partner pursuant to Section 3.02(a)(ii) and 3.02(b)(ii).

**Section 1.02   Formation; Name**.  The Partnership was formed by the filing of the Certificate by an authorized person.  The Partners hereby agree to operate the Partnership as a limited partnership under the terms of this Agreement and the Act.  Whenever the terms of this Agreement conflict with the Act, the terms of this Agreement shall control, except with respect to any matters contained in the Act that cannot be modified or waived by a partnership agreement.  The Partnership shall be operated under the name "Metropolitan EIH13, LP."  An Officer or other authorized person designated by the General Partner shall file such other certificates and documents as are necessary to qualify the Partnership to conduct business in any jurisdiction in which the Partnership conducts business. A copy of the Certificate shall be provided to any Partner on request.

**Section 1.03   Registered Agent and Office; Principal Office**.  The registered agent and office of the Partnership required under the Act shall be as designated in the Certificate, and may be changed by the General Partner in accordance with the Act.  The principal business office of the Partnership shall be located at c/o Metropolitan Equity Partners, L.L.C., 70 E. 55th

GSA-000080

Street, 15th Floor, New York, New York, 10022, or such other address as shall be designated by the General Partner.

Section 1.04   **Purpose**.  The purpose and business of the Partnership is to carry on any lawful business purpose or activity which a limited partnership under the Act and Delaware law is not prohibited from carrying on, including, without limitation, acquiring, holding, owning, investing in and disposing of senior secured debt and warrants and any securities received in exchange for, or otherwise in respect of, such investment (hereinafter referred to as the **"Investment"**), and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to the Investment.  The Partnership is authorized to do any and all acts and things necessary, appropriate, incidental to, or convenient for the furtherance and accomplishment of its purposes.

Section 1.05   **Term**.  The term of the Partnership commenced on the date of filing of the Certificate, and the Partnership shall continue until the Partnership is terminated in accordance with this Agreement.

Section 1.06   **Title to Property**.  All real and personal property owned by the Partnership shall be owned by the Partnership as an entity and no Partner shall have any ownership interest in such property in the Partner's individual name or right, and each Partner's Interest shall be personal property for all purposes.  The Partnership shall hold all of its real and personal property in the name of the Partnership and not in the name of any Partner.  The Partnership's assets shall be used solely for the benefit of the Partnership and not for any individual Partner.

Section 1.07   **Waiver of Partition**.  No Partner shall either directly or indirectly take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to such Partner's Interest, or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

Section 1.08   **Limited Liability of Partners.**  Except to the extent required by law, no Partner shall be personally liable for any of the debts or obligations of the Partnership or of any other Partner.

## ARTICLE II
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 2.01   **Capital Contributions**.  Each Partner has made the Capital Contribution set forth next to its name on Exhibit "A" attached hereto.  No Partner shall be obligated to hereafter make any additional Capital Contribution to the Partnership.  No interest shall be paid on any Capital Contribution of any Partner previously made.  The parties understand and agree that, notwithstanding anything to the contrary contained herein, the General Partner may (a) accept additional subscriptions and related Capital Contributions during the Class B Capital Subscription Period up to the maximum amount set forth in the CDM; and (b) unilaterally amend Exhibit "A" to reflect such additional Capital Contributions.

GSA-000081

**Section 2.02   Capital Accounts**.  A Capital Account shall be maintained and adjusted for each Partner in accordance with §704(b) of the Code and the Regulations issued thereunder. Upon the happening of an event specified in Regulation §1.704-1(b)(2)(iv)(f)(5), Capital Accounts shall be adjusted in accordance with Regulation §1.704-1(b)(2)(iv)(g), unless the General Partner determines that such adjustment is not necessary to reflect the economic arrangement among the Partners.  No Partner shall be obligated to the Partnership or to any other Partner solely because of a deficit balance in such Partner's Capital Account.

## ARTICLE III
## DISTRIBUTIONS

**Section 3.01   Distributions**.  Distributions shall be made to the Partners (a) to the extent there is cash available therefore, in the sole discretion of the General Partner, within thirty (30) days of the end of each calendar quarter and (b) at such times and in such amounts as shall be determined by the General Partner in its sole discretion.  In determining the amount of net proceeds to be distributed to the Partners pursuant to Section 3.02, the General Partner shall take into consideration all expenses required to be paid by the Partnership and all reserves that the General Partner determines are required to satisfy future obligations of the Partnership.

**Section 3.02   Priority of Distributions**.  (a) Distributions of available cash, as determined by the General Partner in its discretion, shall be made to all Partners (other than Institutional Limited Partners) owning Interests at the time of such distribution, as follows:

(i)      First, to the HNW Limited Partners owning Limited Partner Interests in proportion to their relative Unpaid Preferred Return until all Unpaid Preferred Returns are reduced to zero;

(ii)      Second, to the HNW Limited Partners owning Limited Partner Interests who have a positive balance of Unreturned Capital Contributions, in proportion to their respective balances, until all Unreturned Capital Contributions balances have been reduced to zero;

(iii)      Third, to Carried Interest Limited Partner until the amount distributed to it (in the current and all prior fiscal years) pursuant to this Section 3.02(a)(iii) is equal to 20% of the sum of all distributions made pursuant to Section 3.02(a)(i) and made or being made pursuant to this Section 3.02(a)(iii) (in the current and all prior fiscal years); and

(iv)      Fourth, (i) 80% to the HNW Limited Partners owning Limited Partner Interests in accordance with their relative Percentage Interests, and (ii) 20% to the Carried Interest Limited Partner.

(b)      On a pari passu basis with distributions made under 3.02(a), distributions of available cash, as determined by the General Partner in its discretion, shall be made to all Partners (other than HNW Limited Partners) owning Interests at the time of such distribution, as follows:

GSA-000082

(i)     First, to the Institutional Limited Partners owning Limited Partner Interests in proportion to their relative Unpaid Preferred Return until all Unpaid Preferred Returns are reduced to zero;

(ii)     Second, to the Institutional Limited Partners owning Limited Partner Interests who have a positive balance of Unreturned Capital Contributions, in proportion to their respective balances, until all Unreturned Capital Contributions balances have been reduced to zero;

(iii)     Third, to Carried Interest Limited Partner until the amount distributed to it (in the current and all prior fiscal years) pursuant to this Section 3.02(b)(iii) is equal to 15% of the sum of all distributions made pursuant to Section 3.02(b)(i) and made or being made pursuant to this Section 3.02(b)(iii) (in the current and all prior fiscal years); and

(iv)     Fourth, (i) 85% to the Institutional Limited Partners owning Limited Partner Interests in accordance with their relative Percentage Interests, and (ii) 15% to the Carried Interest Limited Partner.

**Section 3.03   Amounts Withheld**.  The Partnership is authorized to withhold from distributions and pay over to any federal, state, local or foreign government any amounts required to be withheld with respect to any Partner pursuant to any provisions of federal, state, local or foreign law.  All amounts so withheld shall be treated as advances of amounts distributed to the Partners pursuant to Section 3.02 of this Agreement, depending upon the source of the income that gives rise to the withholding obligation.  To the extent any amount withheld or required to be withheld with respect to a Partner pursuant to this Section 3.03 for any year exceeds the amount of cash available and distributable to such Partner for such year, such Partner shall repay such excess to the Partnership within ten (10) days after such Partner receives written notice from the Partnership of the amount of such excess, including with respect to tax withholding which is required for a Partner who is not a "U.S. person" under the Code pursuant to Section 1446 of the Code.  Each Partner shall co-operate with the Partnership in supplying needed information and filing out tax forms and returns in order to enable the Partnership to file its tax returns and otherwise comply with all tax laws and rulings.  Each Partner shall indemnify the Partnership for all costs, damages, and losses, including attorneys fees, for failure to satisfy its obligations under this Section 3.03.

**Section 3.04   Certain Distributions**.  Notwithstanding anything else contained herein to the contrary

(a)     Tax Distributions.  The General Partner shall be authorized to distribute, as a priority distribution to those made pursuant to Section 3.02, an amount necessary in order to allow the Partners to pay their United States federal, state, and local income tax liabilities with respect to income allocated from the Partnership, including for estimated tax payments, to the extent of cash available; provided that such distributions shall be made pro rata to all Partners in proportion to their assumed tax liabilities, which shall be calculated by assuming that each Partner is an individual living in New York, New York and is taxable at the highest marginal income tax rates.  Tax distributions pursuant to this Section 3.04 shall be reduced with respect to a Partner to the extent that the Partnership has paid withholding or other income taxes on behalf of such Partner pursuant to Section 3.03.  Any distributions made pursuant to this Section 3.04

GSA-000083

shall be treated as an advance of distributions under Section 3.02 and thus reduce subsequent distributions to which such Partner is entitled under Section 3.02.

(b)     Return of Undeployed Capital.  The Partners acknowledge that each Class A Limited Partner's Capital Contribution was advanced to Reed Energy, LLC by the Fund under that certain Loan and Security Agreement by and between the Partnership and Reed Energy, LLC ("Reed") dated January 4, 2012 (the "**Loan Agreement**"), on or before April 30, 2012 and otherwise in accordance with Section 3.04(b) of the Original Partnership Agreement.  Any portion of a Class B Limited Partner's Capital Contribution that has not been advanced to Reed by the Fund under the Loan Agreement or to the Management Company under Section 5.06 on or before September 30, 2012 (the "**Return Date**") will be repaid to such Class B Limited Partner within ten (10) Business Days thereafter.  If the Fund has entered into a binding agreement to advance all or a portion of a Class B Limited Partner's Capital Contribution to Reed or the Management Company, as applicable, on or prior to the Return Date and such advance occurs not later than the thirtieth (30th) day following the Return Date, such deployment of capital shall for purposes of this Section 3.04(b) be deemed to have occurred on the Return Date.

## ARTICLE IV
## PROFITS AND LOSSES

**Section 4.01   General Allocation of Profits and Losses**.  After taking into account any special allocations pursuant to Section 4.02 and subject to any limitations contained therein, Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction, of the Partnership shall be allocated among the Partners in a manner such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Partner if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Fair Market Value, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Fair Market Value of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with Section 3.02 to the Partners immediately after making such allocation.

**Section 4.02   Special Allocations**.  Prior to making allocations to the Partners pursuant to Section 4.01, the Partnership shall make any allocations that are required in order to comply with the rules of Regulation §1.704-2 concerning allocations attributable to nonrecourse liabilities, and the "qualified income offset" rules of Regulation §1.704-1(b)(2)(ii)(d). No Losses or items of loss or deduction shall be allocated to a Partner to the extent such allocation would cause such Partner to have a negative Capital Account balance that exceeds the amount such Partner is obligated to restore or treated as obligated to restore to the Partnership pursuant to Regulation §1.704-1(b)(2)(ii)(c), Regulation §1.704-2(g), and Regulation §1.704-2(i)(5).  The General Partner shall be authorized to make curative allocations to offset regulatory allocations made pursuant to the previous sentences of this Section 4.02 in its reasonable discretion as necessary in order to realize the intended economic arrangement among the Partners, including the equitable allocation of tax liabilities.

**Section 4.03   Allocation During Year**.  For purposes of determining Profits, Losses, or any other items allocable to any period ending on a date other than the last day of the

GSA-000084

Partnership's year, Profits, Losses, and any such other items shall be allocated among such periods using such method permitted by §706 of the Code and the Regulations thereunder as shall be chosen by the General Partner.

      **Section 4.04**    **Tax Allocations**.  Except as otherwise required by §704(c) of the Code or Regulation §1.704-1(b)(2)(iv)(g), items of income, gain, loss and deduction as determined for federal income tax purposes shall be allocated in the same manner as the related items of Profits, Losses, or specially allocated items.  Allocations pursuant to this Section 4.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, or other items or distributions pursuant to any provision of this Agreement.

      **Section 4.05**    **Intent of Allocations**.  The Partners intend that the allocation provisions set forth in Article IV shall produce final Capital Account balances of the Partners that will permit liquidating distributions that are made in accordance with final Capital Account balances in a manner identical to the order of priorities set forth in Section 3.02.  To the extent that the allocation provisions of this Article IV would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the General Partner if and to the extent necessary to produce such result, and (ii) Profits and Losses for prior open fiscal years (or items of gross income or deduction of the Partnership for such fiscal years) shall be reallocated by the General Partner among the Partners to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the General Partner.  This Section 4.05 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.  The General Partner shall have the power to amend this Agreement without the consent of the Partners, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.05.

**ARTICLE V**
**MANAGEMENT OF PARTNERSHIP**

      **Section 5.01**    **General Provisions Concerning Management**.  The powers of the Partnership shall be exercised by or under the authority of, and the business and affairs of the Partnership shall be managed under the direction of, the General Partner, who may delegate all or any portion of its authority hereunder to the Management Company.  No Person other than the General Partner or Officer acting in such capacity in accordance with this Agreement or any other Person acting pursuant to written authority granted by the General Partner, including the Management Company, has the authority or power to act for or on behalf of the Partnership, to do any act that would be binding on the Partnership or to incur any expenditures on behalf of the Partnership.

      **Section 5.02**    **General Partner**.  Met GP shall be the general partner (the **"General Partner"**) of the Partnership as described in the Act.  Upon a breach of the General Partner's obligations hereunder or upon the incapacity of the General Partner to fulfill its obligations hereunder, the Limited Partners shall be entitled to remove Met GP (or any successor thereto) as the General Partner (but not as a Carried Interest Limited Partner) upon the affirmative vote of Limited Partners (excluding Limited Partners that are the Management Company or any Limited Partner directly or indirectly controlling, controlled by or under common control with the

GSA-000085

Management Company) representing at least 80% of the Capital Contributions.   If Met GP resigns as General Partner or is otherwise removed as General Partner, the vote of a majority of the Percentage Interests held by the Limited Partners shall be entitled to name a successor to the General Partner.

Section 5.03    **Actions by General Partner; Written Consents**.  The approval of the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company shall be the only approval of the Partnership necessary to approve a matter or an action with respect to the Partnership.  Meetings of the Partners may be called by the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company.   Any Partner may participate in a meeting by means of conference telephone or similar communications equipment by means of which all individuals participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a meeting pursuant to this provision shall constitute presence at the meeting.  Any action required or permitted to be taken at a meeting may be taken without a meeting if a consent, in writing, setting forth the action so taken shall be signed by the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company.  Except as specifically set forth herein and except as required by the Act, the Limited Partners shall not vote on any matter and shall not have any authority to approve any matter with respect to the Partnership.

Section 5.04    **Officers**.  The Partnership shall have Officers with such titles and authority as shall be determined by the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company.  Without the consent of the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company, no Officer shall have the authority to undertake on behalf of the Partnership any action that has not been authorized by the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company.

Section 5.05    **Partnership Expenses**.  All expenses of the Partnership shall be billed directly to and paid by the Partnership.  The Management Company shall be entitled to cause the Partnership to pay all such expenses (and to be reimbursed to the extent Management Company has incurred any such expenses) prior to any distributions being made to the Partners including, without limitation, expenses incurred in connection with the sale of the Interests and the purchase by the Partnership of the Investment.

Section 5.06    **Management Fee**.  The General Partner, on behalf of the Partnership, may enter into an agreement with the Management Company, whereby, starting on the date on which the any portion of the Partnership's Investment is consummated and through and including the fourth year during the term of the Partnership, in connection with the issuance of the Interests of the Partnership, the Management Company shall receive a management fee from the Partnership (the "Management Fee").  The amount of such Management Fee shall be equal to: (a) in the first year, 2.0% of each advance made by the Partnership to Reed under the Loan Agreement and (b) in all other years, 1% of the aggregate of all amounts advanced by the Partnership to Reed under the Loan Agreement.  The Management Fee described under clause (b) above shall be paid annually in advance and the Management Fee described under clause (a) above shall be paid as and when advances under the Loan Agreement are made to Reed  (it being

GSA-000086

understood that upon the funding of the full amount of the loan commitment to Reed under the Loan Agreement during the first year, the Management Company shall have been paid the entire Management Fee contemplated by clause (a) above). The Management Company reserves the right to reduce or waive the Management Fee in its sole discretion. To the extent that the Partnership does not have the funds to pay the annual Management Fee in any year, the Management Company shall have the right to cause the Partnership to accrue such management fee and to pay such accrued Management Fees prior to the making of any distributions to the Partners, other than tax distributions required by Section 3.04.

Section 5.07   **Key Man Insurance**. The General Partner shall use its reasonable efforts to cause the Management Company to obtain key man life insurance on commercially reasonable terms for Paul Lisiak that names the Management Company as its sole beneficiary, within ninety (90) days of the date of this Agreement.

## ARTICLE VI
## BOOKS AND RECORDS; TAX AND FINANCIAL MATTERS

Section 6.01   **Books and Records**. Proper and complete records and books of account of the Partnership shall be maintained at the principal place of business of the Partnership. The Partnership books shall be closed and balanced at the end of each fiscal year. Each Partner or duly authorized representative of a Partner shall have access and the right to inspect such books and records during normal business hours, provided any information obtained thereby may be used solely for purposes related to the business of the Partnership. The books of account and records of the Partnership shall be audited as of the end of each fiscal year of the Partnership by an independent certified public accountant selected by the General Partner.

Section 6.02   **Fiscal Year**. The fiscal year of the Partnership shall end on the last day of the month of December each year.

Section 6.03   **Reports and Tax Returns**. Within ninety (90) days after the end of each fiscal year (subject to reasonable delays in the event of difficulty in obtaining or compiling of tax information), the Partnership shall use commercially reasonable efforts to transmit to each Person who was a Partner at any time during the fiscal year the Schedule K-1 (IRS Form 1065) for the Person for such year. The General Partner shall cause to be prepared and filed all tax returns for the Partnership, and all tax elections concerning the Partnership shall be made by the General Partner. Each Partner agrees that it shall not take on any of its original or amended income tax returns or claims for refund any position with respect to any Partnership item of income, gain, loss, deduction, or credit that is inconsistent with the treatment of such item by the Partnership on the Schedule K-1 without first consulting with the Tax Matters Partner and attempting to resolve any difference over the proper treatment of such item.

Section 6.04   **Tax Matters Partner**. The General Partner shall be the "tax matters partner" under §6231(a)(7) of the Code (the **"Tax Matters Partner"**).

Section 6.05   **Banking**. All funds of the Partnership shall be deposited in the name of the Partnership in such checking account or accounts as shall be designated by the General Partner. All withdrawals therefrom are to be made upon checks signed by a Person or Persons authorized by the General Partner.

GSA-000087

**Section 6.06    Tax Classification**.  It is the intention of the Partners that the Partnership be treated as a partnership for federal and, to the extent applicable, state and local income tax purposes, but the Partners do not intend that the Partnership be treated as a partnership for any other purposes.  No Partner or General Partner shall make any election or take any other action that would result in the Partnership being treated as other than a partnership for tax purposes.

**Section 6.07    Safe Harbor Election**.  The Partners acknowledge that IRS Notice 2005-43 announces a future Safe Harbor Election, to become operative when certain future guidance is issued by the Internal Revenue Service, which will consist of the filing of an election that the Partnership intends to treat the issuance of a profits interest in exchange for services as the issuance of an interest which has no capital account or current liquidation value and thus to take no deduction for it, and agree that the General Partner shall be authorized to make such Safe Harbor Election as set forth in Notice 2005-43 in accordance with such future guidance, if any, as may be applicable at the time of an issuance of a profits interest by the Partnership.  Each Partner agrees to comply with all requirements of the Safe Harbor, including, without limitation, filing its income tax returns consistently with the intended treatment under such Safe Harbor.  A Partner's obligations to comply with the requirements of this Section 6.07 shall survive such Partner's ceasing to be a Partner of the Partnership and/or termination, dissolutions, liquidation, and winding up of the Partnership, and, for purposes of this Section 6.07, the Partnership shall be treated as continuing in existence.

**ARTICLE VII**
**TRANSFERS, ADMISSIONS, AND WITHDRAWALS**

**Section 7.01    Transfers**.  Except as provided in this Agreement, no Partner shall transfer, sell, assign, encumber, or otherwise dispose of all or any portion of the Partner's Interest (a **"Transfer"**) without the written consent of the General Partner.  The transferee shall pay all costs and expenses incurred by the Partnership in connection with such transfer.  Any purported transfer, sale, assignment, encumbrance, or other disposition in violation of this Agreement shall be null and void.

**Section 7.02    Admissions**.  Except as provided in this Agreement, no transferee of an Interest shall be admitted as a Partner of the Partnership without the written consent of the General Partner, and only if the transferee agrees to be legally bound by this Agreement as a Partner and executes and delivers to the Partnership such documents and instruments as are necessary or appropriate in connection with the transferee becoming a Partner.  If a transferee obtains the written consent of the General Partner for admission, no consent or vote of any other Partner shall be required for such transferee to be admitted as a Partner.  The transferee shall pay all costs and expenses incurred by the Partnership in connection with such admission.  Subject to Section 7.04, any transferee of an Interest who is not admitted as a Partner shall have the rights of an assignee with respect to distributions and Profits, Losses, and other allocations attributable to the transferred Interest, but shall have no voting rights or any other rights as a Partner under this Agreement or the Act.  Notwithstanding the foregoing, the Interest of the assignee shall be subject to the restrictions contained in this Agreement applicable to Interests held by a Partner.

**Section 7.03    Withdrawal**.  No Partner shall have the right to resign and withdraw from the Partnership and demand payment for such Partner's Interest prior to the dissolution and winding up of the Partnership.

GSA-000088

**Section 7.04    Required Sales by Limited Partners**.

(a)    **Deemed Offers**.  Upon the occurrence of any of the following events (each, a **"Triggering Event"**), the Limited Partner to whom the event relates or his heirs, executor, administrator, guardian or other legal representative (the **"Affected Partner"**), shall be deemed to have made an offer to Transfer such Affected Partner's Interests to the other Partners in accordance with Section 7.04(b) as of the date that the Triggering Event occurred:

(i)    The attachment of, execution against, levy upon or other seizure of a Limited Partner's Interests (other than an attachment that is solely for jurisdictional purposes) unless (and for only so long as) counsel for the Partnership determines that the Affected Partner is in good faith contesting such attachment, execution, levy or other seizure;

(ii)    An assignment by a Limited Partner for the benefit of creditors, which assignment includes such Limited Partner's Interests;

(iii)    The possession by any Person of a Limited Partner's Interests or of a claim to, lien on, interest in or encumbrance upon such Limited Partner's Interests other than a Person that acquired such Interests, claim, lien, interest or encumbrance upon the General Partner's prior written consent or in accordance with conditions hereof; or

(iv)    The Transfer or attempted Transfer of Interests by a Limited Partner in violation of this Agreement.

Within ten (10) days after the occurrence of any of the above Triggering Events, the Affected Partner shall provide a written Communication setting forth the details of such event (the **"Triggering Event Communication Notice"**) to the General Partner and the Limited Partners. Failure of the Affected Partner to provide such Communication shall in no way prevent or relieve any of the Partners from exercising their rights or satisfying their obligations under this Agreement.

(b)    **Exercise of Option**.

(i)    **Option to the Carried Interest Limited Partner**.  Upon the occurrence of a Triggering Event, the Carried Interest Limited Partner (or a designated affiliate thereof) shall have the option to purchase all or any part of the Interests held by the Affected Partner on the date the Triggering Event occurred at the Triggering Event Purchase Price (defined below); provided, however, if the Triggering Event is the event set forth in Section 7.04(a)(iv), the Triggering Event Purchase Price shall be reduced by fifty percent (50%).  The Carried Interest Limited Partner may exercise its option under this Section 7.04(b) by providing a Communication to the Affected Partner and the Limited Partners not later than sixty (60) days after the later of the Triggering Event and its receipt of the Triggering Event Communication (the **"Carried Interest Limited Partner Election Period"**).

(ii)    **Option to the Limited Partners**.  In the event that the Carried Interest Limited Partner elects not to or does not exercise its right to purchase some or all of the Interests of the Affected Partner within the Carried Interest Limited Partner Election Period, the Limited Partners (other than the Affected Partner) (the **"Non-Affected Limited Partners"**) shall

GSA-000089

have the option to purchase some or all of the remaining Interests of the Affected Partner at the Triggering Event Purchase Price. Each Non-Affected Limited Partner shall have the option to purchase such Non-Affected Limited Partner's proportionate share (calculated by dividing the Percentage Interest owned by such Non-Affected Limited Partner by the Percentage Interest owned by all Non-Affected Limited Partners) of the remaining Interests of the Affected Partner by giving a notice of exercise to the Carried Interest Limited Partner and the Affected Partner not later than seventy-five (75) days after the later of the Triggering Event and the receipt by the last Non-Affected Limited Partner of the Triggering Event Communication. If any Non-Affected Limited Partner does not elect to purchase such Non-Affected Limited Partner's proportionate share of the remaining Interests of the Affected Partner, then the General Partner shall provide written notice of such fact to the other Non-Affected Limited Partners, and the other Non-Affected Limited Partners shall have the option to purchase the balance, in such proportions as they may agree upon or, failing such agreement, pro rata as provided above, by giving written notice to the General Partner and the other Non-Affected Partners not later than ninety (90) days after the later of the Triggering Event and the receipt by the last Non-Affected Limited Partner of the Triggering Event Communication Notice. Any notice of exercise by a Non-Affected Limited Partner shall be deemed to be a binding offer to purchase the Interests of the Affected Partner for which such exercise was made.

(iii)  **Exercise of Option**. If the Carried Interest Limited Partner and/or the Non-Affected Limited Partner(s) exercise its or their option to acquire all of any part of the Interests owned by an Affected Partner pursuant to Section 7.04(b), the closing on such sale shall be held at the offices of the Management Company, 590 Madison Avenue, 34th Floor, New York, New York 10022, at 10 a.m. Eastern Time on such date as shall be determined by the Affected Partner and the Carried Interest Limited Partner and/or the Non-Affected Partner(s), as the case may be, but not later than ninety (90) days after the later of the Triggering Event and the receipt by the last Non-Affected Limited Partner of the Triggering Event Communication Notice, and the Affected Partner shall (x) tender to the Carried Interest Limited Partner and/or the Non-Affected other Partner(s), as applicable, an assignment of all or the purchased portion of the Affected Partner's right, title and interest in and to such Interests, free and clear of all liens and encumbrances and (y) execute a form of release in the manner determined by the Carried Interest Limited Partner. The Carried Interest Limited Partner and/or the Non-Affected Limited Partner(s), as applicable, shall pay the Triggering Event Purchase Price to the Affected Partner, as determined in accordance with Sections 7.04(b)(i) and 7.04(b)(iv).

(iv)  **Purchase Price and Payment Terms**. The Triggering Event Purchase Price of all Interests sold pursuant to this Section 7.04 shall be established as follows: The Carried Interest Limited Partner shall submit to the Affected Partner (or the Affected Partner's representative) a purchase price determined in good faith equal to the Fair Market Value of the Interests being sold pursuant to Section 7.04. The Affected Partner (or the Affected Partner's representative) shall in its sole subjective discretion either (i) accept the Carried Interest Limited Partner's determination of the purchase price, or (ii) cause to be performed an independent Fair Market Value valuation of the Interests being sold pursuant to Section 7.04 (at the Affected Partner's expense) and submit to the Partnership a purchase price base on such valuation. Should the Affected Partner and the Partnership, and/or their respective representatives, fail to reach agreement as to the purchase price, the matter together with both independent valuations shall be submitted to and resolved in binding arbitration pursuant to the

GSA-000090

rules of the American Arbitration Association.  The amount finally determined hereby as the purchase price for the Interests being sold pursuant to Section 7.04 (including the adjustment required pursuant to Section 7.04(b) for the Triggering Event set forth in Section 7.04(a)(iv)) shall be referred to as the **"Triggering Event Purchase Price."**  The Triggering Event Purchase Price, shall be paid as follows:  (i) ten percent (10%) of the purchase price shall be paid at closing, and (ii) the balance shall be paid in equal quarterly installments of principal over five years together with interest accrued on the unpaid balance to the date of each payment at the mid-term applicable Federal rate determined under Section 1274(d) of the Code for the month in which the Triggering Event occurred.  Notwithstanding the foregoing, if any amount is owed to the Partnership or the purchaser by the Affected Partner, such amount shall be offset first against the payment at closing, and then against any subsequent installments, and such offset amounts shall be remitted to the appropriate party (if due to a party other than the purchaser(s)).

**ARTICLE VIII**
**TERMINATION AND DISSOLUTION**

**Section 8.01    Dissolution Events**.  The Partnership shall be terminated and dissolved only upon the election of the General Partner to dissolve the Partnership or the entry of a final decree of judicial dissolution under the Act.  The happening of any event that causes a dissociation of a Partner from the Partnership shall not cause a dissolution of the Partnership.

**Section 8.02    Liquidation**.

(a)    **Winding Up**.  Upon the dissolution of the Partnership, the Partnership's business shall be liquidated in an orderly manner.  The General Partner shall determine which Partnership property shall be distributed in-kind and which Partnership property shall be liquidated.  The liquidation of Partnership property shall be carried out as promptly as is consistent with obtaining the Fair Value thereof.

(b)    **Payments and Distributions**.  Partnership property or the proceeds there-from, to the extent sufficient therefor, shall be applied and distributed in the following order of priority, with no distribution being made in any category set forth below until each preceding category has been satisfied in full:

(i)    To the payment and discharge of all of the Partnership's debts and liabilities, including any debts and liabilities owed to any Partner, and to the expenses of liquidation;

(ii)    To the establishment of Reserves (which Reserves, to the extent no longer needed by the Partnership, shall be distributed in accordance with the order of priority set forth in subsection (iii) below); and

(iii)    To and among the Partners in accordance with Article III of this Agreement.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01   Exculpation**.  No Indemnified Party shall be liable, responsible or accountable in damages or otherwise to the Partnership or the Partners for any act or omission of the Indemnified Party on behalf of the Partnership, provided that the act or omission is not determined by a court to be due to such Indemnified Party's willful misconduct.

**Section 9.02   Indemnification**.  The Partnership shall indemnify and hold harmless each Indemnified Party against any loss or damage (including attorneys' and other professional fees) incurred by the Indemnified Party on behalf of the Partnership or in furtherance of the Partnership's interests, without relieving the Indemnified Party of liability for willful misconduct.  The satisfaction of any indemnification shall be from and limited to Partnership's assets and no Partner shall have any liability on account thereof.  The right to indemnification shall include the right to be paid or reimbursed by the Partnership the reasonable expenses incurred by the Indemnified Party in advance of the final disposition of any proceeding; provided, however, that the advance payment of such expenses shall be made only upon delivery to the Partnership of a written affirmation by such Indemnified Party of such Indemnified Party's good faith belief that the Indemnified Party has met the standard of conduct necessary for indemnification under this Agreement and a written undertaking, by or on behalf of such Indemnified Party, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified under this Agreement or otherwise.

## ARTICLE X
## REPRESENTATIONS

**Section 10.01  General**.  As of the date hereof, each of the Partners makes each of the representations and warranties applicable to such Partner as set forth in this Section 10.01 and, in the case of each of the Limited Partners, in his, her or its Subscription Agreement, and such representations and warranties shall survive the execution of this Agreement.

(a)      **Due Incorporation or Formation; Authorization of Agreement**.  If such Partner is a corporation, partnership, trust, limited liability company, or other legal entity, it is duly organized or formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the power and authority to own property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Partner is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or Partnership action.  This Agreement constitutes the legal, valid, and binding obligation of such Partner.

(b)      **No Conflict or Default**.  The execution, delivery, and performance of this Agreement and the consummation by such Partner of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator,

GSA-000092

applicable to such Partner, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Partner, or of any material agreement or instrument to which such Partner is a party or by which such Partner is or may be bound or to which any of its material properties or assets are or may be subject.

(c)    **Governmental Authorizations**.  Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Partner under this Agreement or the consummation by such Partner of any transaction contemplated hereby has been completed, made, or obtained on or before the effective date of this Agreement.

(d)    **Litigation**.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Partner, threatened against or affecting such Partner or any of such Partner's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Partner's ability to perform its obligations under this Agreement.

**Section 10.02  Investment Representations**.  Each Partner represents and warrants that it has acquired its Interest for its own account as part of a transaction exempt from registration under the Securities Act and applicable state law for investment purposes and not with a view to the resale or distribution thereof, and that it has had access to any and all information necessary to arrive at its decision to acquire its Interest.  In addition to the restrictions on transfer of Interests otherwise set forth in this Agreement, no Interest may be sold, transferred, assigned or otherwise disposed of by any Partner in the absence of registration under the Securities Act and applicable state law, or an opinion of counsel experienced in securities matters and satisfactory to the Partners that such assignment or other disposition will not be in violation of the Securities Act or state laws.  No Partner shall have any right to require registration of its Interest under said Securities Act or applicable state law and, in view of the nature of the Partnership and its business, such registration is neither contemplated nor likely.  Each Partner further acknowledges that it understands that the effect of the foregoing representation and warranty and restriction on assignment or other disposition is generally to require that such Interest be held indefinitely unless it is registered or an exemption from registration is available.

## ARTICLE XI
## CONFIDENTIALITY COVENANT

**Section 11.01  Confidentiality**.  Each Partner covenants that during the period such Partner is a Partner and at all times thereafter, such Partner will hold in confidence the Confidential Information and will not disclose it to any Person except with the specific prior written consent of the Partnership or except as otherwise expressly permitted by the terms of this Agreement.

GSA-000093

**Section 11.02  Enforcement and Construction**.  Each Partner acknowledges and agrees that any violation by a Partner of any of the covenants contained in Section 11.01 would cause the Partnership immediate, substantial and irreparable injury for which the Partnership has no adequate remedy at law, and that in the event of a breach or threatened breach by any Partner of any of said restrictions, in addition to rights and remedies otherwise available to the parties hereunder or under any other agreement or applicable law, the Partnership will be entitled to seek temporary and permanent injunctive relief in any court of competent jurisdiction.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.01  Notices**.  All notices, approvals, consents, requests, instructions, and other communications (collectively **"Communications"**) required to be given in writing pursuant to this Agreement shall be validly given, made or served only when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Partnership or the Partner at the address that is on record at the principal office of the Partnership, or by facsimile to the number that is on record at the principal office of the Partnership.  Any such Communication shall be treated as given under this Agreement when the Communication is delivered to such address or received at such facsimile number.  The designation of the Person to receive such Communication on behalf of a Partner or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Partnership pursuant to this Section 12.01.

**Section 12.02  Parties Bound; No Third Party Beneficiaries**.  This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective heirs, successors and assigns.  No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

**Section 12.03  Applicable Law**.  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware without regard to its conflict of law rules.

**Section 12.04  Amendment**.

(a)  Subject to Section 12.04(b) and Section 12.04(c), no amendment to this Agreement shall be valid unless the same is in writing and signed by the General Partner and Limited Partners owning a majority of the Percentage Interests held by the Limited Partners.

(b)  Notwithstanding anything to the contrary contained in Section 12.04(a), the General Partner may modify the provisions of this Agreement without the consent of the Limited Partners (i) if the modification is necessary to cause (A) the Partnership to be or to continue to be classified as a partnership for federal income tax purposes or (B) the allocations under Article IV to have substantial economic effect or to be in accordance with the Partners' interests under Section 704 of the Code and the Treasury Regulations thereunder, (ii) to create and/or admit one or more Partners; (iii) create and issue additional classes of partnership interests so long as the issuance of such additional classes of partnership interests does not have a materially adverse and disproportionate effect on the right of a Partner to distributions and

GSA-000094

allocations hereunder (it being agreed that an investment of capital which dilutes all Limited Partners equally shall be considered not to have a materially adverse and disproportionate effect for this purpose), unless the prior written consent of any Partner thus materially adversely and disproportionately affected is obtained, (iv) to make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership and (v) to effect such other amendments as may be deemed by the General Partner to be necessary and or desirable to conduct the Partnership's business, and not adverse in any material respect to the interests of existing Partners; provided that no amendment shall be valid if it would (x) create an obligation of a Partner to contribute additional Capital Contributions to the Partnership, (y) impair the limited liability of such Partner with respect to the liabilities of the Partnership, or (z) have a materially adverse and disproportionate effect on the right of a Partner to distributions and allocations hereunder (it being agreed that an investment of capital which dilutes all Limited Partners equally shall be considered not to have a materially adverse and disproportionate effect for this purpose), unless, in the case of clauses (x), (y), or (z) above, the prior written consent of any affected Partner thus affected is obtained.

(c)     No amendment to this Agreement shall be valid unless the same is in writing and signed by the General Partner and Limited Partners owning at least 80% of the Percentage Interests held by the Limited Partners.

**Section 12.05  Entire Agreement**  This Agreement together with the Subscription Agreements of the Limited Partners contains the entire understanding among the parties and supersedes any prior understandings and agreement between them respecting the subject matter hereof.  There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein.

**Section 12.06  Severability**.  If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

**Section 12.07  Counterparts**.  This Agreement may be executed in counterparts with the same effect as if all of the Partners had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.

**Section 12.08  Construction**.  When from the context it appears appropriate, each term stated either in the singular or the plural shall include the singular and the plural and pronouns stated either in the masculine, the feminine or the neuter shall include the masculine, the feminine and the neuter.  The principle of construction that ambiguities are construed against the draftsperson shall not apply to this Agreement.

**Section 12.09  Headings and Captions**.  The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

GSA-000095

**Section 12.10  <u>No Waiver</u>**.  The failure of any Partner to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such Partner's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Partner giving the same.

**Section 12.11  <u>Additional Instruments</u>**.  Each Partner agrees to execute and deliver such additional agreements, certificates, and other documents as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

**Section 12.12  <u>Exclusive Jurisdiction; Waiver of Jury Trial</u>**.  In the event of any dispute between or among the Partners or in the event of a dispute with the Partnership, each Partner hereby consents to the exclusive jurisdiction of the federal and state courts located in New York, New York and agrees that service of process may be made by registered or certified mail to the address of the Partner on the records of the Partnership.  In the event of any dispute between or among the Partners, or in the event of a dispute with the Partnership, EACH PARTY HEREBY IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY.

*[Signature page follows.]*

GSA-000096

IN WITNESS WHEREOF, the General Partner has executed this Agreement in compliance with Section 12.04(b) of the Original Partnership Agreement as of the day and year first above written.

**GENERAL PARTNER**:

METROPOLITAN GP HOLDINGS, LLC, SERIES MEIH13

By: _____

Name:  Eric D. Chasser
Title:  Manager

GSA-000097

**CLASS B**

**JOINDER SIGNATURE PAGE TO**

**PARTNERSHIP AGREEMENT**

**OF**

**METROPOLITAN EIH13, LP**

By its execution and delivery of this signature page, the undersigned Limited Partner, intending to be legally bound hereby, joins in and agrees to be bound by the terms and conditions of the Partnership Agreement for Metropolitan EIH13, LP dated as of May 31, 2012 (the **"Agreement"**), and authorizes this signature page to be attached to the Agreement or counterparts thereof.

IF SIGNATORY IS A NATURAL PERSON:

Sign Name:_____

Print Name:_____

Address:_____

_____

Dated:   _____, 2012

IF SIGNATORY IS AN ENTITY:

Entity name: _____

Signature: _____

Print Name:_____

Title:_____

Address:_____

Dated: _____, 2012

{N2455569.3}

**Partnership Agreement**
**METROPOLITAN EIH13, LP**
**Exhibit "A"**

**Capital Contributions and Percentage Interests**

(Revised November 30, 2012)

| | Capital Contributions | Percentage Interest |
|---|---|---|
| **General Partner** | | |
| Series MEIH13 of Metropolitan GP Holdings, LLC | | |
| 70 East 55th Street, 15th Floor | $0 | 0.000% |
| New York, NY  10022 | | |
| | | |
| **Carried Interest Limited Partner** | | |
| Series MEIH13 of Metropolitan GP Holdings, LLC | | |
| 70 East 55th Street, 15th Floor | $0 | 0.000% |
| New York, NY  10022 | | |
| | | |
| **Class A - HNW Limited Partners:** | | |
| Addison Holdings LLC | | |
| 7001 Post Road | $2,000,000 | 6.655% |
| Dublin, OH  43016 | | |
| | | |
| Adrian Blumfield | | |
| 408 Jasper Way | $100,000 | 0.333% |
| Superior, CO  80027 | | |
| | | |
| Ceceile Chasser Rev. RE Trust | | |
| 2165 SW Olympic Club Terrace | $170,000 | 0.566% |
| Palm City, FL  34990 | | |
| | | |
| Charlene C. Berardino | | |
| 295 Brushy Ridge Road | $100,000 | 0.333% |
| New Canaan, CT  06840 | | |
| | | |
| Clay Lebhar | | |
| 1155 NW 118th Lane | $200,000 | 0.666% |
| Coral Springs, FL  33071 | | |
| | | |
| Comfort Enterprises CA LLC | | |
| 252 Seventh Avenue | $550,000 | 1.830% |

{N2455569.3}

Apt. 10V
New York, NY  10001

| | | |
|---|---|---|
| Dana Comfort<br>37 Heatherbloom Road<br>White Plains, NY  10605 | $150,000 | 0.499% |
| David Comfort<br>252 Seventh Avenue<br>Apt. 10V<br>New York, NY  10001 | $150,000 | 0.499% |
| David Willey<br>3235 Longview Lane<br>Delaplane, VA  20144 | $250,000 | 0.832% |
| Demetris Papademetriou<br>77 Seventh Avenue<br>Apt. 9M<br>New York, NY  10011 | $25,000 | 0.083% |
| DNV Investment Partnership<br>6401 Poplar Avenue<br>Suite 250<br>Memphis, TN 38119 | $200,000 | 0.666% |
| Edward Bloomberg<br>2422 Oakcrest Lane<br>Holladay, UT  84121 | $100,000 | 0.333% |
| Entrust Tennessee Inc. FBO Menard, D.<br>IRA<br>5184 Caldwell Mill Road<br>Suite 204-303<br>Birmingham, AL  35244 | $250,000 | 0.832% |
| Entrust IRA Administration<br>FBO J. Wakerly 1632680<br>135 S LaSalle Street, Suite 4000<br>Chicago, IL  60603 | $500,000 | 1.664% |
| Entrust IRA Administration<br>FBO G. Zoeller 1632721<br>135 S LaSalle Street, Suite 4000<br>Chicago, IL  60603 | $150,000 | 0.499% |
| Eric S Von Stroh<br>1100 Madison Avenue | $100,000 | 0.333% |

{N2455569.3}

Apt. 4L
New York, NY  10028

| | | |
|---|---|---|
| Fred Ganning<br>8 Tall Pines Road<br>Morristown, NJ  07960 | $1,000,000 | 3.328% |
| Gudrun Zoeller<br>936 Intracoastal Drive<br>#14C<br>Fort Lauderdale, FL  33304 | $50,000 | 0.166% |
| Hal Mintz<br>18 Swan Road<br>Mahwah, NJ  07430 | $150,000 | 0.499% |
| Henry Trust Company, Ltd.<br>450 Royal Palm Way, Suite 401<br>Palm Beach, FL  33480 | $500,000 | 1.664% |
| IRA Services FBO Duffy, R.<br>PO Box 7080<br>San Carlos, CA  94070-7080 | $100,000 | 0.333% |
| IRA Services FBO Solari, J.<br>PO Box 7080<br>San Carlos, CA  94070-7080 | $2,000,000 | 6.655% |
| Jason F Henthorne<br>Petro Evaluation Svcs. Inc.<br>3927 Cleveland Road<br>Wooster, OH  44691 | $100,000 | 0.333% |
| Jennifer Quasha-Deinard<br>39 Birch Lane<br>Greenwich, CT  06830 | $250,000 | 0.832% |
| Joint Rev. Trust of Warren & Penny Weiner<br>100 W. Elm Street<br>Suite 400<br>Conshohocken, PA  19428 | $500,000 | 1.664% |
| Ken Lisiak<br>17 Ross Lane<br>Middleton, MA  01949 | $100,000 | 0.333% |
| Kenneth A Grinspun | $100,000 | 0.333% |

{N2455569.3}

PO Box 38264
Germantown, TN  38183

| | | |
|---|---|---|
| Kingswood Partners LLC<br>326 Round Hill Road<br>Greenwich, CT  06831 | $500,000 | 1.664% |
| KJH Holdings Co., Inc.<br>200 Public Square, Suite 2500<br>Cleveland, OH  44122 | $500,000 | 1.664% |
| Kurt Thoss<br>3100 NE 48th Street, Apt. 611<br>Ft. Lauderdale, FL  33308 | $50,000 | 0.166% |
| Marcus Childress<br>200 West 72nd Street<br>Apt. 12H<br>New York, NY  10023 | $100,000 | 0.333% |
| Mark Hopkinson<br>1654 Moores Hill Road<br>Syosset, NY  11791 | $100,000 | 0.333% |
| Maurice Mark Castellano<br>PO Box 272248<br>Boca Raton, FL  33427 | $125,000 | 0.416% |
| Metropolitan Equity Partners, LLC<br>70 East 55th Street, 15th Floor<br>New York, NY  10022 | $150,000 | 0.499% |
| Metropolitan EIH14, LP<br>70 East 55th Street, 15th Floor<br>New York, NY  10022 | $125,000 | 0.416% |
| Michael Doniger<br>151 West 17th Street<br>Apt. 7C<br>New York, NY  10011 | $500,000 | 1.664% |
| Osterjung LLC<br>381 Highland Avenue<br>Montclair, NJ  07043 | $500,000 | 1.664% |
| Peet Family Investments, LLC<br>101 Central Park West<br>Apt. 7G | $100,000 | 0.333% |

{N2455569.3}

New York, NY  10023

| | | |
|---|---|---|
| Peter Kearns<br>150 Waughaw Road<br>Towaco, NJ  07082 | $250,000 | 0.832% |
| Peter Sterling<br>65 Southlawn Avenue<br>Dobbs Ferry, NY  10522 | $75,000 | 0.250% |
| Robert Grundstein<br>172 Godwin Avenue<br>Wyckoff, NJ  07481 | $25,000 | 0.083% |
| Rodrigo Rodriguez<br>98 Rodenhurst Road<br>Clapham<br>London SW4 8AP<br>UK | $50,000 | 0.166% |
| Rosenman Family LLC<br>134 Middle Neck Road<br>Great Neck, NY  11021 | $1,000,000 | 3.328% |
| Ross Berman<br>200 East 64th Street<br>Apt. 19CD<br>New York, NY  10065 | $550,000 | 1.830% |
| Ryan Hedrick<br>389 East 89th Street<br>Apt. 28A<br>New York, NY  10128 | $25,000 | 0.083% |
| S. Eugene Mathis, Jr.<br>6401 Poplar Avenue<br>Suite 250<br>Memphis, TN  38119 | $100,000 | 0.333% |
| Super G, LLC<br>2721 E Pacific Coast Hwy<br>#107<br>Corona Del Mar, CA  92625 | $100,000 | 0.333% |
| The Highlander Fund, LP<br>40 Marlborough Road<br>Briarcliff Manor, NY  10510 | $835,000 | 2.779% |

{N2455569.3}

| | | |
|---|---|---|
| Thomas Labenz<br>150 Lilac Lane<br>Chalfont, PA  18914 | $50,000 | 0.166% |
| W. Robert Dahl<br>83 Pecksland Road<br>Greenwich, CT  06831 | $500,000 | 1.664% |
| Wakerly Family Foundation<br>373 Foxborough Drive<br>Mountain View, CA  94041 | $500,000 | 1.664% |
| Wakerly Trust Agreement DTD 6/96<br>1704 Fairfax Lane<br>Oakbrook Terrace, IL  60181 | $1,000,000 | 3.328% |
| Nicholas Walters<br>100 Eleventh Avenue, Apt. 3A<br>New York, NY  10011 | $100,000 | 0.333% |
| **Total Class A - HNW Limited Partners** | **$17,755,000** | **59.083%** |
| **Class A - Institutional Limited Partners:** | | |
| Context Direct II, LP<br>401 City Avenue<br>Suite 815<br>Bala Cynwyd, PA  19004 | $2,675,000 | 8.902% |
| Ilex Investments LP<br>152 Woodlands Road<br>Harrison, NY  10528 | $900,000 | 2.995% |
| IRA Services FBO Crawford, G.<br>PO Box 7080<br>San Carlos, CA  94070-7080 | $2,100,000 | 6.988% |
| SGM Holdings, LLC<br>3075 Charlevoix Dr. SE<br>Suite 175<br>Grand Rapids, MI  49546 | $2,500,000 | 8.319% |
| **Total Class A-<br>Institutional Limited Partners** | **$8,175,000** | **27.204%** |

{N2455569.3}

GSA-000104

| | | |
|---|---|---|
| **Total Class A - Limited Partners** | **$25,930,000** | **86.287%** |

**Class B - HNW Limited Partners:**

| | | |
|---|---|---|
| Appalachian Capital LLC<br>Ted Deinard<br>39 Birch Lane<br>Greenwich, CT  06830 | $38,100 | 0.127% |
| Charlene C. Berardino<br>295 Brushy Ridge Road<br>New Canaan, CT  06840 | $50,000 | 0.166% |
| Ceceile Chasser Rev. RE Trust<br>2165 SW Olympic Club Terrace<br>Palm City, FL  34990 | $25,900 | 0.086% |
| Jennifer Chasser<br>1966 Hornblend Street<br>Apt. 4<br>San Diego, CA  92109 | $40,100 | 0.133% |
| Marcus Childress<br>200 West 72nd Street<br>Apt. 12H<br>New York, NY  10023 | $100,000 | 0.333% |
| David Comfort<br>252 Seventh Avenue<br>Apt. 10V<br>New York, NY  10001 | $50,000 | 0.166% |
| John Damico<br>1861 Boyce Street<br>Sarasota, FL  34239 | $100,000 | 0.333% |
| W. Robert Dahl<br>83 Pecksland Road<br>Greenwich, CT  06831 | $160,000 | 0.532% |
| DNV Investment Partnership, LLC<br>6401 Poplar Avenue<br>Suite 250<br>Memphis, TN 38119 | $30,500 | 0.101% |
| Stephen Edelson<br>36 Plymouth Road<br>Port Washington, NY  11050 | $50,000 | 0.166% |

{N2455569.3}

| | | |
|---|---|---|
| Entrust Tennessee Inc. FBO Menard, D.<br>IRA<br>5184 Caldwell Mill Road<br>Suite 204-303<br>Birmingham, AL  35244 | $38,100 | 0.127% |
| Rafael Escanez<br>Ricardo Villa 4 2B<br>08017 Barcelona<br>Spain | $20,000 | 0.067% |
| Rev. Trust Agmt. of W. Farnsworth, Jr.<br>8403 Arbor Gate Court<br>Orlando, FL  32819 | $50,000 | 0.166% |
| Fred Ganning<br>8 Tall Pines Road<br>Morristown, NJ  07960 | $180,000 | 0.599% |
| Ken Grinspun<br>PO Box 38264<br>Germantown, TN  38183 | $25,000 | 0.083% |
| Robert Grundstein<br>172 Godwin Avenue<br>Wyckoff, NJ  07481 | $10,000 | 0.033% |
| Peter Harding<br>16 Richmond Place<br>New Orleans, LA  70155 | $100,000 | 0.333% |
| Denis Harte<br>5246 Bailey Court East<br>Doylestown, PA  18902 | $100,000 | 0.333% |
| Paul Harte<br>59 Susan Drive<br>Chatham, NJ  07928 | $50,000 | 0.166% |
| Ryan Hedrick<br>389 East 89th Street<br>Apt. 28A<br>New York, NY  10128 | $25,000 | 0.083% |
| Henry Trust Company, Ltd.<br>450 Royal Palm Way, Suite 401<br>Palm Beach, FL  33480 | $76,200 | 0.254% |

GSA-000106

| | | |
|---|---|---|
| The Highlander Fund, LP<br>40 Marlborough Road<br>Briarcliff Manor, NY  10510 | $135,000 | 0.449% |
| IRA Services FBO G. Crawford<br>PO Box 7080<br>San Carlos, CA  94070-7080 | $350,000 | 1.165% |
| Peter Kearns<br>150 Waughaw Road<br>Towaco, NJ  07082 | $125,000 | 0.416% |
| Thomas Labenz<br>150 Lilac Lane<br>Chalfont, PA  18914 | $250,000 | 0.832% |
| Seamus Lamb<br>220 East 65th Street, Apt. 6N<br>New York, NY  10065 | $100,000 | 0.333% |
| Ken Lisiak<br>17 Ross Lane<br>Middleton, MA  01949 | $74,934 | 0.249% |
| Arthur Lutzke<br>85 Hand Lane<br>Amagansett, NY  11930 | $100,000 | 0.333% |
| S. Eugene Mathis<br>6401 Poplar Avenue<br>Suite 250<br>Memphis, TN  38119 | $50,000 | 0.166% |
| Metropolitan EIH14, LP<br>70 East 55th Street, 15th Floor<br>New York, NY  10022 | $19,000 | 0.063% |
| MSSB FBO A. Pollack<br>Keith Heller<br>55 East 52nd Street, 29th Floor<br>New York, NY  10055 | $50,000 | 0.166% |
| Osterjung LLC<br>381 Highland Avenue<br>Montclair, NJ  07043 | $76,200 | 0.254% |
| Demetris Papademetriou<br>77 Seventh Avenue | $3,800 | 0.013% |

Apt. 9M
New York, NY  10011

| | | |
|---|---|---|
| Peet Family Investments, LLC<br>101 Central Park West<br>Apt. 7G<br>New York, NY  10023 | $15,000 | 0.050% |
| Pelagic Capital Advisors, LLC<br>136 East 57th Street<br>Suite 1501<br>New York, NY  10022 | $100,000 | 0.333% |
| Diego Reyes<br>135 East Putnam Avenue<br>Greenwich, CT  06830 | $100,000 | 0.333% |
| Rodrigo Rodriguez<br>98 Rodenhurst Road<br>Clapham<br>London SW4 8AP<br>UK | $50,000 | 0.166% |
| Kurt Thoss<br>3100 NE 48th Street, Apt. 611<br>Ft. Lauderdale, FL  33308 | $25,000 | 0.083% |
| Wakerly Family Foundation<br>373 Foxborough Drive<br>Mountain View, CA  94041 | $378,600 | 1.260% |
| David Willey<br>3235 Longview Lane<br>Delaplane, VA  20144 | $100,000 | 0.333% |
| Gudrun Zoeller<br>936 Intracoastal Drive<br>#14C<br>Fort Lauderdale, FL  33304 | $35,000 | 0.116% |
| **Total Class B - HNW Limited Partners** | **$3,456,434** | **11.502%** |
| **Class B - Institutional Limited Partners:** | | |
| Context Direct II, LP<br>401 City Avenue<br>Suite 815<br>Bala Cynwyd, PA  19004 | $407,586 | 1.356% |

GSA-000108

| | | |
|---|---|---|
| Ilex Investments LP<br>152 Woodlands Road<br>Harrison, NY  10528 | $257,000 | 0.855% |
| **Total Class B - Institutional Limited Partners** | **$664,586** | **2.212%** |
| **Total Class B - Limited Partners** | **$4,121,020** | **13.713%** |
| **TOTAL – Limited Partners** | **$30,051,020** | **100.000%** |

GSA-000109

**Exhibit G**

**Limited Liability Company Agreement**
**of Reed as of January 4, 2012**

*Attached.*

GSA-000110

---

LIMITED LIABILITY COMPANY AGREEMENT

OF

REED ENERGY, LLC

A DELAWARE LIMITED LIABILITY COMPANY

JANUARY 4, 2012

---

{N2389188.10.2}

GSA-000111

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 1

ARTICLE II ORGANIZATIONAL MATTERS ................................................................ 9

    2.1    Formation of LLC .................................................................................... 9
    2.2    Limited Liability Company Agreement .................................................. 9
    2.3    Name ........................................................................................................ 9
    2.4    Purpose .................................................................................................. 10
    2.5    Principal Office; Registered Office ...................................................... 10
    2.6    Term ...................................................................................................... 10
    2.7    No State-Law Partnership .................................................................... 10

ARTICLE III CAPITAL CONTRIBUTIONS ................................................................ 10

    3.1    Unitholders ............................................................................................ 10
    3.2    Capital Accounts .................................................................................. 13
    3.3    Negative Capital Accounts .................................................................. 14
    3.4    No Withdrawal ...................................................................................... 14
    3.5    Loans From Unitholders ...................................................................... 14
    3.6    Distributions In-Kind ............................................................................ 14
    3.7    Transfer of Units .................................................................................. 14
    3.8    Conversion to Corporation .................................................................. 14

ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS ............................................... 15

    4.1    Distributions .......................................................................................... 15
    4.2    Allocations ............................................................................................ 16
    4.3    Special Allocations .............................................................................. 16
    4.4    Tax Allocations .................................................................................... 18
    4.5    Offsetting Allocations .......................................................................... 18
    4.6    Indemnification and Reimbursement for Payments on Behalf of a
           Unitholder ............................................................................................ 18

ARTICLE V MANAGEMENT .......................................................................................... 19

    5.1    Board of Managers .............................................................................. 19
    5.2    Delegation of Authority ...................................................................... 24
    5.3    Officers ................................................................................................ 24
    5.4    Reimbursement of Expenses ................................................................ 25

ARTICLE VI RIGHTS; OBLIGATIONS; AND CERTAIN COVENANTS OF
UNITHOLDERS ................................................................................................................ 25

    6.1    Limitation of Liability .......................................................................... 25

GSA-000112

| | | |
|---|---|---|
| 6.2 | Lack of Authority | 25 |
| 6.3 | No Right of Partition | 25 |
| 6.4 | Indemnification | 26 |
| 6.5 | Members' Right to Act | 27 |
| 6.6 | Investment Opportunities and Conflicts of Interest | 27 |
| 6.7 | Confidentiality | 28 |
| 6.8 | Refinancing; Recapitalization | 29 |

**ARTICLE VII BOOKS, RECORDS, ACCOUNTING AND REPORTS** .......... 29

| | | |
|---|---|---|
| 7.1 | Records and Accounting | 29 |
| 7.2 | Audited Financial Statements | 30 |
| 7.3 | Fiscal Year | 30 |
| 7.4 | Reports | 30 |
| 7.5 | Transmission of Communications | 30 |

**ARTICLE VIII TAX MATTERS** .......... 30

| | | |
|---|---|---|
| 8.1 | Preparation of Tax Returns | 30 |
| 8.2 | Tax Elections | 31 |
| 8.3 | Tax Controversies | 31 |
| 8.4 | Code Section 83 Safe Harbor Election | 31 |

**ARTICLE IX TRANSFER OF UNITS** .......... 32

| | | |
|---|---|---|
| 9.1 | Transfers by Unitholders | 32 |
| 9.2 | Exit Rights | 32 |
| 9.3 | First Refusal Rights Regarding Transfer of Units | 32 |
| 9.4 | Tag Along Rights | 33 |
| 9.5 | Approved Sale; Drag Along Obligations; Public Offering | 34 |
| 9.6 | Void Transfers | 36 |
| 9.7 | Additional Restrictions on Transfer | 36 |
| 9.8 | Prospective Transferees | 37 |
| 9.9 | Legend | 37 |
| 9.10 | Transfer Fees and Expenses | 37 |

**ARTICLE X ADMISSION OF MEMBERS** .......... 37

| | | |
|---|---|---|
| 10.1 | Substituted Members | 37 |
| 10.2 | Additional Members | 37 |

**ARTICLE XI WITHDRAWAL AND RESIGNATION OF UNITHOLDERS** .......... 38

| | | |
|---|---|---|
| 11.1 | Withdrawal and Resignation of Member | 38 |

**ARTICLE XII DISSOLUTION AND LIQUIDATION** .......... 38

| | | |
|---|---|---|
| 12.1 | Dissolution | 38 |

GSA-000113

| | | |
|---|---|---|
| 12.2 | Liquidation and Termination | 38 |
| 12.3 | Cancellation of Certificate | 40 |
| 12.4 | Reasonable Time for Winding Up | 40 |
| 12.5 | Return of Capital | 40 |

**ARTICLE XIII GENERAL PROVISIONS**................................................................**40**

| | | |
|---|---|---|
| 13.1 | Information Rights | 40 |
| 13.2 | Power of Attorney | 41 |
| 13.3 | Amendments | 41 |
| 13.4 | Title to LLC Assets | 42 |
| 13.5 | Remedies | 42 |
| 13.6 | Successors and Assigns | 42 |
| 13.7 | Severability | 42 |
| 13.8 | Counterparts | 42 |
| 13.9 | Descriptive Headings; Interpretation | 42 |
| 13.10 | Applicable Law | 43 |
| 13.11 | Addresses and Notices | 43 |
| 13.12 | Waiver | 43 |
| 13.13 | Further Action | 43 |
| 13.14 | Offset | 44 |
| 13.15 | Entire Agreement | 44 |
| 13.16 | Delivery by Hand or FedEx | 44 |
| 13.17 | Arbitration | 44 |
| 13.18 | Survival | 44 |
| 13.19 | Expenses | 45 |

**ARTICLE XIV VALUATION**................................................................**45**

| | | |
|---|---|---|
| 14.1 | Determination | 45 |
| 14.2 | Fair Market Value | 45 |

GSA-000114

# REED ENERGY, LLC
# LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (this "Agreement"), is entered into, for good and valuable consideration, and shall become effective as of January 4, 2012, by and among Reed Energy, LLC, a Delaware limited liability company (the "LLC"), and the Unitholders (as defined herein).

## ARTICLE I
## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

"Additional Member" means a Person admitted to the LLC as a Member pursuant to Section 10.2.

"Additional Opportunities" has the meaning set forth in Section 6.6(b).

"Additional Opportunity Notice" has the meaning set forth in Section 6.6(b).

"Additional Opportunity Notice Period" has the meaning set forth in Section 6.6(b).

"Adjusted Capital Account Deficit" means with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Person's Capital Account balance shall be:

(a)    reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and

(b)    increased for any amount such Person is obligated to contribute to the LLC or is treated as being obligated to contribute to the LLC pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to minimum gain).

The immediately preceding sentence is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" of any particular Person means, other than an individual, any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Agreement, as amended, modified and waived from time to time in accordance with the terms hereof.

"Anderson Group" means Bobby B. Anderson, Marjorie I. Anderson and certain of their affiliated companies.

{N2389188.10.2}

GSA-000115

"Approved Sale" has the meaning set forth in Section 9.5(a).

"Assignee" means a Person to whom Units have been Transferred in accordance with the terms of this Agreement, but who has not become a Member pursuant to Article X.

"Base Rate" means, on any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"Board" has the meaning set forth in Section 5.1(a).

"Board of Managers" has the meaning set forth in Section 5.1(a).

"Book Value" means, with respect to any LLC property, the LLC's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g).

"Business" means, at any particular time, the exploration, production, acquisition, sale or operation of interests in, assets and operations relating to, the exploration, production or other operations involving Hydrocarbons, whether up-, mid-, or down-stream, by the LLC or any Subsidiaries of the LLC.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"Capital Account" means the capital account maintained for a Member pursuant to Section 3.3.

"Capital Contributions" means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property which a Unitholder contributes to the LLC pursuant to the terms of this Agreement.

"Certificate" means the LLC's Certificate of Organization as filed with the Delaware Secretary of State on November 10, 2011.

"Certificated Units" has the meaning set forth in Section 9.9.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Commitment Fees" has the meaning ascribed to it in the Loan Agreement.

"Confidential Information" has the meaning set forth in Section 6.7.

"Delaware Act" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to the Delaware Act.

"Deep Rights" means those specified deep rights in the mineral leases contemplated by (i) the Option Assignment Agreement dated January 4, 2012, pursuant to which Clarence W. Mutschelknaus and Raymond McCormick (collectively, "M&M") have agreed to convey to the

{N2389188.10.2}

2

GSA-000116

LLC their rights to acquire certain specified deep rights in the mineral leases described therein; and (ii) the Option and Purchase and Sale Agreement between M&M and Anderson Group, dated April 27, 2011, as amended, pursuant to which the Anderson Group has agreed to sell to the LLC (as assignee of M&M under the Option Assignment Agreement) such deep rights.

"Distribution" means each distribution made by the LLC to a Unitholder, whether in cash, property or securities of the LLC and whether by liquidating distribution, redemption, repurchase or otherwise; provided that none of the following shall be a Distribution (a) any redemption or repurchase by the LLC of any securities of the LLC in connection with the termination of employment of an employee of the LLC or any of its Subsidiaries (including Units), (b) any recapitalization or exchange of securities of the LLC, and any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units, or (c) any fees, other remuneration or expense reimbursement paid to any Unitholder in such Unitholder's capacity as an employee, officer, consultant or other provider of services to the LLC.

"Equity Securities" has the meaning set forth in Section 3.1(c).

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the LLC.

"Excluded Securities" means (a) Units issued in connection with any Unit split, Unit dividend or recapitalization of the LLC or any of its Subsidiaries, or (b) Equity Securities issued in connection with strategic transactions involving the LLC or any of its respective Subsidiaries and any other entities (including (i) joint ventures and similar arrangements or (ii) Equity Securities issued in connection with an acquisition by the LLC or any of its Subsidiaries).

"Fair Market Value" means, with respect to any asset or equity interest, its fair market value determined according to Article XIV.

"Fiscal Period" means any interim accounting period within a Taxable Year established by the Board pursuant to Section 706 of the Code.

"Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board.

"Fiscal Year" means the LLC's annual accounting period established pursuant to Section 7.3.

"Forfeiture Allocations" has the meaning set forth in Section 4.3(f).

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time.

"Governmental Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

GSA-000117