UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

DNV INVESTMENT PARTNERSHIP, *et al.*,

           *Plaintiffs*,

   -against-

LAWRENCE FIELD, *et al.*,

           *Defendants.*

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 7, 2017

15 Civ. 1255 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs, who are limited partners, allege that Defendants conspired to fraudulently induce them to invest in a partnership. They contend that Defendants misrepresented and omitted facts about the viability of the investment partnership. Defendants move for dismissal based on Plaintiffs' supposed (1) lack of standing, (2) release of their claims, and (3) failure to adequately allege fraud. For reasons stated below, the Court denies Defendants' motion to dismiss.

## BACKGROUND[1]

On March 1 2011, Lawrence Field, on behalf of his company Regent Private Capital, LLC ("Regent"), entered into an agreement with Richard Featherly, on behalf of his company, Syndicated Geo Management, Inc. ("SGM"), for Regent to help SGM exploit Ohio oil and gas properties on which SGM had options. *See* Third Am. Compl. ("TAC") ¶¶ 44–45; TAC Ex. 1,

---

[1] On a motion to dismiss, the Court takes as true the allegations in Plaintiffs' Third Amended Complaint. *See Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000). The Court also considers the exhibits attached to the Third Amended Complaint and "any statements or documents incorporated in it by reference," as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *See id.* at 88.

1

Dkt. 98-1. Field turned to Metropolitan Equity Partners, LLC ("MEP") and its managing partner, Paul Lisiak, to raise capital to finance the endeavor. *Id.* ¶ 49. To acquire the financing, MEP created Metropolitan EIH13, LP ("Met13"). *Id.* ¶ 50. Met13 was to use the capital it raised to lend money at a 20% interest rate to its 52%-owned subsidiary, Reed Energy, LLC ("Reed"). Confidential Disclosure Memorandum ("CDM"), TAC Ex. 4 at 1, 3, 5, Dkt. 98-4. And Reed, in turn, was to acquire shallow and deep drilling rights from SGM Holdings, LLC ("SGM Holdings") on which SGM Holdings had options. *Id.* at 1–2.

In an effort to raise the money, Field allegedly made a series of misrepresentations and omissions to Plaintiffs, Lisiak, MEP, and Met13. He had calls with various plaintiffs where he told them that his other company, defendant Premier Natural Resources, LLC ("Premier"), had conducted diligence on the land and that the transaction would be lucrative, as it would be easy to flip the property to any number of potential buyers. *See, e.g.*, Van Menard Decl. ¶ 18, Dkt. 98-5; Crawford Decl. ¶¶ 16–17, Dkt. 98-7. Field also said that the shallow drilling rights had been neglected, but with funding, they could produce a large amount of cash flow. *See, e.g.*, Van Menard Decl. ¶ 22; *see also* Crawford Decl. ¶¶ 18–19. In fact, Field stated that because of an exclusive arrangement Premier had with Kohlberg Kravis & Roberts, he was unable to do the transaction himself, but otherwise, he would have. *See, e.g.*, Van Menard Decl. ¶¶ 23–24; Crawford Decl. ¶ 20. All of this was a lie, according to Plaintiffs; Defendants had never conducted any diligence. TAC ¶¶ 56, 86.

Moreover, Plaintiffs allege that Defendants hid contrary information from them. In June 2011, Defendants arranged for Bayswater Exploration and Production ("Bayswater") to tour the property with MEP. TAC ¶ 66. Defendants sought to have Bayswater operate and manage the operation of the shallow rights and represented that Bayswater was willing to do so. *Id.* ¶ 67.

But after the tour, Bayswater doubted the project's viability and declined to participate. *Id.* ¶¶ 69–70. Defendants lied to MEP about the reason that Bayswater did not want to participate: Field told MEP that Bayswater wanted to do the project by itself, but that he saved the deal for MEP. *Id.* ¶ 71. And in September 2011, Field sent Lisiak a purged version of a report Bayswater prepared ("Bayswater Report") that excluded negative information, such as that the "[e]xisting deal structure, upfront capital, coupon on debt doesn't fit the asset and opportunity." *See id.* ¶¶ 72, 76; Bayswater Report, TAC Ex. 2 at 6, Dkt. 98-2; TAC Ex. 3, Dkt. 98-3.

Met13 then drafted a CDM, dated December 15, 2011, which was sent to and relied upon by Plaintiffs in deciding to invest in Met13. CDM at i; TAC ¶¶ 73, 75. The CDM described the investment opportunity, and stated, among other things:

> As of today, a small portion of the 171 wells are not fully functioning and the remainder are producing at sub-standard production levels due to a lack of ongoing investment in required capital expenditures and proper maintenance. While neglected, the General Partner's diligence in conjunction with industry experts suggests that basic improvements may result in a material increase in current production. Further the diligence suggests that there are unproven but probable unexploited reserves on the acreage.

CDM at 1. The CDM later identified its industry experts as including Regent, "the Company's advisor on energy sector specific decisions." *Id.* at 2. Met13 supplemented the CDM on May 22, 2012 ("CDM Supp.") to issue Class B limited partnership interests and solicit additional funds from investors. TAC ¶ 74; CDM Supp., TAC Ex. 8, Dkt. 98-8. The CDM Supp. "supplement[ed] and modifie[d] the information contained in the" CDM. CDM Supp. at 1. Investors were directed not to "rely upon the information contained in [the CDM Supp.] without also reviewing the risk factors and other information contained in the CDM." *Id.* Following their investment in Met13, Plaintiffs claim that they "have since been notified that their investments are a complete loss." TAC ¶ 87.

As limited partners in Met13, Plaintiffs granted Met13's general partner ("GP"), Metropolitan GP Holdings, LLC ("MetGP"), and its delegee, MEP, authority to sign documents on behalf of Met13. *See* TAC ¶ 88; First Amended & Restated Partnership Agreement of Met13 ("Met13 LP Agreement"), Schulman Decl. Ex. 2 § 5.03, Dkt. 104-2. The Met13 LP agreement states that "[t]he approval of the General Partner or, if the General Partner has delegated such authority to the Management Company, the Management Company shall be the only approval of the Partnership necessary to approve a matter or an action with respect to the Partnership." Met13 LP Agreement § 5.03.

Consistent with this authority, MetGP signed a Global Settlement Agreement ("GSA"), dated as of November 30, 2012, which released SGM Holdings and its affiliates from any liability. *See* TAC ¶ 91; Global Settlement Agreement ("GSA"), Schulman Decl. Ex. 1, Dkt. 104-1. Specifically, the GSA provided:

> MET13, MEP and Paul Lisiak, for themselves and their respective, assigns, representatives and agents (as applicable) . . . , hereby fully and finally release, forgive and forever discharge SGM [Holdings] and its successors, assigns, subsidiaries, affiliates, members, managers, shareholders, officers, directors, employees and agents and any and all persons or entities acting by, through, under or in concert with any of them . . . from any and all actions, suits, prosecutions, claims, liabilities, damages or other legal or equitable remedies, whether known or unknown, foreseeable or unforeseeable, arising or claimed to arise out of any act or failure to act of any SGM Released Party from the beginning of time to the date of the execution of this Agreement.

GSA § 11(b). The GSA further provided that "MET13, MEP and Paul Lisiak hereby warrant that each is the legal and equitable holder of all claims released by them under the terms of this Section 11(b)." *Id.* And the parties acknowledged that the GSA "shall be binding upon each Party and their heirs, predecessors, successors, subsidiaries, parties, affiliates, assigns, past and present officers, directors, agents, servants, employees, attorneys and any and all persons or entities acting in concert or participation with the foregoing entities and individuals." *Id.* § 21.

4

On April 2, 2014, plaintiffs filed this action in the United States District Court for the Western District of Tennessee. On May 26, 2014, the plaintiffs filed an amended complaint, stating three causes of action: (1) fraudulent misrepresentation and concealment and fraud in the inducement; (2) violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §1961, *et seq.*; and (3) conspiracy. Second Am. Compl. ¶¶ 112–35, Dkt. 22. On February 13, 2015, District Judge Sheryl H. Lipman ordered the Tennessee action transferred to this Court. Dkt. 46. Judge Lipman relied in part on the GSA's forum-selection provision, which she held to be "applicable and enforceable" against the plaintiffs. *Id.* at 13.

On March 17, 2016, the Court dismissed all of Plaintiffs' claims, holding that Plaintiffs lacked standing to sue. Dkt. 85. The Court concluded that Plaintiffs' injuries were purely derivative of injuries suffered by Met13 – in contrast to direct injuries suffered in their individual capacities – and that, without direct injuries, Plaintiffs could not state a direct claim against Defendants. *Id.* at 4-5.

On appeal, the Second Circuit vacated Court's ruling that Plaintiffs lacked standing to sue, affirmed the dismissal of the Plaintiffs' RICO claim on a separate ground, and remanded for further consideration. Dkt. 93. The Second Circuit explained that Plaintiffs had standing to state a direct claim that they were misled into making the investment to Met13, and that Plaintiffs did not have to allege "the precise amount of the overvaluation, but must only plausibly allege that there was a distinct overvaluation of the opportunity presented by Met13 on the date of their investment due to Defendants' identified allegedly fraudulent misstatements and omissions in the CDM." *Id.* at 2–3. The Second Circuit instructed the Court to "reconsider its ruling" and "encourage[d] the [Court] to more fully develop the factual record in this case if necessary." *Id.* at 3.

5

On January 12, 2017, the Court authorized Plaintiffs to file a third amended complaint. Dkt. 94. Plaintiffs filed the TAC on February 1, 2017, and Defendants renewed their motion to dismiss. Dkt. 98.

## DISCUSSION

### I. Legal Standards

A motion to dismiss cannot be granted if the factual allegations in a complaint "state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action." *Id.* The Court "credit[s] all non-conclusory factual allegations in the complaint and draw[s] all reasonable inferences in Plaintiffs' favor." *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

### II. Standing

In this case, the Second Circuit ruled that to avoid dismissal for lack of standing, the plaintiffs, as limited partners bringing direct fraud claims, need "only plausibly allege that there was a distinct overvaluation of the opportunity presented by Met13 on the date of their investment due to Defendants' identified allegedly fraudulent misstatements and omissions in the CDM." Dkt. 93 at 2–3. Defendants contend Plaintiffs have failed to do so and that Plaintiffs' claims must be dismissed. The Court disagrees.

Plaintiffs plausibly allege that misstatements and omissions in the CDM overstate the value of the opportunity. Specifically, the CDM claims that although 171 wells on the property have been neglected, diligence conducted with industry experts (*i.e.*, Regent) "suggests that basic improvements may result in a material increase in current production. Further, the diligence

6

suggests that there are unproven but probable unexploited reserves on the acreage." CDM at 1. In contrast, the Bayswater Report identified numerous negatives associated with the opportunity, including that the "[u]pside cannot be de-risked through study / technical work;" the "[c]urrent cash flow does not justify much PDP value;" and the "[e]xisting deal structure, upfront capital, coupon on debt doesn't fit the asset and opportunity." Bayswater Report at 6. Comparing the statements in the CDM with the statements in the Bayswater Report, it is plausible that there was a distinct overvaluation of the opportunity.

Defendants argue that Plaintiffs must allege the dates of their investments or some particular value of the opportunity, but that is not required. Defendants do not establish that there may have been no overvaluation of the opportunity presented by Met13 depending on the specific date of investment; as a result, it is enough that Plaintiffs have alleged that they made investments. And it is sufficient at this stage for Plaintiffs to plausibly allege only a distinct discrepancy between the value of the opportunity as presented versus the value in reality; no particular value need be alleged. *See* Dkt. 93 at 2 ("At the motion to dismiss stage, Plaintiffs need not allege the precise amount of the overvaluation . . . ."). Finally, Defendants' assertion that Plaintiffs' claims in fact belong to Reed is meritless; Plaintiffs' claims are not based on the purchase of the oil and gas assets, as Defendants suggest, but on their investments into Met13. Plaintiffs have standing.

### III. Release of Claims

Defendants argue that the release of claims in the GSA bars Plaintiffs' claims. The Court in its prior decision stated that the plaintiffs "are likely bound by the GSA's release of claims," Dkt. 85, at 5 n.1, but the Second Circuit's decision encouraged the Court to reconsider that

7

position. Upon reconsideration, the Court determines that Met13's GP did not have the authority to release the claims Plaintiffs assert here.

The GP's authority extended only "to approve a matter or an action with respect to the Partnership." Met13 LP Agreement § 5.03. But Plaintiffs bring *direct* fraud claims, which belong to them in their individual capacities; not in their capacities as limited partners. *See, e.g., Abrams v. Donate*, 66 N.Y.2d 951, 953 (1985) (noting difference exists between "a shareholder's derivative and individual rights"); *Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 272 (2010) (explaining that the plaintiffs only sought to establish derivative injury, which "they experienced . . . in their capacities as limited partners in common with all other limited partners"); *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 383 (1st Dep't 2012) ("A plaintiff asserting a derivative claim seeks to recover for injury to the business entity. A plaintiff asserting a direct claim seeks redress for injury to him or herself individually.").

Nothing supports Defendants' argument that Plaintiffs gave Met13's GP authority to bind Plaintiffs in their individual capacities, or that Plaintiffs transferred their individual claims to the limited partnership such that Met13's GP had the power to release them. *See* GSA § 11(b) ("MET13, MEP and Paul Lisiak hereby warrant that each is the legal and equitable holder of all claims released by them . . . ."). The GSA does not bar Plaintiffs' claims.[2]

## IV. Fraud Claims

Plaintiffs assert two causes of action: (1) fraudulent misrepresentation and concealment of fraud in the inducement and (2) fraud in the inducement. TAC ¶¶ 97–113. "Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge

---

[2] To the extent the Court departs from the law of the case in so holding, the Court finds it is appropriate to do so in order "to correct a clear error or prevent manifest injustice." *Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) (internal quotation marks omitted).

8

of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015). Additionally, common law fraud claims must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b). *See id.* at 171. Defendants argue that Plaintiffs have failed to allege fraudulent intent and justifiable reliance, and further failed to plead fraud with particularity. Not so.

### A. Scienter

"To survive a Rule 12(b)(6) challenge, Plaintiffs must state facts sufficient to give rise to a strong inference of fraudulent intent." *Lorely*, 797 F.3d at 176 (internal quotation marks omitted). "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (internal quotation marks omitted).

Plaintiffs attempt to argue motive sufficient to support a strong inference of scienter based on Defendants' so-called "undisclosed financial interest," (*i.e.*, Regent's agreement with SGM, and Regent's fee agreement pursuant to which Reed would pay Regent if Reed successfully resold certain property). Opp. at 16; TAC ¶ 85. "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (internal quotation marks omitted). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.*

9

Regent's mere potential to earn fees from the agreements with SGM and Reed is not such a concrete and personal benefit. Moreover, Plaintiffs' argument, at bottom, is that Defendants wanted to earn money from the successful realization of the project. But this motive is common to all who were involved in the venture, and is thus "too generalized to demonstrate scienter." *See id.* In fact, if anything, the "undisclosed financial interest" shows that Defendants believed in the viability of the project since Regent's fees were tied to its success, and undermines any suggestion of bad motive. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.").

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. However, where a plaintiff premises a fraud claim on omissions and the complaint "does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness." *Id.* at 144. A duty to disclose arises under New York law in three situations: (1) "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth;" (2) "when the parties stand in a fiduciary or confidential relationship with each other;" and (3) "where one party possesses superior knowledge, not readily known to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

Plaintiffs contend that they have adequately pleaded scienter based on the TAC's allegations of Field's "fraudulent and misleading telephone calls" and Field's redaction of the

Bayswater Report. Opp. at 16. The TAC highlights that during telephone calls with certain plaintiffs, Field omitted his "conflict of interest," *i.e.*, Regent's agreement with SGM. *See generally* TAC ¶¶ 27–43, 83, 85. But nothing in the TAC suggests that Field was under a clear duty to disclose his supposed "conflict of interest." The same cannot be said, however, about the redacted Bayswater Report. Field undertook to provide a redacted version of the report to Lisiak, and the allegations in the TAC plausibly establish that Field was under an obligation to disclose the whole report. Field's failure to do so therefore gives rise to a sufficiently strong inference of scienter. When discovery is completed, the fact may be that Field had no obligation to disclose the full content of the Bayswater Report, but at the pleading stage, these allegations are sufficient to survive Defendants' motion to dismiss.

**B.     Justifiable Reliance**

Defendants contend that Plaintiffs' reliance was unjustified because:

(i) Plaintiffs disclaimed reliance on representations not contained in the CDM;

(ii) Plaintiffs are sophisticated;

(iii) Plaintiffs fail to allege any fiduciary duty, privity, or any other special relationship with Defendants; and

(iv) the CDM contained risk disclosures.

Plaintiffs do not dispute that they are sophisticated parties but claim that they were entitled to "justifiably rely on facts that are 'peculiarly within the other party's knowledge.'" Opp. at 18 (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 495 (S.D.N.Y. 2001)).

"It is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New

11

York courts are particularly disinclined to entertain claims of justifiable reliance." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997). But, "[w]hen matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Id.* at 1542. Thus, "[w]here the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable. *Id.* "The availability of information in this context is not whether the requisite material was made available to Plaintiffs by Defendants. Rather, available in this context denotes accessible—would the information necessary to unmask the alleged fraud have been accessible to the sophisticated party through minimal diligence." *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 449–50 (S.D.N.Y. 2010).

Based on the allegations in the TAC, the Court cannot determine that, as a matter of law, the full Bayswater Report would have been available to Plaintiffs through the exercise of minimal diligence. Since this is a question of fact, dismissal is inappropriate. *See Doehla v. Wathne Ltd.*, 98 Civ. 6087 (CSH), 1999 WL 566311, at *12 (S.D.N.Y. Aug. 3, 1999). And for the same reason, the Court will not dismiss Plaintiffs' claims based on the disclaimers and risk disclosures in the CDM. *Cf. Basis Yield*, 980 N.Y.S.2d at 30–31 (affirming denial of motion to dismiss fraud claims despite disclaimers and disclosures in offering circulars where "pleadings sufficiently alleged that the seller possessed peculiar knowledge of the facts underlying the fraud").

### C. Pleading with Particularity

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he complaint must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Lorely*, 797 F.3d at 171 (internal quotation marks omitted). Plaintiffs have satisfied their burden here based on the redacted Bayswater Report.

Plaintiffs have included as an exhibit an email where Field provided Lisiak with the allegedly fraudulently redacted Bayswater Report, *see* TAC Ex. 3, Dkt. 98-3, and Plaintiffs adequately allege that the CDM was drafted "in reasonable reliance on the fact that the Bayswater [Report] had been fully and accurately provided to [MEP]." TAC ¶ 102. Moreover, Plaintiffs allege "Field intentionally misled [MEP]" by providing the redacted Bayswater Report, "with the full knowledge that the fraudulent information would be passed on to and relied upon by the Plaintiffs." *Id.* ¶ 72. They also state, with respect to the CDM Supp., that it was "based primarily on the fatally flawed CDM," *id.* ¶ 74, and in fact, the CDM Supp. states that investors should also review "the risk factors and other information contained in the CDM," CDM Supp. at 1. Finally, the TAC alleges that "[e]ach and every Plaintiff received and relied upon the [CDM] in making the decision to invest in Met13." TAC ¶ 75. This is sufficient.

Defendants contend that Plaintiffs have failed to adequately particularize their allegations of damages. They cite only one case for the unremarkable proposition that damages are an element of a common law fraud claim. *See* Mot. at 21 (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)). They provide no support, however, for the argument that Rule 9(b) requires damages to be pleaded with

13

particularity. Nor has the Court located any. As a result, the Court will not dismiss Plaintiffs' claims on this basis.

## **CONCLUSION**

For the foregoing reasons, the Court denies Defendants' motion to dismiss. The Clerk of Court is directed to close the motion pending at docket 102.

Dated: New York, New York
       September 7, 2017

SO ORDERED

/s/ *Paul A. Crotty*
PAUL A. CROTTY
United States District Judge