UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
DNV INVESTMENT PARTNERSHIP, et al., :
:
        *Plaintiffs*, :
:
  -v- :
:    15 Civ. 1255 (PAC)
LAWRENCE FIELD and PREMIER :
NATURAL RESOURCES, LLC, :
:    **OPINION & ORDER**
        *Defendants*. :
:
:
:
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

    In 2011, Plaintiffs, who are limited partners invested in a highly speculative oil and gas investment in Ohio. Plaintiffs allege that Defendants conspired to fraudulently induce them to invest in a limited partnership. They contend that Defendants misrepresented and omitted facts about the viability of the shallow operations that induced Plaintiffs to invest into an overvalued business venture.

    The parties filed cross-motions for summary judgment on Plaintiffs' fraudulent inducement and conspiracy claims. (*See* Pls. Mot. Summ. J., Dkt. 184; Defs. Mot. Summ. J., Dkt. 189.) For the reasons stated below, the Court finds that the disputed facts are not material because even construing the evidence in the light most favorable to Plaintiffs the reliance on Mr. Field's alleged misrepresentations was not justifiable as a matter of law. Accordingly, Plaintiffs' motion for summary judgment is denied and Defendants' cross-motion is granted.

1

## BACKGROUND

### A. Parties

Plaintiffs are individuals and entities who are some of the limited partners in Metropolitan EIH13, LP ("Met13"), a partnership and fund created for highly speculative oil and gas investments in Ohio. (Schulman Dec. Ex. 13 at Confidential Disclosure Memorandum [hereinafter CDM]). Plaintiffs did not invest directly in any oil and gas assets, but rather through Met13, which made "a secured first lien" debt investment in a third company Reed Energy LLC ("Reed"). Met13's manager and founder is a private equity company, Metropolitan Equity Partners ("MEP"), and its managing partner Paul Lisiak. (*Id.* at i, iv.) MEP is "a New York based firm that provides outsourced private equity services to a select group of high net worth individuals and family office investors." (Pls.' Ex. 34 at MET1264.) MEP's investors include "distinguished high net worth individuals, executives from major publicly traded companies, family offices, hedge funds and other private equity firms." (*See id.*)

Defendant Lawrence Field is the founder and director of Regent Private Capital, LLC, ("Regent") who brokered the deal at issue. (*See e.g.*, CDM at 13.) Regent described itself as a joint family office of Charles Stephenson and Lawrence Field families. (*See* Schulman Dec. Ex. 16.) Stephenson was the co-founder of Defendant Premier Natural Resources, LLC, an Oklahoma-based oil and gas exploration company. (Pls.' Ex. 1; Stephenson Dec. ¶ 4.)

### B. Overall Deal Structure

In 2011, private equity firm MEP and its managing partner, Paul Lisiak learned of a speculative oil and gas investment opportunity in Ohio from Defendant Field. Defendant Field presented the deal to MEP on behalf of Syndicated Geo Management ("SGM") and its President Richard Featherly who was seeking capital to exploit oil and gas properties in Ohio on which

SGM had options.  (CDM at 3.)  At the time, SGM had already invested $2 million into the development and acquisition of certain options for deep drilling rights and shallow drilling rights in Ohio (together the "Anderson Options").  (*Id.*)

To acquire financing for the deal, private equity firm MEP, in December 2011, formed a new limited partnership and raised a new fund: Met13.  (*See* CDM; Schulman Dec., Ex. 31, Met13 Subscription Agreement.)  MEP formed a subsidiary for the joint venture:  Reed Energy LLC ("Reed").  (CDM at 17.)  Met13 intended to use the capital raised to lend money at a 20% interest rate to its newly created subsidiary, Reed.  (*Id.* at 3.)  In return for the capital, Reed would acquire shallow and deep drilling rights from SGM.  (*Id.* at 2.)  The proposed ownership structure for Reed was: Met13—52%, SGM—40%, Regent—6%, and MEP—2%.  (*Id.* at 5.)  Reed was to be managed by two representatives of MEP and two representatives of SGM, including Lisiak (MEP) and Featherly (SGM) (together the "Management Team").  (*Id.* at 8.)  Reed paid Defendant Regent $500,000 for services provided in connection with the negotiation, execution, and delivery of the Anderson Options, which was disclosed to investors in the CDM. (*Id.* at 13.)  Defendants were not members of the Management Team.  (*See id.* at 8.)

### C. Alleged Fraud

Months before the deal closed during the course of developing the investment, Defendant Field introduced Bayswater Exploration and Production ("Bayswater"), a potential candidate to operate the Shallow Operation in Ohio, to Lisiak of MEP and Met13.  Lisiak met with Bayswater in Denver before visiting the oil and gas assets in Ohio.  (Pls. Resp. to Defs. 56.1 Statement [*hereinafter* Defs. 56.1 Statement ¶ 57.], Dkt. 198.)  On June 7, 2011, Lisiak and Featherly accompanied Bayswater on a one-day trip to see parts of the Shallow Operation in Ohio.[1]  (Defs.

---

[1] The entire shallow production operation covered 6,000 acres.  (*See* CDM, at 1.)

56.1 Statement ¶ 58; Featherly Dec. ¶ 43.) Defendants did not attend the trip. (Defs. 56.1 Statement ¶ 59; Featherly Dec. ¶ 43.)

MEP was in contact with Bayswater following the trip. (*See e.g.*, Schulman Dec., Ex. 2.) Immediately after the trip to the Shallow Operation with Bayswater, Lisiak sent an email to the Bayswater team suggesting, "a follow-up/debrief call end of day Thursday." (Schulman Dec., Ex. 22, at MET3664.) Defendants were not included on the email. (*Id.*) Steve Struna from Bayswater responded to Lisiak the following day, on June 9, 2011, and wrote:

> We saw a great deal in a short period of time, and Mr. Anderson told us about the many different aspects of the properties and associated possibilities. With that, *and the general realization that lots of what we saw and heard did not strictly conform to the upside quantified in the Hefner report*, we will need a few days to get our arms around the trip and what the go-forward plan might be. I would think a conference call early next week makes sense – I will suggest a more specific time shortly.

(Schulman Dec., Ex. 22, at MET3663-64) (emphasis added). Following the trip and emails indicating that Bayswater believed that what they had seen and heard did not conform to the "upside quantified in the Hefner report," Lisiak did not ask Bayswater for any notes from the trip. (Pls.' Ex. 7, Lisiak Dep. Tr. at 28:10-17.) It is undisputed that Lisiak could have asked Bayswater for notes or a report following the trip. (Defs. 56.1 Statement ¶ 65.) Lisiak and Featherly spoke with Bayswater after the site visit, but the parties dispute the content of the discussion. (*See* Defs. 56.1 Statement ¶ 60.)

On June 13, 2011, Steve Struna of Bayswater sent Defendant Field an email with the subject: Anderson Ohio due diligence thoughts to L. Field, stating, "[i]f helpful, I'm attaching our internal due diligence draft memo. This lays out more clearly the upsides and issues we see associated with the property." (*See* Schulman Dec., Ex. 27, at MET2284.) That same day, Defendant Field forwarded the email and attachment to Featherly, who later became President of Reed. (*Id.*)

4

Several months later on September 27, 2011, Featherly emailed Field stating that Lisiak had mentioned Field would forward a copy of the Bayswater notes to him.  (*See* Pls.' Ex. 13 at LF_00521.)  Featherly wrote: "I know we discussed this and you were thinking that you would edit some of the content before forwarding-can you take care of this?" (*Id.*)  Field replied, "[d]one." (*Id.*)  On September 28, 2011, Defendant Field emailed an edited version of the internal Bayswater diligence notes to Lisiak.  (*See* Pls.' Ex. 13.)  It is undisputed that Lisiak asked Defendant Field for "a headline summary" of the Bayswater trip notes.  (Pls. Ex. 7, Lisiak Dep. at 13:8-9.)  The edited version of the notes removed Bayswater's thoughts concerning certain "technical issues/needs" including notes such as, *inter alia*, "no existing geology/geological maps" and "no list of active vs. inactive wells – can probably get that posted on a map based on recent state data." (*See* Pls. Ex. 13; Schulman Dec., Ex. 27, at MET2287.)  The edited version of the internal notes also did not include negative impressions that Bayswater appeared to have including, *inter alia*, "[e]xisting deal structure, upfront capital, coupon on debt doesn't fit the asset and opportunity," "[t]remendous lack of technical information," and "uncertainty around pace of execution." (*See* Pls. Ex. 13; Schulman Dec., Ex. 27, at MET2289.)

### D. Due Diligence

Plaintiffs relied on diligence provided by MEP/Lisiak.  (*See* Pls. Resp. to Defs. 56.1 Statement ¶ 83.)  Lisiak of MEP was aware as of April 14, 2011 that wells in the Shallow Operation were not well maintained.  (*See* Schulman Dec., Ex. 35 (Lisiak notes) at MET3687.)  Accordingly, Plaintiffs acknowledge they were aware, at the time of purchase, that the Shallow Operation was in disrepair and needed capital expenditure to meet projected revenue.  (Defs. 56.1 Statement ¶ 88.)  Plaintiffs never saw any version of the Bayswater trip notes (complete or edited) before investing in Met13.  (Defs. 56.1 Statement ¶ 66.)  All Plaintiffs, however, received

5

or had access to the Boyd Report on or before the date they invested. (Defs. 56.1 Statement ¶ 67.) The Boyd Report considered the Anderson Options,

> to be speculative from a development perspective for the following primary reasons: *Existing wells in the shallow gas formation are largely nonproducing or have minimal production*. We assign no material value to the upper formations, but believe existing wells are important to retain the Anderson lessor interests.

(*See* Pls. Ex. 13; Schulman Dec., Ex. 20, at MET1229.) (emphasis added.) The report also considered "the market value of the income from the existing wells to be negligible (and possibly a liability)." (*Id.*) The Boyd Report further noted,

> these wells are near the end of their production curve and will eventually need to be capped. Typical industry average capping cost for wells of this nature currently cost about $25,000 per well. The estimated cost to cap the 47 nonproducing wells is approximately $1,175,000 (47 X $25,000).

(*Id.* at MET1237.) Plaintiffs' own expert geologist, Brian Fisher, admitted that the Boyd report "said the shallow reserves have no value. And I agree with him." (*See* Schulman Reply Dec., Ex. 3 Fisher Dep. Tr. at 237:6-9.)

The manager of Met13 also received and reviewed another due diligence report in December 2011: the TEEMCO report, which was commissioned by Featherly on behalf of SGM. (Defs. 56.1 Statement ¶ 71-72.) The TEEMCO report stated, among other things, that wells were missing and could not be located. (*Id.* ¶ 72.)

By November 2011, MEP was no longer considering Bayswater as an operator of the Shallow Operation. (*See* Schulman Reply Dec., Ex. 1 at 21 at AH-000354.) As set forth in diligence provided to Plaintiffs, MEP was considering a different operator: Providian Resources LLC. (*See id.*) MEP provided a Diligence Supplement, dated November 21, 2011, to Plaintiffs and potential investors, which included a slide titled "Estimating Shallow Production" that featured "high level estimates pending diligence and the development plan by the new operator

6

[Providian]." (Schulman Reply Dec., Ex. 1 at AH-000352.)  The estimates that Plaintiffs received included estimates of capital expenditures ("CapEx"), anticipated revenue, and cash flow—*subject to pending diligence and the input of Providian*.  (*Id.*)  The slide also noted, under Future Monetization Strategy, "[a]ccess traditional reserve-based lenders *once reserves are proven*."  (*Id.*) (emphasis added.)

### E.  The Met13 Confidential Disclosure Memorandum

MEP drafted the CDM, dated December 15, 2011, which was sent to Plaintiffs deciding to invest in Met13.  (*See* CDM.)  MEP provided all Plaintiffs with the CDM.  (Defs. 56.1 Statement ¶¶ 75-76.)

MEP aimed to raise $27 million for Met13.  (*See* CDM at 3.)  The CDM described the investment opportunity, and stated, among other things:

> As of today, a small portion of the 171 wells are not fully functioning and the remainder are producing at sub-standard production levels due to a lack of ongoing investment in required capital expenditures and proper maintenance.  While neglected, the General Partner's diligence in conjunction with industry experts suggests that basic improvements may result in a material increase in current production.

(CDM at 1.)  The CDM contemplated purchasing both deep drilling rights and shallow drilling rights.[2]  (*Id.* at 2.)  The CDM provided that the assets would be acquired by Reed in three stages.  Deep drilling rights would be acquired in Stages One and Two.  The CDM indicated that Reed would acquire the shallow drilling rights in the final stage: Stage Three.  With respect to the shallow drilling rights the CDM provided that,

> [i]t is the intention of the Company [Reed] to secure a relationship with a new exploration and production operator for the shallow drilling rights who will develop an execution plan to revitalize production.  The Company [Reed] has identified a lead

---

[2] Plaintiffs dismissed all claims relating to the deep drilling rights.  (*See* Dkt. 173.)  The remaining claims in this action solely relate to the Shallow Operation.

7

candidate to be the operator[3] and has begun negotiations, but will not enter into a binding joint operating agreement *until its diligence of the shallow rights is complete*.

(CDM at 2) (emphasis added). The CDM stated that the purchase price for the shallow drilling rights plus 2,000 deep drilling rights is approximately $8 million. (*Id.*) The CDM further provided that "to execute the [shallow operation] revitalization plan, the Company intends to invest $2 million to fund the new capital expenditure program." (*Id.*)

The CDM noted that investors in the Fund (Plaintiffs) "should rely on their own investigations and evaluation of the Fund and the terms and conditions of the offering, including the merits and risks of the investment offered." (*Id.* at i.) In making their respective investments in Met13, each Plaintiff represented they relied solely upon the CDM, the LP Agreement, and an independent investigation made by the Investor. (*See* Schulman Dec., Ex. 31, Met13 Subscription Agreement, § II(B).) Plaintiffs admit they are sophisticated investors, who by their own representations were capable of evaluating and accepting risks inherent in the "highly speculative" investment in the shallow drilling rights. (*See e.g.,* CDM at ii.) The CDM made clear that no assurance could be given that the investors would receive a return of their capital. (*See id*.) Plaintiff investors and their professional advisors were "invited to request additional information" by contacting MEP or the Management Team. (*Id.* at i.) Defendants were not members of MEP or the Management Team. (*Id.* at 2.)

The CDM also outlined Certain Risk Factors stating, "an investment in the Interests involves a high degree of risk" and "the risks below are not the only ones facing us or the Company [Reed]." (*See id.* at 17.) The risks included, among others, (i) lack of diversification; (ii) that the fund is a newly formed entity with no history of operating performance; (iii) the

---

[3] As set forth in diligence provided to Plaintiffs, MEP was considering a different operator: Providian Resources LLC. (Schulman Reply Dec., Ex. 1 at AH-000352.)

investment is illiquid and long-term with no certainty of return; and (iv) that the potential extended decline in oil and natural gas prices would significantly affect revenue and profitability. (*Id.*)  Specifically, the CDM outlined risks unique to oil and natural gas investments stating,

> [t]here is a possibility you will lose all or substantially all of your investment. We cannot predict whether any currently producing wells will continue to, or any prospect will, produce oil or natural gas or commercial quantities of oil or natural gas, nor can we predict the time it will take to recover any oil or gas the Company [Reed] produces.

(CDM at 20.)  The CDM further cautioned with respect to the production life of wells that it was "not possible to predict the life and production of any well" and that the "actual lives and production could differ significantly from those anticipated." (*Id.* at 22.)  Again, the CDM noted that the oil and natural gas production may not be sufficient for the Company [Reed], Fund [Met13], or investors [Plaintiffs] "to receive a profit" or to even recoup the initial investment. (*Id.*)

No Defendant was a member of the Management Team responsible for managing the Met13 investment.  (*See e.g.*, CDM at 2; Defs. 56.1 Statement ¶ 46.)  The CDM does not name Defendant Field.  (*See* CDM.)  The CDM specifically mentions Defendant Regent in connection with the deep drilling rights:

> While the epicenter of deep drilling rights activity formed in Carroll County, Ohio [], our diligence, as conducted with industry experts, including Regent Private Capital, LLC, the Company's advisor on energy sector specific decisions ("Regent"), suggests that significant evidence exists for corporate interest *in deep drilling rights* for Washington County and Meigs County at values in excess of the Company's purchase price.

(CDM at 2.) (emphasis added.)  The CDM further provided that Regent introduced SGM to MEP and "will advise the Company [Reed] *prospectively* on all energy sector specific decisions, including the sale of the deep drilling rights." (*Id.* at 3.) (emphasis added.)

The CDM does not mention Defendant Premier.  (*See id.*)  MEP and Met13 did not mention Premier, by name, in any of the diligence documents that MEP or Met13 provided to the

9

investors or potential investors.  (Defs. 56.1 Statement ¶ 2.)  Premier did not have any written or oral contract, or any fee agreement with Plaintiffs, or with Met13, or Reed.  (*See* Field Dec. ¶ 1; Stephenson Dec. ¶ 15; Schulman Dec. Ex. 5 Lisiak Dep. Tr. at 10:4.)  Neither Premier, nor its chairman Stephenson, agreed to or entered into any obligation at any time to generate or provide any engineering, diligence, or any other information in connection with the investment at issue in this action.  (Stephenson Dec. ¶ 19.)  Premier's website never referenced Lawrence Field, and Field was never identified as a member of Premier's management team.  (Defs. 56.1 Statement ¶ 9.)

### F.  Following the Close of Met13 and Creation of Reed

A few weeks after Met13 was funded, the price of natural gas reached a ten-year low. (Defs. 56.1 Statement ¶ 102.)  Plaintiffs were informed by at least January 13, 2012, that a sustained low natural gas price would substantially reduce the value of the Shallow Operation, which is 40% to 50% natural gas.  (*Id.* ¶ 103.)  Plaintiffs knew or were advised that the declining price of natural gas would adversely affect Reed's ability to sell its holdings.  (*Id.* ¶ 104.)

Two months later, in March 2012, Richard Featherly as President of Reed, after meeting with Lisiak, re-negotiated the purchase price of the shallow drilling rights.  (*Id.* ¶ 105.)  The actual purchase price of the shallow drilling rights was reduced to $3 million.  (*See id.*)

On April 19, 2012, MEP advised Plaintiffs that the plan remained to invest $2-3 million in capital expenditures necessary to improve the Shallow Operation.  (*Id.* ¶ 89.)  On May 9, 2012, Lisiak informed Plaintiffs about the need to restore the underperforming wells in the Shallow Operation.  (*Id.* at 90.)  MEP made clear in May 2012 that the Reed parties needed to recomplete and improve the current production of the Shallow Operation.  (*Id.* ¶ 91.)  MEP, Met13, and Reed, however, never invested the $2-3 million of capital expenditures required to

redevelop and improve the Shallow Operation. (*Id.* ¶ 92.)  Reed made well under $1 million in capital investments in the Shallow Operation. (Featherly Dec. ¶ 51.)

### G. Procedural History

On April 2, 2014, plaintiffs filed this action in the United States District Court for the Western District of Tennessee.  On May 26, 2014, the plaintiffs filed an amended complaint, stating three causes of action: (1) fraudulent misrepresentation and concealment and fraud in the inducement; (2) violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §1961, *et seq.*; and (3) conspiracy. (Second Am. Compl. ¶¶ 112–35, Dkt. 22.)  On February 13, 2015, District Judge Sheryl H. Lipman ordered the Tennessee action transferred to this Court.  (Dkt. 46.)  Judge Lipman relied in part on the GSA's forum-selection provision, which she held to be "applicable and enforceable" against the plaintiffs.  (*Id.* at 13.)

On March 17, 2016, the Court dismissed all of Plaintiffs' claims, holding that Plaintiffs lacked standing to sue. (Dkt. 85.)  The Court concluded that Plaintiffs' injuries were purely derivative of injuries suffered by Met13 – in contrast to direct injuries suffered in their individual capacities – and that, without direct injuries, Plaintiffs could not state a direct claim against Defendants. (*Id.* at 4-5.)  On appeal, the Second Circuit vacated Court's ruling that Plaintiffs lacked standing to sue, affirmed the dismissal of the Plaintiffs' RICO claim on a separate ground, and remanded for further consideration.  (Dkt. 93.)

Plaintiffs filed a Third Amended Complaint on February 1, 2017, (Dkt. 98), and Defendants renewed their motion to dismiss. (Dkt. 102.)  On September 17, 2017, the Court denied Defendants' motion to dismiss. (Dkt. 111.)

On June 19, 2019, the parties voluntarily dismissed all claims relating to the deep drill rights, pursuant to Federal Rule of Civil Procedure 41. (Dkt. 173.)  Accordingly, the remaining

claims in this action solely relate to the Shallow Operation.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).  To defeat summary judgment, the nonmoving party cannot rely merely on "conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). Instead, the nonmoving party must point to concrete "evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).   If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law.  *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citation omitted).

### II.   Fraudulent Inducement

To establish a claim of fraud in the inducement under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or

omission; and (4) the plaintiff suffered damage as a result of such reliance. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416-17 (2d Cir. 2006). Where a fraud claim is based on an omission or concealment, a plaintiff must also establish that the defendant had a duty to disclose information to the plaintiff and that it failed to so. *See Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015) ("Under both federal and New York law, an omission is actionable only if the defendant had a duty to disclose.") Each element of the fraud claim must be shown by clear and convincing evidence, at the summary judgment stage as well as at trial. *See PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*, No. 99 CIV. 3794 (BSJ), 2003 WL 22118977, at *19 (S.D.N.Y. Sept. 11, 2003); *see also Woo v. Times Enter., Inc.*, No. 98–CV–9171, 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000) ("At the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement.")

The justifiable reliance element is dispositive of the present motion for summary judgment.

A. **Material False Statement or Omission**

Here the alleged misrepresentations/omissions concern (1) Field's failure to disclose his "financial interest" in the transaction[4] and (2) his editing of the Bayswater Notes.[5] A duty to

---

[4] This Court previously found that Plaintiffs failed to state a claim with respect to this alleged misrepresentation because Plaintiffs had not adequately alleged a duty of disclosure concerning Field's "financial interest." *See DNV Inv. P'ship v. Field*, No. 15 CIV. 1255 (PAC), 2017 WL 3973955, at *5 (S.D.N.Y. Sept. 7, 2017). In any event, the record shows that the CDM clearly did disclose the $500,000 fee and the 6% carried interest that Regent would receive and all plaintiffs received the CDM. Accordingly, this claim is without merit.

[5] The Court rejects Plaintiffs' attempt to plead new claims of fraudulent inducement based on the TEEMCO report in their motion for summary judgment. It is well settled that a party may not amend its pleadings in its briefing papers. *See Avillan v. Donahoe,* 483 F. App'x 637, 639 (2d Cir. 2012) (citing *Wright v. Ernst & Young LLP,* 152

disclose arises under New York law in three situations: (1) "when the parties stand in a fiduciary or confidential relationship with each other"; (2) "where one party possesses superior knowledge, not readily known to the other, and knows that the other is acting on the basis of mistaken knowledge"; and (3) "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

In this case, the question of whether Field made a material omission with respect to the Bayswater Notes concerning a one-day visit to the Shallow Operation and whether Field had a duty to disclose is a close one.  Defendants argue there was no duty to disclose the edited information to Plaintiffs.  Plaintiffs urge that when Defendant Field provided an edited copy of the Bayswater notes to Lisiak/MEP (neither of which is a party in this case) that established a duty to disclose—on the theory that had Plaintiffs known of the negative information removed from the trip notes they would not have invested in Met13.  But the alleged "partial statement" was never made to Plaintiffs—it was made to Lisiak of MEP and it is undisputed that MEP never provided the partial statement/edited notes to *Plaintiffs* before they invested.  Further, there is no dispute that when Lisiak asked Field for the Bayswater Notes, he requested a "headline summary."  (Pls. Ex. 7, Lisiak Dep. at 13:8-9.)

In opposing Defendants' motion for summary judgment, Plaintiffs argue a different theory—that a duty to disclose existed because Reed was a close corporation and Defendant Regent and Met13 were shareholders.  (*See* Pls. Opp. at 15, Dkt. 197.)  The obvious problem is that it is undisputed that Reed did not yet exist at the time of the alleged misrepresentation; and

---

F.3d 169, 178 (2d Cir. 1998)).  There is no evidence that Defendants had anything to do with the TEEMCO report, which was commissioned by Featherly on behalf of SGM.  (Defs. 56.1 Statement ¶ 71.)

thus, there was no "shareholder relationship" requiring disclosure.  Nevertheless, Plaintiffs cannot demonstrate that they have met their burden under the third element of New York's fraud standard: reasonable reliance.  The Court, therefore, turns to an analysis of this element.

### B. Justifiable Reliance

Defendants contend that Plaintiffs' reliance was unjustified because (1) Plaintiffs disclaimed reliance on representations not contained in the CDM; (2) Plaintiffs are sophisticated; (3) Plaintiffs were aware or had access to other due diligence suggesting similar problems and risks associated with the Shallow Operation;  (4) the CDM contained risk disclosures; and (5) Lisiak of Met13 was present for the Bayswater inspection, could have requested the notes from Bayswater or Reed, and had spoken with the author of the notes both before and after the one-day diligence visit.  Plaintiffs admit they are sophisticated parties but claim that they were entitled to justifiably rely on facts that are peculiarly within the other party's knowledge and that had MEP known of the negative information in the Bayswater notes it would have affected the CDM and whether Met13 would have been presented to investors.  (Pls. Opp'n at 13, Dkt. 197.)

"Justifiable reliance is a 'fundamental precept' of a fraud cause of action."  *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 579 (2018).  Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it."  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).  "It is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain

claims of justifiable reliance." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997).

In evaluating justifiable reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them," *Century Pacific*, 354 F. App'x at 498, as well as "the investor's access to information and whether that investor engaged in due diligence before investing." *Abbey v. 3F Therapeutics, Inc.*, No. 06 CV 409, 2011 WL 651416, at *7 (S.D.N.Y. Feb. 22, 2011). Courts apply heightened scrutiny to plaintiffs claiming fraud in transactions between sophisticated entities. *See PPI Enters.*, 2003 WL 22118977, at *20. When sophisticated parties fail to exercise care in their affairs, they "will not be heard to complain that [they were] induced to enter into the transaction by misrepresentations." *Id.* (internal citations omitted).

"When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Lazard Freres,* 108 F.3d at 1542. But, where "both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable." *Id.* "The availability of information in this context is not whether the requisite material was made available to Plaintiffs by Defendants. Rather, available in this context denotes accessible—would the information necessary to unmask the alleged fraud have been accessible to the sophisticated party through minimal diligence." *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 449–50 (S.D.N.Y. 2010), *aff'd*, 450 F. App'x 32 (2d Cir. 2011).

Based on the undisputed evidence, the Court determines that, as a matter of law, the full version of the Bayswater notes were not peculiarly in the Defendants' knowledge, and would have been available through the exercise of minimal diligence. Plaintiffs and MEP concede they are sophisticated investors. The Court finds that MEP knew or should have known that they were in a position to acquire additional information regarding the alleged misrepresentations because the undisputed facts show that MEP was in significant contact with Bayswater—there were calls and emails before the diligence visit, Lisiak of MEP attended the one-day site visit with Bayswater to conduct diligence on the assets (without Defendants), and there were calls and emails following the visit between Lisiak and Bayswater. Critically in one email sent to Lisiak, Bayswater stated that it believed that what they had seen and heard on the diligence trip did not conform to the "upside quantified in the Hefner report." (*See* Schulman Dec., Ex. 22, at MET3663-64.) Even viewing the evidence in the light most favorable to Plaintiffs, assuming that MEP never knew of Bayswater's negative impressions from correspondence and conference calls following the visit to Ohio, the information was still accessible. It is not disputed that MEP—a sophisticated private equity firm—could have, but never did ask Bayswater for their notes or a report. *See Ashland Inc. v. Morgan Stanley,* 700 F. Supp. 2d 453, 469 (2d Cir. 2010) ("Where the investor knows that he or she is in a position to acquire additional information, but does not inquire, the Second Circuit has found that the duty to exercise minimal diligence renders the investor's reliance unreasonable."); *Siemens Solar Indus. v. Atlantic Richfield Co.,* 673 N.Y.S.2d 674, 674 (1st Dep't 1998) ("[S]ophisticated entity's opportunities to obtain knowledge of the matters that are subjects of the alleged misrepresentations preclude its claims of reasonable reliance.").

Moreover, MEP even after being put on notice by Bayswater of a potential red flag (i.e., that the upside reported was not supported by an actual site visit) and knowing from other diligence reports that the Shallow Operation was in disrepair—never inquired or sought additional information about what "upside" Bayswater believed was overstated. And when Lisiak requested information concerning the Bayswater trip, he asked Field, not Bayswater (the author of the notes) for only "a headline summary;" and despite being on notice that he received partial, not full information he did not question the absence of negative impressions in that summary and proceeded with the transaction even though he knew Bayswater believed that the upside previously reported was not supported by the site visit. *See e.g.*, *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (A claim of reasonable reliance can be defeated where it is clear that "a party has been put on notice of the existence of material facts which have not been documented and [ ] nevertheless proceeds with a transaction" because in doing so the party "may truly be said to have willingly assumed the business risk that the facts may not be as represented."). In short, MEP at no time availed itself of obtainable information it had several opportunities to access. An alleged informal advisory relationship or "trust" does not justify a sophisticated investor abandoning its duty to conduct diligence. The standard for legal protection of reliance requires more.

Additionally, despite Plaintiffs' claims that Field withheld information about nonproducing wells and risks associated with the Shallow Operation, the record indicates that Plaintiffs were given numerous indications from the Boyd Report, TEEMCO report, and the CDM that production of the shallow wells was minimal and could not be guaranteed, that the Shallow Operation was in disrepair, and that the investment was highly speculative. Specifically, the Boyd report flagged the shallow wells as *largely* nonproducing and assigned

them no value.  And the CDM explicitly cautioned that it was "not possible to predict the life and production of any well" and reiterated that it was possible that Plaintiffs would lose all or substantially all of their investment.  (*See e.g.*, CDM at 20, 22.)  *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) ("The presence of cautionary language is a relevant factor to be considered in deciding whether a reasonable investor could have been misled.")  Moreover, Plaintiffs invested despite receiving only high level estimates of shallow production and return projections that were still subject to pending diligence and input from a different operator (not Bayswater).  (*See* Schulman Reply Dec., Ex.1 at AH-000352.)  In sum, Plaintiffs—sophisticated investors—understood the risks of purchasing the Shallow Operation, were aware of negative information about the production of existing wells that would affect cash flow and anticipated returns, and reached their own decision to gamble that the Shallow Operation would produce enough oil and gas to generate profits for investors even though diligence on the Shallow Operation was not complete when Plaintiffs invested.

Thus, the Court finds, based on undisputed facts, that Plaintiffs and MEP (1) were sophisticated business entities and individuals, (2) did not heed the significant warnings of Bayswater and other diligence reports indicating that the Shallow Operation was in disrepair; existing wells were largely nonproducing; the assets were speculative from a development perspective; and that "the value of the income from the existing wells [was] negligible (and possibly a liability)"; and (3) could not have justifiably relied on alleged misrepresentations and omissions by Defendant Field as a matter of law.

The Court grants Defendants' motion for summary judgment on the fraudulent inducement claim.

### III. Civil Conspiracy

New York does not recognize an independent tort of conspiracy. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citing *Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 969 (1986). Because the Court has granted summary judgment to Defendants' on the underlying fraud claim, the claim of civil conspiracy fails.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. Defendants' motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied.

The Clerk of the Court is directed to close all open motions and to close this case.

Dated: New York, New York　　　　　　SO ORDERED
　　　　May 19, 2020

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　PAUL A. CROTTY
　　　　　　　　　　　　　　　　　　　United States District Judge